Robert J. Herrington (SBN 234417)
herringtonr@gtlaw.com
Matthew R. Gershman (SBN 253031)
gershmanm@gtlaw.com
**GREENBERG TRAURIG, LLP**
1840 Century Park East, Suite 1900
Los Angeles, California 90067-2121
Telephone: 310.586.7700
Facsimile: 310.586.7800
herringtonr@gtlaw.com

Attorneys for Defendants WAL-MART STORES, INC.
and WAL-MART ASSOCIATES, INC.,

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHELSEA HAMILTON, et al., | CASE NO. 5:17-cv-01415 AB (KKx) |
| Plaintiffs, | **DEFENDANTS' APPENDIX OF EVIDENCE SUBMITTED IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| WAL-MART STORES, INC., a corporation, WAL-MART ASSOCIATES, INC., a corporation and DOES 1 through 50, inclusive, | Date: January 18, 2019<br>Time: 10:00 AM<br>Place: Courtroom 7B |
| Defendants. | Hon. Andre Birotte Jr. |

Defendants Wal-Mart Stores, Inc. and Wal-Mart Associates, Inc. (collectively "Walmart") hereby submit this Appendix of Evidence in support of Walmart's Motion for Partial Summary Judgment.  The included declaration of Matthew R. Gershman authenticates the exhibits submitted, as appropriate.

## I.    DECLARATIONS

| DECLARANT | APPENDIX CONSECUTIVE PAGE NO. |
|---|---|
| Aguilar, Jose | D 1 – D 4 |
| Brown, Sophia | D 5 – D 8 |
| Elskamp, James | D 9 – D 12 |
| Gershman, Matthew R. (and Exs. 1-5) | D 13 – D 143 |
| Hernandez, Arturo | D 144 – D 147 |
| Limon, Leigh | D 148 – D 151 |
| McNeill, Marnita | D 152 – D 155 |
| Segura, River | D 156 – D 158 |
| Torres, Joshua | D 159 – D 162 |
| Vidana, Robert Francis | D 163 – D 167 |

## II.    DEPOSITION TESTIMONY

| DEPONENT | M. GERSHMAN DECL. EXHIBIT NO. |
|---|---|
| Hamilton, Chelsea | Exhibit 1 (D 17 – D 22) |
| McChristian, Diana | Exhibit 2 (D 23 – D 33) |
| Ex. 3, bates no. WM_HAMILTON 000197 | |

///

///

APPENDIX IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

LA 134121472v1

## III.   ADDITIONAL MATERIALS

| DEPONENT | M. GERSHMAN DECL. EXHIBIT NO. |
|---|---|
| Pls.' expert disclosure, Kriegler Report | Exhibit 3 (D 34 – D 84) |
| *Canales v. Wells Fargo Bank, N.A.*, No. B276127 (Cal. Ct. App. May 30, 2018) | Exhibit 4 (D 85 – D 105) |
| Reporter's Transcript of Proceedings, August 17, 2018 | Exhibit 5 (D 106 – D 143) |

Respectfully submitted,

Dated: Nov. 16, 2018          GREENBERG TRAURIG, LLP

*/s/ Matthew R. Gershman*
Attorneys for Defendants

APPENDIX IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
*LA 134121472v1*

# AGUILAR DECLARATION

<u>DECLARATION OF JOSE AGUILAR</u>

I, Jose Aguilar, based upon my personal knowledge of the facts stated herein, hereby declare that the following facts are true and correct under penalty of perjury:

1.     I am over 18 years of age and a resident of Highland, California.  The information contained in my Declaration is true, correct and based upon my personal knowledge.

2.     On July 10, 2018, I met with Michael Augustin, counsel for Wal-Mart Stores, Inc. and Wal-Mart Associates, Inc. (together "Walmart") from the law firm of Greenberg Traurig, LLP at the Fulfillment Center in Chino, California.  Nobody else was present and I have not discussed this Declaration with anyone at Walmart.  Before speaking to Walmart's counsel, counsel explained to me that he does not represent me, and that my participation in the interview was completely voluntary and would have no impact on my employment.  I was informed that I did not have to answer any questions and could stop the interview at any time.  Counsel for Walmart also explained to me that I may be a member of a putative class in the lawsuit, that the Court has not yet decided whether or not to certify the case as a class action, that I may have the opportunity to participate in the lawsuit if a class is certified, that the information provided in this Declaration could be used by Walmart to be filed in court and defend itself in the lawsuit, and that I am not being required to give this Declaration.  With that clear understanding, I agreed to provide this Declaration.

3.     I currently work as a Receiving Department Associate at the Walmart Fulfillment Center in Chino, California.  I have been in this position since January 11, 2016, so I have worked for Walmart in this position for about two and a half years.

4.     I work on an alternative work-week schedule, and I am regularly scheduled to work 10 hours per shift, four days a week.  My shift begins at 6:00 a.m. and ends at 4:30 p.m.  I knew about the alternative work week schedule when I agreed to work here, and I like that it allows for me to have three days off, which I would not have if I worked a typical schedule of eight-hour shifts, five days a week.

D 002

5.      During my typical shift, I receive two 15-minute rest breaks.   Rest breaks are paid and on the clock.  My first break begins around 8:15 a.m., and my second break begins around 2:00 p.m.  I choose to take my rest breaks at the break room nearest to my work area.  It takes me no longer than two minutes of walking time to travel to and from the break room, and I am not working during that time. Even if you consider the time I spend walking from and back to my work area, I always have at least 10 minutes to myself that I can spend in the break room, or to go to the restroom or my locker.

6.      For each of my 10-hour shifts, I also receive one meal period that lasts 30 minutes. Meal breaks are typically announced via intercom.  When it's time for my meal break, I go to the timeclock near the break room and punch out.  There are many punch clocks available to use, and since I started, the facility has added many timeclocks in different locations over time.  There is typically not a line at the timeclock to punch in after lunch.

7.      I usually eat lunch in one of the break rooms closest to my work area.  The company provides several break rooms as options where I can take my break.  I can use any of the break rooms or even leave the facility during my meal period.  I've never felt like I could not leave the facility to eat lunch.

8.      At the end of my shift, I clock out.  Then I gather my belongings and head to the exit. Each associate needs to go through security before they leave.  The line to get through security normally takes less than one minute to get through. The amount of time to get through security can take a little longer, depending on how many people are trying to exit the facility at the same time, whether all the available security check points and exits are being used, whether other associates are trying to take things outside with them, whether people are slowing things down by using opaque bags and containers (as opposed to the clear bags provided by the company to make the process quicker), and how fast the security at that particular line is screening people.  Obviously, the amount of time can vary depending on what everyone has in his or her bag.  In my case, I choose to use clear containers so the security

D 003

personnel can quickly look at my bag.  If I didn't use clear containers, then security would need to look inside each one.  As part of the security process, I also need to unlock my cell phone to show that it's mine and not one taken from someone else or from the stock.  It only takes a second to unlock my phone.  On a few occasions, I saw other associates whose phone batteries were dead at the security line. Although those associates had to plug their phone in to power them up, that did not hold up the rest of the line or cause me any delay.  I usually am at my car within 5 minutes of clocking out.

9.      I have never been asked to work off the clock, nor have I done so.

10.     When I began working at Walmart, I went through an orientation process.  During orientation, I learned that I was responsible for my own time and for taking my rest breaks and meal periods, and for ensuring that I do not work off the clock.  I was told that if I worked more than 10 hours in a day that I was entitled to a second meal break and a third rest break.  I was also told that if I had not waived my first meal break, then I could waive my second meal break for shifts over 10 hours if I chose to do so.  After thinking about the issue, I chose to waive my second meal break and signed a form to that effect.  I did not feel pressured in making this decision, and no one at Walmart instructed me one way or the other.  It was my choice.

11.     I was provided a full opportunity to review this Declaration and make any and all changes so as to ensure that it is true and correct based on my personal knowledge.

I declare under penalty of perjury that the forgoing is true and correct.

7 - 11 - 2018

Date

Jose Aguilar

3

DECLARATION

D 004

# BROWN
# DECLARATION

D 005

<u>DECLARATION OF SOPHIA BROWN</u>

I, SOPHIA BROWN, based upon my personal knowledge of the facts stated herein, hereby declare that the following facts are true and correct under penalty of perjury:

1.     I am over 18 years of age and a resident of California. The information contained in my Declaration is true, correct and based upon my personal knowledge.

2.     On July 10, 2018 I met with Amber Duffy, counsel for Wal-Mart Stores, Inc. and Wal-Mart Associates, Inc. (together "Walmart") from the law firm of Greenberg Traurig, LLP at the Fulfillment Center in Chino, California. Nobody else was present and I have not discussed this Declaration with anyone at Walmart. Before speaking to Walmart's counsel, counsel explained to me that she does not represent me, and that my participation in the interview was completely voluntary and would have no impact on my employment. I was informed that I did not have to answer any questions and could stop the interview at any time. Counsel for Walmart also explained to me that I may be a member of a putative class in the lawsuit, that the Court has not yet decided whether or not to certify the case as a class action, that I may have the opportunity to participate in the lawsuit if a class is certified, that the information provided in this Declaration could be used by Walmart to be filed in court and defend itself in the lawsuit, and that I am not being required to give this Declaration. With that clear understanding, I agreed to provide this Declaration.

3.     I currently work as a Packer in the Consolidation Department at the Walmart Fulfillment Center in Chino, California. I have been in this position since November 14, 2017.

4.     I work on an alternative work week schedule. I work 10 hours a day, 4 days a week on the day shift. I will sometimes work an additional day shift during the week for which I get paid overtime.

5.     In a typical 10 hour shift I get two 15-minute rest breaks, one at 9:00 a.m. and one at 3:00 p.m. These rest breaks are paid and on the clock. I usually take my breaks at the front break room. When

1
DECLARATION

it's time for a break, I start walking there. It takes me about 2 minutes to arrive, depending on how fast I walk. Then, I'll grab my lunch bag from the fridge and sit down to have a snack. I usually get up to leave about a minute before my 15 minutes are up and start walking back to my work area. If I need to use the restroom, I'll get up a couple of minutes earlier than that. Although the time it takes to walk to and from my breaks varies, I have at least 10 minutes of sitting and resting during my 15-minute break.

6.      I also get one 30-minute meal period per 10-hour shift. When it's time for my meal break, I go to the timeclock and punch out. I usually use the timeclock closest to the break room, and then I usually eat lunch outside, either in my car or I'll head to the gas station nearby to grab some food. I do need to go through security to exit the building during lunch. The line at security to exit the building at lunch usually takes less than 30 seconds to get through.  I've never felt like I couldn't leave the facility to eat lunch, or that I wouldn't get my full break if I chose to leave for lunch. When I get back from lunch I clock in at the timeclocks close to my work area. There is typically not a line at the timeclock to punch in after lunch.

7.      At the end of my shift, I clock out. Everyone needs to go through security before they leave. The security line at the end of my shift usually takes anywhere from 1 to 2 minutes to get through. The length of the line varies depending on what people are bringing with them. If someone has a lot of containers in their bag it will take them longer to get through the line because security will need to open them all. The line has gotten a lot faster lately. The facility has opened a new lines and that's helped cut down the time. Walmart also provides clear bags for its associates to carry their belongings in which has sped up the line as well. While people with phones have to turn their phone on to show that it is theirs and not one taken from the stock, you show your phone at the same time that security is looking at your bag so it doesn't increase the length of the security line. I have seen people have to plug in their phone to get enough charge to turn the phone on, but that has never happened to me. If my phone is even close to being dead that day, I'll leave it in my car.

2
DECLARATION

8.      When I began working at Walmart, I was given an orientation and I was told that if I worked more than 10 hours in a day that I was entitled to a second meal break and a third rest break. I was also told that if I had not waived my first meal break, then I could waive my second meal break if I wanted to. I chose to waive my second meal break because that meal break is off the clock and unpaid and I would rather stay on the clock and go home earlier at the end of my shift. No one at Walmart pressured me to sign the waiver and I would sign it again today.

9.      I usually never work over 10 hours in a shift. However, during peak season there were times that I worked 11 hours. When that happened, I received overtime pay and I also always received a third rest break of at least 10 minutes.

10.     Sometimes we have slow days at work. On those days sometimes the Managers will ask if anyone would like to go home early. It doesn't happen very often, but anyone who volunteers can sign a Voluntary Time Off ("VTO") log and clock out to end their shift early. Then, we can either use any Paid Time Off ("PTO") we have to get paid for the rest of the shift, or we can choose to keep our PTO and not get paid for those hours we don't work. I've used PTO at times, and at other times I haven't. Or, if I want to stay, I'm allowed to do that and I'm paid for my full shift.

11.     I was provided a full opportunity to review this Declaration and make any and all changes so as to ensure that it is true and correct based on my personal knowledge.

I declare under penalty of perjury that the forgoing is true and correct.

_____7/10/18_____                          _Sophia J. Brown_

Date                                             SOPHIA BROWN

3
DECLARATION

**D 008**

# ELSKAMP DECLARATION

D 009

## DECLARATION OF JAMES ELSKAMP

I, JAMES ELSKAMP, based upon my personal knowledge of the facts stated herein, hereby declare that the following facts are true and correct under penalty of perjury:

1.      I am over 18 years of age and a resident of California.  The information contained in my Declaration is true, correct and based upon my personal knowledge.

2.      On July 10, 2018, I met with Amber Duffy, counsel for Wal-Mart Stores, Inc. and Wal-Mart Associates, Inc. (together "Walmart") from the law firm of Greenberg Traurig, LLP at the Fulfillment Center in Chino, California.  Nobody else was present and I have not discussed this Declaration with anyone at Walmart.  Before speaking to Walmart's counsel, counsel explained to me that she does not represent me, and that my participation in the interview was completely voluntary and would have no impact on my employment.  I was informed that I did not have to answer any questions and could stop the interview at any time.  Counsel for Walmart also explained to me that I may be a member of a putative class in the lawsuit, that the Court has not yet decided whether or not to certify the case as a class action, that I may have the opportunity to participate in the lawsuit if a class is certified, that the information provided in this Declaration could be used by Walmart to be filed in court and defend itself in the lawsuit, and that I am not being required to give this Declaration.  With that clear understanding, I agreed to provide this Declaration.

3.      I currently work as a forklift driver in the Receiving Department at the Walmart Fulfillment Center in Chino, California.  I have worked at this facility for just shy of two years.

4.      In a typical shift, I begin around 5:30 a.m., and end around 4:30 p.m., except for Mondays when I start at 6:00 a.m. During my typical shift, I get two 15-minute rest breaks. My first break is typically at 8:15 a.m. and my second rest break is at 2:00 p.m. It takes me no more than 3 minutes to get from my area to the break room,  and even less time if I drive my forklift because there are places right outside the break room to park.  I usually take my full 15-minute break, and even if we

1

DECLARATION

add in my walking time, I always have at least 10 minutes to myself that I can spend in the break room, to use the restroom, and/or to visit my locker. So if my morning rest break starts at 8:15 a.m., I don't start walking back to my work area from the break room until 8:30 a.m.

5.      I also get one 30-minute meal period per 10-hour shift. Meal breaks are typically announced. When it's time for my meal break, I go to the timeclock and punch out. There are many punch clocks available to use, and the facility has added many in different locations over time.  They are located throughout the facility and in different locations, and I can use whichever one I want, although I usually clock in and out at the timeclock by my work area. It's right by my locker and it's more convenient for me. I either eat my lunch in my car or in the back break room by my area. Where I take my lunch usually varies by season. It's really hot right now because it is summertime, so I take my lunch break in the break room. When it's cooler I'll eat in my car and take a short nap. If I leave the facility to go to my car, I do need to go through security to exit the building. The line at security to exit the building at lunch usually takes a few seconds to get through. I've never felt like I couldn't leave the facility to eat lunch, or that I wouldn't get my full break if I chose to leave for lunch. There is typically not a line at the timeclock to punch in after lunch because there are many timeclocks for people to use.

6.      At the end of my shift, I clock out. Then I gather my belongings and head to the exit. Each associate needs to go through security before they leave. The line at the end of a shift usually takes no more than 5 minutes to get through. Walmart provides clear bags for its associates to carry their belongings in so that the time through security doesn't take as long. How long it takes also depends on what you have in your bag. All of the containers I bring are clear, so that security can just look at my bag and I can go. If you don't use clear containers, security needs to look in each individual container. I usually bring my phone in with me to use during my lunch break and I do need to unlock it for security to show that it is mine and not one taken from the stock.  It only takes a second to unlock. I have seen people have to plug in their phone to get enough charge to turn the phone on, but that does not hold up

D 011

the rest of the line and I've never been delayed as a result.  I usually am at my car within 5 minutes of clocking out.  I have never been asked to work off the clock, nor have I done so.

7.    I was provided a full opportunity to review this Declaration and make any and all changes so as to ensure that it is true and correct based on my personal knowledge.

I declare under penalty of perjury that the forgoing is true and correct.

7-10-18
_____
Date

_____
JAMES ELSKAMP

3
DECLARATION

D 012

# GERSHMAN
# DECLARATION

D 013

GREENBERG TRAURIG LLP
Robert J. Herrington (SBN 234417)
herringtonr@gtlaw.com
Matthew R. Gershman (SBN 253031)
gershmanm@gtlaw.com
1840 Century Park East, Suite 1900
Los Angeles, California 90067-2121
Tel: 310-586-7700; Fax:  310-586-7800

*Attorneys for Defendants Wal-Mart Stores, Inc.*
*and Wal-Mart Associates, Inc.*

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHELSEA HAMILTON, et al., | CASE NO.  5:17-CV-01415-AB (KKx) |
| Plaintiffs, | **DECLARATION OF MATTHEW R. GERSHMAN IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| WAL-MART STORES, INC., a Delaware corporation; and WAL-MART ASSOCIATES, INC., a Delaware corporation, | Date:      January 18, 2019<br>Time:      10:00 a.m.<br>Place:     Courtroom 7B<br>Judge:     Hon. André Birotte Jr. |
| Defendants. | |

GERSHMAN DECLARATION IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## DECLARATION OF MATTHEW R. GERSHMAN

I, Matthew R. Gershman, declare as follows:

1.      I am an attorney at law duly licensed to practice before all courts of the State of California and the United States District Court for the Central District of California.  I am a shareholder at the law firm Greenberg Traurig, LLP, attorneys for Defendants Wal-Mart Stores, Inc. and Wal-Mart Associates, Inc (together, "Walmart").  The facts set forth herein are true of my own personal knowledge, and if called upon to testify thereto, I could and would competently do so under oath.

2.      Attached hereto as **Exhibit 1** is a copy of testimony excerpts from the transcript of the June 29, 2018 deposition of Plaintiff Chelsea Hamilton.

3.      Attached hereto as **Exhibit 2** is a copy of testimony excerpts from the transcript of the April 12, 2018 deposition of Diana McChristian and an excerpt from Exhibit 3 thereto containing a document with the bates number WM_HAMILTON 000197.

4.      Attached hereto as **Exhibit 3** is a copy of a document dated September 21, 2018 and entitled Expert Report of Brian Kriegler, Ph.D. ("Kriegler Report").  The Kriegler Report was attached as Exhibit A to Plaintiffs' Disclosure of Expert Witness Information served upon my office on September 21, 2018.

5.      Attached hereto as **Exhibit 4** is a copy of the California Court of Appeal decision in the matter of *Canales v. Wells Fargo Bank, N.A.*, Case No. B276127.  I retrieved it from the internet address. http://www.courts.ca.gov/opinions/archive/B276127.PDF which is located on the official California Court of Appeal website.

6.      Attached hereto as **Exhibit 5** is a copy of the Reporter's Transcript of Proceedings before this Court on August 17, 2018 in the above-captioned matter.

/ / /

/ / /

/ / /

1

D 015

1      I declare under penalty of perjury under the laws of the United States of America

2  that the foregoing is true and correct.  Executed this 16th day of November 2018 at

3  Glendale, California.

4                          */s/ Matthew R. Gershman*

# EXHIBIT 1

D 017

Page 1

1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3

4    CHELSEA HAMILTON,                  )
     individually and on behalf        )
5    of all others similarly situated,)
      and ALYSSA HERNANDEZ,            )
6    individually and on behalf        )
     of all others similarly situated )
7                                      )
              Plaintiffs               ) Case No.
8                                      ) 5:17-cv-01415 AB
              vs.                      )
9                                      )
     WALMART STORES, INC.,             )
10   a corporation, WALMART            )
     ASSOCIATES, INC., a               )
11   corporation and DOES 1            )
     through 50, inclusive,            )
12                                     )
              Defendants               )
13   _____)

14

15      Videotaped Deposition of Chelsea Hamilton

16             Los Angeles, California

17             Friday, June 29, 2018

18

19

20   Reported by:

21   JOANNE M. FARRELL, RPR, CRR

22   CSR Nos. 4838(CA)  506(HI)  507(NM)

23   Job No. 2953552

24

25   Pages 1 - 230

Page 2

1              UNITED STATES DISTRICT COURT
2            CENTRAL DISTRICT OF CALIFORNIA
3
4    CHELSEA HAMILTON,                )
     individually and on behalf      )
5    of all others similarly situated,)
      and ALYSSA HERNANDEZ,          )
6    individually and on behalf      )
     of all others similarly situated )
7                                     )
            Plaintiffs                ) Case No.
8                                     ) 5:17-cv-01415 AB
            vs.                       )
9                                     )
     WALMART STORES, INC.,            )
10   a corporation, WALMART           )
     ASSOCIATES, INC., a             )
11   corporation and DOES 1           )
     through 50, inclusive,           )
12                                    )
            Defendants                )
13   _____)
14
15
16          Videotaped Deposition of Chelsea Hamilton,
17   taken on behalf of Defendants, at Veritext Legal
18   Solutions, 707 Wilshire Boulevard, Suite 3500, Los
19   Angeles, California 90017, beginning at 8:58 a.m.,
20   on Friday, June 29, 2018, before Joanne M. Farrell,
21   Certified Shorthand Reporter No. 4838.
22
23
24
25

Page 3

1    APPEARANCES:

2    For Plaintiffs:

3      LAW OFFICES OF G. SAMUEL CLEAVER

4      By:  G. SAMUEL CLEAVER, ESQ.

5      5670 Wilshire Boulevard, 18th Floor

6      Los Angeles, California 90036

7      323.648.6676

8      sam@gscleaverlaw.com

9      - and -

10     YOON LAW APC

11     By:  STEPHANIE E. YASUDA, ESQ.

12     One Wilshire Boulevard, Suite 2200

13     Los Angeles, California 90017

14     213.612.0988

15     syasuda@yoonlaw.com

16    - and -

17     FERNANDEZ & LAUBY LLP

18     By:  PETER J. CARLSON, ESQ.

19     4590 Allstate Drive

20     Riverside, California 92501

21     951.320.1444

22     pjc@fernandezlauby.com

23

24

25

1   level because you cannot leave it because you would

2   get in trouble.

3       Q.   Right.

4       A.   I would have to walk down the stairs.  I

5   would have to walk to the break room to get my

6   lunch.  Then once I get my lunch I would go out to

7   where the security is; go through the metal

8   detector; put my lunch, phone, bag in the container;

9   put it on the conveyor belt.

10          Once that was done I would go over to the

11  security, show them my phone.  It would have to be

12  on.  You have to show them the main screen to make

13  sure the phone isn't stolen.  Open up -- I would

14  unravel my purse, my bag, unlock every zipper in my

15  purse.  Then once everything is checked out, then I

16  would go to my lunch.  But before I even go to

17  security I would have to ding for lunch.

18      Q.   Ding?

19      A.   Clock out for lunch, yes.

20      Q.   Okay.  Okay.  That gets you out and you're

21  at lunch.  Where would you eat?

22      A.   Yes.  I would always eat in my vehicle.

23      Q.   In your car?

24      A.   Yes.

25      Q.   Okay.  And then describe the process coming

Page 229

1          I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, do hereby

3     certify:

4          That the foregoing proceedings were taken

5     before me at the time and place herein set forth;

6     that any witnesses in the foregoing proceedings,

7     prior to testifying, were administered an oath; that

8     a record of the proceedings was made by me using

9     machine shorthand which was thereafter transcribed

10    under my direction; that the foregoing transcript is

11    a true record of the testimony given.

12         Further, that if the foregoing pertains to the

13    original transcript of a deposition in a Federal

14    Case, before completion of the proceedings review of

15    the transcript {X} was { } was not requested.

16         I further certify I am neither financially

17    interested in the action nor a relative or employee

18    of any attorney or any party to this action.

19         IN WITNESS WHEREOF, I have this date

20    subscribed my name.

21

22    Dated:  July 1, 2018

23

24                    *Joanne M. Farrell*

25              Joanne M. Farrell, CSR No. 4838

# EXHIBIT 2

D 023

Atkinson-Baker Court Reporters
www.depo.com

```
 1                  UNITED STATES DISTRICT COURT

 2                 CENTRAL DISTRICT OF CALIFORNIA

 3

 4   CHELSEA HAMILTON, individually

 5   and on behalf of all others

 6   similarly situated,

 7            Plaintiff,

 8       v.                      Case No. 5-17-cv-01415 AB (KKx)

 9   WAL-MART STORES, INC.,

10   a corporation, WAL-MART

11   ASSOCIATES, INC., a corporation,

12   and DOES 1 through 50, inclusive,

13            Defendants.

14                      DEPOSITION OF

15                   DIANA McCHRISTIAN

16                Taken at 21c Museum Hotel

17                 200 Northeast A Street

18                Bentonville, Arkansas 72712

19                April 12, 2018, 10:09 a.m.

20   A P P E A R A N C E S:

21   For the Plaintiff:        Kenneth H. Yoon

22                             Attorney at Law

23                             Yoon Law, APC

24                             One Wilshire Boulevard

25                             Los Angeles, CA 90036
```

CERTIFIED COPY

PMQ: Diana McChristian
April 12, 2018

D 024

Atkinson-Baker Court Reporters
www.depo.com

```
 1   For the Plaintiff:          G. Samuel Cleaver

 2                               Attorney at Law

 3                               Law Offices of G. Samuel Cleaver

 4                               5670 Wilshire Blvd, 18th Floor

 5                               Los Angeles, CA 90036

 6

 7

 8

 9

10                               Peter Carlson

11                               Attorney at Law

12                               Fernandez & Lauby, LL

13                               4590 Allstate Drive

14                               Riverside, CA 92501

15

16

17

18

19   For the Defendants:         Robert J. Herrington

20                               Attorney at Law

21                               Greenberg Traurig, LLP

22                               1840 Century Park East

23                               Suite 1900

24                               Los Angeles, CA 90067

25
```

2

PMQ: Diana McChristian
April 12, 2018

**D 025**

Atkinson-Baker Court Reporters
www.depo.com

```
 1                              Katisha Fortune

 2                              Wal-Mart Legal Department

 3                              702 Southwest 8th Street

 4                              Bentonville, AR 72716

 5

 6

 7

 8

 9

10

11

12

13

14

15

16                              Videographer: Jeff Paz

17

18

19

20

21

22

23

24                         Joanne Greenway

25                      Certified Court Reporter
```

3

Atkinson-Baker Court Reporters
www.depo.com

1    Chino.

2    Q:    Okay, so if you go to Exhibit Number 3, and you go to

3    page handwritten 197, or excuse me, there's a WHSE Incentive.

4    Do you see that?

5    A:    I do.

6    Q:    And there's an earnings of $191.79? Do you see that?

7    A:    I do.

8    Q:    Since there's no hours or rate, does that mean that it's

9    a flat premium?

10   A:    No.  I know what that is.  That's the flat quarterly

11   warehouse incentive that Associates working in logistics

12   centers typically receive if they meet the performance

13   guidelines.

14   Q:    And you say, if they meet, you mean if all the employees

15   meet?

16   A:    If they qualify, yes.

17   Q:    So there's a group of employees who might qualify for an

18   incentive, and if the group qualifies, then everybody gets

19   it.

20   A:    I'm going to tell you, I believe yes.  That the answer

21   to your question is yes. I believe it's by center.

22   Q:    Okay, and then it's not a flat rate incentive though.

23   A:    It's a flat rate incentive.  There's a calculation

24   behind it that may include hours. I don't know if it does or

25   not. I don't know what that calculation is for this

PMQ: Diana McChristian
April 12, 2018

**D 027**

1    particular incentive. This is paid at a flat rate.  Is that

2    what you're asking me?

3    Q:   Well, yes, because I don't see the hours or the rate, so

4    just as an example of talking about different types of

5    premiums that might be paid or might not be paid. I'm just

6    asking, since there is no hours, does that mean something?

7    And I'm just asking for this particular example, if there was

8    no hours, does that mean it's a flat fee?

9    A:   It's not a premium in my world.  In a payroll world or

10   even in HR, that would not be considered a premium that would

11   be considered a bonus or an incentive.

12   Q:   Okay, an incentive.  But if it's an incentive, is it a

13   flat incentive because there's no hours?  Can I -- can I look

14   at the paystub, see that there's no hours data and then

15   conclude that it's a flat incentive?

16   A:   Yes, you can.

17   Q:   And in this case, there was an overtime/inc line in

18   there as well?

19   A:   Correct.

20   Q:   And that shows the earnings of the overtime adjustments

21   for the period for which the wholesale incentive was earned?

22   A:   Yes.

23   Q:   And that's divided by the total hours worked in all

24   those weeks with a cap of 40 hours a week?

25   A:   By work week, yes. That dollar value will be spread

Atkinson-Baker Court Reporters
www.depo.com

1  across the earned period, which typically in this case is a

2  quarter, the previous quarter, by week. And then the regular

3  rate re-calc will be done by week and applied by week for any

4  applicable overtime hours. And then it will roll it up and

5  pay it for that entire pay period.

6  Q:   So, the company could put in this hours column all the

7  overtime hours in the quarter, right? Because the company

8  knows that that's the calculation, right?

9  A:   That's used in the calculation, yes.

10 Q:   And the rates. I'm going to guess there's some number in

11 the cents, or maybe a little bit more, but some rate that's

12 pretty modest times of many more hours than you might see for

13 a regular pay period of overtime. And then multiply to get

14 the $28.17?

15 A:   It could -- it could, well, the company could put the

16 hours in there that were used in the calculation because to

17 your point, they do know them. They don't put it there.

18 Q:   The hours that matter though, you need to know all the

19 hours for the calculation, but the only hours that are paid

20 are the overtime hours, right?

21 A:   The only time, the only hours that for the period in

22 which that incentive was earned that are paid the additional

23 dollars due to the recalculation of regular rate because of

24 the incentive are the overtime hours worked by work week in

25 that quarter or period.

PMQ: Diana McChristian
April 12, 2018

**D 029**

Atkinson-Baker Court Reporters
www.depo.com

1   Q:   Which is all the hours in each work week with a 40-hour

2   cap?

3   MR. HERRINGTON: Objection, vague.  I think you're talking

4   hours at this point.

5   A:   I think you're talking hours, and I'm talking how

6   overtime hours literally at, because they've already been

7   calculated.

8   Q:   Oh, right, right.  So you were talking about the all

9   right -- so you were talking about the payment is that's the

10   number of hours, the overtime hours being paid at the rate.

11   And the rate is determined by taking the incentive dividing

12   by all the hours in the quarter because in this case it's a

13   quarterly incentive, and all the hours are all the hours in

14   every work week with a 40-hour cap?

15              MR. HERRINGTON:  Objection to form.

16   A:   No, that's incorrect. The incentive is -- I used the

17   word spread, and I apologize if I'm confusing you.  Say

18   there's one in a typical quarter, you're going to have 12 or

19   13 weeks, so then there's 12. In this particular quarter,

20   that, on this page, 191.79 is done.  191.79 would be divided

21   by 12 and then that particular as an incentive value for

22   calculation purposes would be applied back to every single

23   one of those work weeks, so it might be what, $15.  It's

24   going to spread over that work week, it's going to do that

25   calculation, cap at 40 on the base, figure out what the new

83

Atkinson-Baker Court Reporters
www.depo.com

1   regular rate is for that work week and apply the additional

2   dollars to any overtime, if applicable, worked in that work

3   week.  And it's going to do that for every week in the

4   quarter and then it's going to add all those dollar values

5   together and pay it.

6   Q:   Okay.  You answered that. I won't follow up.  Okay, so

7   -- all right. So another factor in terms of calculating the

8   pay is whether it's a scheduled day or not a scheduled day,

9   right?

10  A:    I believe that when an Associate in an alternative work

11  week, is working on a day that is not scheduled that there

12  could potentially be different overtime rules around that or

13  how those hours are paid.

14  Q:   And the T&A System will give you the regular and

15  overtime based upon that schedule or will they give you the

16  days from the punch records from which you will calculate?

17  A:   Payroll doesn't use the punch records. Payroll uses the,

18  the accumulated values of category of pay that is derived

19  from the punch records, which also will have a look back to

20  what, what type of work week is this Associate on and what is

21  this Associate scheduled. So all that's taken into account in

22  the time and attendance system.  By the time it gets to

23  payroll, payroll uses it to pay the time and attendance

24  system has rolled it up into pay period. So for this pay

25  period, based on the two work weeks included, the time and

PMQ: Diana McChristian
April 12, 2018

**D 031**

1          C E R T I F I C A T E

2              STATE OF ARKANSAS

3

4          I, Joanne Greenway, certified court reporter number 511

5     and notary public hereby certify that the foregoing pages do

6     constitute a true, correct, and accurate transcript of the

7     testimony heard before me, and was transcribed by me or under

8     my supervision.   I further certify that I am a disinterested

9     party to this action and that I am of neither kin nor counsel

10    to any of the parties hereto.

11         In witness whereof, I hereby affix my hand on this the

12    23rd day of April, 2018.

13

14

15             Joanne Greenway

16

17

18

19

20         Certified Court Reporter

21         Certificate Number 511

22    signature      requested

23

24

25

D 032

# Statement of Earnings and Deductions.

**Wal-Mart Associates, Inc., 702 S.W. 8th St.,Bentonville, Arkansas 72716.**

Admin View -- Pay Period Beginning Date: 08-20-2016 through Ending Date: 09-02-2016

| 01 WS 08103 07 0911 H08103 222244393 CHELSEA HAMILTON REDACTED CHINO, CA 'REDACTED | Payee | Type | Account # | Amount |
|---|---|---|---|---|
| | Account Now | CHECK DEPOSIT | REDACTED | $1,223.78 |
| | | | Total Amount | $1,223.78 |

| Deposit Date | Advice # |
|---|---|
| 09-08-2016 | 388452379 |

| W4 Withholding: | Tax Method: | Exemptions: | Additional Withholding: |
|---|---|---|---|
| Federal | Single | 0 | $0.00 |

Note: State and local W4 information is not available at this time.

| Description | Rate | Hours | Earnings | Year to Date | Type of Deductions | Taxes / Deductions | Year to Date |
|---|---|---|---|---|---|---|---|
| REGULAR EARNING | $15.3500 | 59.93 | $919.93 | $8,542.52 | FEDERAL TAX | $0.00 | $979.33 |
| OVERTIME EARN | $23.0250 | 14.28 | $328.80 | $1,528.36 | SOCIAL SECURITY | $109.43 | $773.91 |
| OVERTIME/INCT | | | $28.17 | $28.17 | CALIFORNIA | $37.31 | $173.87 |
| CO STK CONT | | | $0.00 | $0.60 | SDI | $12.87 | $91.04 |
| WHSE INCENTIVE | | | $191.79 | $191.79 | **INS LIFE COPD** | **$1.85** | **$9.32** |
| | | | | | INS LIFE | $2.95 | $13.49 |
| PTO AVAILABLE | | 42.50 | | | **INS WALMART PD** | **$174.41** | **$798.17** |
| WRKDHRS | | 74.21 | | | **NO DIS ACCUM** | **$0.00** | **$0.60** |
| | | | | | INS DEN U * | $8.30 | $37.94 |
| | | | | | INS AD&D U * | $1.29 | $5.90 |
| | | | | | CRITICAL ILL * | $1.76 | $8.05 |
| | | | | | INS MED U HMO* | $23.50 | $107.43 |
| | | | | | **MED COPD HMO** | **$172.56** | **$788.85** |
| | | | | | 401K * | $44.06 | $351.71 |
| | | | | | ACCIDENT * | $0.68 | $3.11 |
| | | | | | CO STK CONT | $0.00 | $0.60 |
| | | | | | STOCK PURCH | $0.00 | $4.00 |
| | | | | | **BENEFIT ACCUM** | **$25.00** | **$220.00** |
| | | | | | INS VIS * | $2.76 | $12.62 |
| | | | | | CHECK DEPOSIT | $1,223.78 | $7,043.10 |

| | Earnings | Taxes | Deductions | Net Pay | | Deposit No. | Amt. of Deposit |
|---|---|---|---|---|---|---|---|
| Current | $1,468.69 | $159.61 | $85.30 | $1,223.78 | | | |
| Year to Date | $10,291.44 | $2,018.15 | $544.85 | $7,728.44 | | 388452379 | $1,223.78 |

**Would you like to receive your W-2 online? Click here for more information.**

WM_HAMILTON 000197

**EXCERPT FROM EXHIBIT 3 TO McCHRISTIAN DEPOSITION**

**D 033**

# EXHIBIT 3

D 034

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Chelsea Hamilton et al., | |
|       Plaintiffs, | No. 5:17-CV-01415 |
| v. | |
| Walmart Stores, Inc. et al., | |
|       Defendants. | |

**EXPERT REPORT OF BRIAN KRIEGLER, PH.D.**

**Econ ONE Research, Inc.**

**September 21, 2018**

Suite 800
550 South Hope Street
Los Angeles, California 90071

**EXHIBIT A**

# TABLE OF CONTENTS

I.    **Introduction** ................................................................................................ 1

    A. Qualifications ................................................................................ 2

    B. Fee Statement ............................................................................... 2

II.   **Class Definitions, Assignment, and Data/Documents
Considered** ................................................................................................ 2

    A. Class Definitions ........................................................................... 2

    B. Assignment .................................................................................. 3

    C. Data/Documents Used to Calculate Damages ................................ 5

        1. Timekeeping Data ............................................................... 5

        2. Payroll Data ........................................................................ 6

        3. Turnstile Data ..................................................................... 6

        4. Shift Pattern Data ............................................................... 6

III.  **Understanding of Pertinent California Laws and Plaintiffs'
Allegations** ............................................................................................... 7

    A. Working Off-the-Clock by Members of the Security Checkpoint and
Overtime Subclasses ..................................................................... 7

        1. Understanding of California Laws ........................................... 7

        2. Plaintiffs' Classwide Allegation ............................................. 7

    B. Underpaid Overtime for Members of the Alternative Workweek
Subclass ...................................................................................... 8

*Chelsea Hamilton et al. v. Walmart Stores, Inc. et al.* • Expert Report of Brian Kriegler, Ph.D.

## EXHIBIT A

**D 036**

1. Understanding of California Laws .................................................. 8

2. Plaintiffs' Allegations for the Alternative Workweek Subclass ............. 8

C. Meal Periods ............................................................................. 9

1. Understanding of California Laws .................................................. 9

2. Plaintiffs' Meal Period Allegations ............................................. 10

D. Wage Statements ...................................................................... 11

1. Understanding of California Laws ................................................ 11

2. Plaintiffs' Wage Statement Allegations ...................................... 11

E. Waiting Time Penalties .............................................................. 12

1. Understanding of California Laws ................................................ 12

2. Plaintiffs' Waiting Time Allegations ........................................... 12

IV.   **Preliminary Damages, Pre-Judgment Interest, and Penalty Calculations to Date** ............................................................. **12**

A. Preliminary Principal Damages for the Security Checkpoint and Overtime Subclasses ................................................................. 12

1. Future Damages Analysis Relating to the Security Checkpoint and Overtime Subclasses .......................................................... 13

B. Preliminary Damages and Pre-Judgment Interest for the Alternative Workweek and Meal Break Subclasses ....................................... 15

1. Alternative Workweek Subclass ................................................. 15

2. Meal Break Subclass ............................................................... 16

C. Preliminary Penalties ............................................................... 17

ECON ONE

*Chelsea Hamilton et al. v. Walmart Stores, Inc. et al.* • Expert Report of Brian Kriegler, Ph.D.

## EXHIBIT A

1. Additional Details Pertaining to Meal Break Subclass Penalties ......... 18

2. Additional Details Pertaining to the Waiting Time Penalty Subclass ... 18

3. Additional Details Pertaining to the Wage Statement Subclass ......... 18

4. Future Analysis Relating to Penalties ........................................... 19

**V.    Concluding Remarks**................................................................**19**

### LIST OF ATTACHMENTS

1 - Curriculum Vitae and Testimony
2 - Formulas and Data Sources Used to Calculate Damages
3 - Summary of Classwide Damages and Pre-Judgment Interest for the
      Alternative Workweek and Meal Break Subclasses
4 - Criteria for Determining Shift Assignments
5 - Summary of Classwide Waiting Time and Wage Statement Penalties

ECON
ONE

*Chelsea Hamilton et al. v. Walmart Stores, Inc. et al.* • Expert Report of Brian Kriegler, Ph.D.
## EXHIBIT A

D 038

9/21/2018

## I.   Introduction

1.   I have personal knowledge of the facts set forth in this declaration, except where otherwise specified.  If called to testify to these facts as a witness in this action, I would so testify.

2.   I am the same Brian Kriegler who has given the following testimony and opinions to date:

- Declaration of Brian Kriegler, Ph.D., in Support of Plaintiffs' Motion for Class Certification, dated June 7, 2018 ("1st Declaration" or "1st Decl.")

- Reply Declaration of Brian Kriegler, Ph.D., in Support of Plaintiffs' Motion for Class Certification, dated August 3, 2018 ("2nd Declaration" or "2nd Decl.")

- Deposition of Brian Roger Kriegler, Ph.D., dated July 2, 2018 ("Kriegler Deposition" or "Kriegler Depo.")

- Declaration of Brian Kriegler, Ph.D., in Support of Plaintiffs' Motion to Compel, dated September 18, 2018 ("3rd Declaration" or "3rd Decl.")

Hereinafter I employ the same terminology introduced in my 1st Declaration, except where specified otherwise.

3.   I have been retained by Plaintiffs' counsel in *Chelsea Hamilton v. Walmart Stores, Inc. et al.* ("Walmart"), Case No. 5:17-CV-01415, pending in the United States District Court, Central District of California.  The purpose of this report is to describe and show my damages, pre-judgment interest, and penalty calculations to date.  To the extent possible I also describe work that I anticipate performing in the upcoming months.

4.   My work in this case is ongoing because some relevant data have not been produced yet.  Going forward I expect to receive some or all of the following data:

- Post-February timekeeping, shift patterns, payroll, and turnstile data



Page 1

*Chelsea Hamilton et al. v. Walmart Stores, Inc. et al.* • Expert Report of Brian Kriegler, Ph.D.

## EXHIBIT A

**D 039**

9/21/2018

- Dates of employment for each employee

- Security camera (surveillance) footage

- Timekeeping data showing which timeclock was used for each clock in/out

### A. Qualifications

5. I am a Managing Director at Econ One Research, Inc. ("Econ One"), an economic and statistical consulting firm with offices in Houston, Los Angeles, Memphis, Sacramento, the San Francisco Bay Area, Washington, D.C, and India. I have master's and doctoral degrees in statistics from UCLA, and I have a bachelor's degree in mathematics/economics from Claremont McKenna College.

6. I have testified as an expert statistician in both State and Federal courts several dozen times, of which approximately half were in connection with wage and hour class actions. I was on a panel of speakers on the use of representative evidence at the 2017 American Bar Association Annual Labor and Employment Conference. I have published several articles in peer-reviewed journals on the use of sampling and statistical modeling. A true and correct copy of my curriculum vitae, which includes my testimonial experience, is attached hereto as **Attachment 1**.

### B. Fee Statement

7. Econ One currently is being compensated for the time I spend on this matter at $340 per hour. Econ One is being compensated for the time spent by other Econ One employees on this project at their normal and customary hourly rates.

## II.  Class Definitions, Assignment, and Data/Documents Considered

### A. Class Definitions

8. I understand that the Court has certified the following classes of individuals:[1]

---

[1] Order Granting in Part and Denying in Part Plaintiffs' Motion for Class Certification (Dkt. 121), dated August 21, 2018 ("Class Certification Order").



Page 2

*Chelsea Hamilton et al. v. Walmart Stores, Inc. et al.* • Expert Report of Brian Kriegler, Ph.D.
## EXHIBIT A

**D 040**

9/21/2018

**Security Checkpoint Subclass:** All current and former non-exempt employees employed by Defendants in the State of California and who worked in a Walmart Fulfillment center and who were required to go through a security checkpoint during a meal period and/or at the end of his/her shift during the period from June 8, 2013 to the present.

**Overtime Subclass:** All current and former non-exempt employees employed by Defendants in the State of California and who worked in a Walmart Fulfillment center and who worked one or more shifts in excess of eight (8) hours in a day or forty (40) hours in a workweek and who were not properly paid all overtime wages during the period from June 8, 2013 to the present.

**Alternative Workweek Subclass:** All current and former non-exempt employees employed by Defendants in the State of California and who worked in a Walmart Fulfillment center and pursuant to an alternative workweek schedule and were not paid daily overtime for work in excess of eight (8) but less than ten (10) hours.

**Meal Break Subclass:** All current and former non-exempt employees employed by Defendants in the State of California and who worked in a Walmart Fulfillment center and who worked a shift in excess of six (6) hours during the period from June 8, 2013 to the present

**Waiting Time Penalty Subclass:** All current and former non-exempt employees employed by Defendants in the State of California and who worked in a Walmart Fulfillment center and who separated from their employment with Defendants during the period from June 8, 2014 to the present.

**Wage Statement Penalty Subclass:** All current and former nonexempt employees employed by Defendants in the State of California and who worked in a Walmart Fulfillment center during the period June 8, 2016 to the present.

### B. Assignment

9.  Plaintiffs have asked me to calculate damages/penalties for each of the aforementioned certified classes. At the outset I have performed these computations through mid-February 2018, *i.e.*, the end of Walmart's produced timekeeping and payroll data. These calculations are based on Plaintiffs' applicable liability theories



Page 3

*Chelsea Hamilton et al. v. Walmart Stores, Inc. et al.* • Expert Report of Brian Kriegler, Ph.D.
## EXHIBIT A

**D 041**

9/21/2018

and the Court's Class Certification Order.  Below are additional details about my classwide computations to date.

    a.    Off-the-clock damages for travel time to the facility exit, waiting in the security checkpoint line, and undergoing a security check (§ IV.A) - I have estimated classwide damages per minute of compensable time off-the-clock through mid-February 2018.

    b.    Underpaid overtime damages stemming from an invalid AWS (§ IV.B.1) - I have estimated these damages through mid-February 2018.

    c.    Meal break damages under the assumption that all meal periods are non-compliant (§ IV.B.2) - I have calculated damages under the legal assumption that Walmart's meal period policy was wholly invalid. Under this legal assumption I have assigned a meal premium to each workday over six hours.

    d.    Meal break damages for sub-30-minute meal periods (§ IV.B.2) - I have calculated meal period  damages under the assumption that the following circumstances constitute a violation: (i) the meal period was exactly 30 minutes long according to the timekeeping data and (ii) Walmart's data show that the employee took an off-site meal period. Plaintiffs allege that these meal periods were less than 30 minutes after accounting for time spent off-the-clock but under the control of the employer.  Hereinafter I refer to these meal periods as "Net Under 30-Minute Meals."

    e.    Waiting time and wage statement penalties (§ IV.C)- I have calculated stand-alone wage statement penalties for allegedly failing to state the correct regular rate of pay.  Additionally I report waiting time and wage statement penalties for the following individuals through February 2018:

        •    All employees

        •    Alternative Workweek Subclass members

        •    Meal Break Subclass members

*Chelsea Hamilton et al. v. Walmart Stores, Inc. et al.* • Expert Report of Brian Kriegler, Ph.D.

## EXHIBIT A

9/21/2018

- Members of the Alternative Workweek and/or Meal Break
  Subclasses

### C. Data/Documents Used to Calculate Damages

#### 1. Timekeeping Data

10. Walmart produced "Timekeeping Data" for 3,826 putative class members. My understanding is that this comprises the population of putative class members at the time of the data production. I further understand that the timestamps in the Timekeeping Data reflect when employees clock in/out at a time clock station. The Timekeeping Data were produced in multiple files.

- ("2015-2016 Timekeeping") Walmart produced one Excel file that indicates the dates and times that each employee punched in or out, along with corresponding designations (*e.g.*, denoting work time, meal time, etc.).[2] This file includes putative class members' data from July 13, 2015 through December 31, 2016. There are 110,922 employee workdays in 2015-2016 Timekeeping.

- ("2017-2018 Timekeeping") Walmart produced a second Excel file indicating the dates and times that each employee punched in or out, along with corresponding designations ("IN," "OUT", "IN MEAL," or "OUT MEAL").[3] This file includes putative class members' data from January 1, 2017 through February 16, 2018. There are 302,396 employee workdays in 2017-2018 Timekeeping.

- ("2017-2018 Timekeeping Corrections") Walmart also produced a series of PDFs showing when employees clocked in/out and when they took meal periods.[4] My understanding is that this file includes timekeeping corrections. As I explain below it appears that this file includes timekeeping corrections but overwhelmingly is duplicative of the data in 2017-2018 Timekeeping. There are 304,505 employee workdays listed in these PDFs.

---

[2] *See* WM_HAMILTON_012373.

[3] *See* WM_HAMILTON_012374.

[4] *See* WM_HAMILTON_012375-WM_HAMILTON_029944.



*Chelsea Hamilton et al. v. Walmart Stores, Inc. et al.* • Expert Report of Brian Kriegler, Ph.D.
## EXHIBIT A

**D 043**

9/21/2018

### 2. Payroll Data

11.    The "Payroll Data" consist of one Excel file for each of 3,734 employees.[5]  For each pay period and putative class member, the Payroll Data include identification numbers, hours worked, and various categories of earnings.  Each Excel file also contains a separate tab that lists the amount paid for missed rest and meal break premiums.  Across all putative class members, the Payroll Data include over 66,000 employee pay periods spanning June 2013 to February 2018.

### 3. Turnstile Data

12.    Walmart's "Turnstile Data" consist of eight Excel files.[6]  My understanding is that these capture when each employee enters the Walmart Fulfillment Center during each workday.  Each row of data includes a timestamp, the name of the person entering, a badge ID number, and whether the card was "admitted" or "rejected."  Across these eight files there are 8,083 names and 1,129,423 rows of data spanning January 2016 to May 2018.[7]

### 4. Shift Pattern Data

13.    Walmart's "Shift Pattern Data" consist of one Excel file for 3,474 employees.[8]  Each row of data provides information about an employee's workweek schedule, including the applicable start date.  I use these data--along with Timekeeping Data--to identify employees on an AWS, which is relevant to my analyses of the Alternative Workweek Subclass.

---

[5] *See* WM_HAMILTON_008641-WM_HAMILTON_012374.

[6] *See* WM-HAMILTON-029955-WM-HAMILTON-029962.

[7] This does not include rows of data where the card was either "rejected" or where the employee name was "Test Badge."

[8] WM_HAMILTON_029993.



9/21/2018

## III. Understanding of Pertinent California Laws and Plaintiffs' Allegations

### A. Working Off-the-Clock by Members of the Security Checkpoint and Overtime Subclasses

#### 1. Understanding of California Laws

14.    My understanding is that California minimum wage laws require employers to pay nonexempt employees for all hours worked.  I further understand that this includes all time that an employee is subject to the employer's control.[9]

#### 2. Plaintiffs' Classwide Allegation

15.    Plaintiffs contend that they were not paid for all hours under Walmart's control. Specifically they allege that they are paid based on the time during which they are "on the clock."  Such time includes when they clock in/out at a time clock station *within* the Walmart Fulfillment Center.[10]

16.    Employees experience two events from the time that employees clock out until they leave the facility. *First*, they must travel (walk) from the timeclock terminal to the security checkpoint. *Second*, they must undergo a security check.  Additionally my understanding is that sometimes employees must wait in a line to get through the security checkpoint.

17.    Virtually all employees spent some time allegedly under the control of Walmart at the end of their shift during which they were not clocked in.  At the very least, employees almost surely exited the facility after their shift was complete.  My understanding is that the Court has permitted Plaintiffs' classwide off-the-clock claims to proceed with respect to time spent between clocking out and exiting the facility.

---

[9] *See* IWC Orders 1-16: Section 2(G). ("'Hours worked' means the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so.") (Available at https://www.dir.ca.gov/IWC/WageOrderIndustries.htm)

[10] *See* Deposition of David Alvarado, dated 4/13/2018 ("Alvarado Depo."), Ex. 24.  There are 15 time clock stations marked on this map.



Page 7

*Chelsea Hamilton et al. v. Walmart Stores, Inc. et al.* • Expert Report of Brian Kriegler, Ph.D.
## EXHIBIT A

**D 045**

9/21/2018

### B. Underpaid Overtime for Members of the Alternative Workweek Subclass

#### 1. Understanding of California Laws

18.    **Table 1** below shows my understanding of which hours are supposed to be paid at a multiple of the regular rate of pay:[11]

| Table 1: Summary of Expected Pay for Putative Class Members, Per Plaintiffs' Allegations | |
|---|---|
| **Description** | **Expected Pay** |
| (Daily Overtime) Hours in excess of 8, up to 12 hours in a workday | 1.5 x regular rate of pay |
| (Weekly Overtime) Hours in excess of 40 per workweek | |
| (7th Consecutive Day Overtime) The first 8 hours of work on the 7th consecutive day of work in a workweek | |
| (Daily Double Time) Hours in excess of 12 in a workday | 2.0 x regular rate of pay |
| (7th Consecutive Day Double Time) Hours in excess of 8 on the 7th consecutive day of work in a workweek | |

#### 2. Plaintiffs' Allegations for the Alternative Workweek Subclass

19.    Plaintiffs allege that Walmart failed to enact a valid Alternative Workweek Schedule (AWS) for its *daytime* shift employees. Accordingly, my understanding is that there is no exemption available to Walmart that would permit it to avoid paying daily overtime to the putative class members. Putative class members received *straight* time pay for all hours up to 10 hours even if that shift exceeded eight hours. Therefore Plaintiffs contend that Walmart's putative class members were underpaid for *daily* overtime hours.

20.    **Table 2** below lists my understanding of Walmart's various Alternative Workweek Schedules.[12]

---

[11] California Department of Industrial Relations, "Overtime," accessed on April 29, 2017. (Available at http://www.dir.ca.gov/dlse/faq_overtime.htm).

[12] *See* WM-HAMILTON000798-WM-HAMILTON000800 (4 x 10 schedules) and WM_HAMILTON_001012-WM_HAMILTON_001014 (3 x 11.25 schedules). *See also,* Alvarado Depo. at 46:16-50:17 describing the S1, S2, S4, and S5 shifts.



*Chelsea Hamilton et al. v. Walmart Stores, Inc. et al.* • Expert Report of Brian Kriegler, Ph.D.

## EXHIBIT A

**D 046**

9/21/2018

| Table 2: Summary of Alternative Workweek Schedules | | | |
|---|---|---|---|
| Shift Type | Days of Work | Potential Start Times | Scheduled Shift Length |
| Weekday Morning (S1) | Tues, Weds, Thurs, Fri | 6:00, 7:00, 7:30 | 10 Hours |
| Weekday Night (S2) | Tues, Weds, Thurs, Fri | 16:30, 17:00, 18:00, 18:30 | 10 Hours |
| Weekend Morning (S4) | Sat, Sun, Mon | 5:00, 6:00 | 11.25 Hours |
| Weekend Night (S5) | Sat, Sun, Mon | 17:00, 18:00 | 11.25 Hours |

21.   Consider an employee who worked his/her scheduled 10 hours per day for four days in a workweek. Walmart paid this employee at straight time for all 40 of these hours of work. Plaintiffs allege that the employee was supposed to be paid an additional 0.5 times the regular rate of pay for two overtime hours per day, *i.e.*, 8 overtime hours for this workweek.

## C. Meal Periods

### 1. *Understanding of California Laws*

22.   **Table 3** below shows the number of 30-minute uninterrupted meal periods that California employers are supposed to provide to non-exempt employees during each workday, per my understanding of California law.[13]

---

[13] "We conclude that, absent waiver, section 512 requires a first meal period no later than the end of an employee's fifth hour of work, and a second meal period no later than the end of an employee's 10th hour of work… [t]he statute requires a first meal period no later than the start of an employee's sixth hour of work…Accordingly, first meal periods must start after no more than five hours… [Section 512] require[s] a second meal period after no more than 10 hours of work in a day, *i.e.*, no later than what would be the start of the 11th hour of work…" *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal. 4th 1004, 1037-39.

*Chelsea Hamilton et al. v. Walmart Stores, Inc. et al.* • Expert Report of Brian Kriegler, Ph.D.

## EXHIBIT A

**D 047**

9/21/2018

| Table 3: Number of Meal Periods Employer is Supposed to Provide to Each Putative Class Member on each Workday, Per Brinker | |
|---|---|
| **Number of Hours Worked** | **Number of Meal Periods** |
| 5 hours or less | 0 |
| Between 5 hours, 1 minute and 10 hours | 1 |
| Between 10 hours, 1 minute and 15 hours | 2 |

23.    I further understand that when California non-exempt employees are not provided all
of their timely 30-minute uninterrupted meal breaks in a workday, they are owed one
hour of pay at their regular rate of compensation (hereinafter, "Meal Premium
Payment"). By way of example, this means that the employee is owed one hour of
compensation--*i.e., a single* Meal Premium Payment--under each of the following
scenarios:

- The employee works 9 hours and is not provided with a compliant
  meal period within the first five hours

- The employee works more than 10 hours and is not provided with any
  compliant meal periods

- The employee works more than 10 hours and is provided with a
  compliant meal period within the first five hours but not a second meal
  period

### 2. Plaintiffs' Meal Period Allegations

24.    Plaintiffs contend that the need to pass through the security checkpoint discouraged
employees from taking a meal period. Under this legal theory my understanding is
that all meal periods are impacted.[14]

---

[14] Class Certification Order, p. 11 ("If the mere existence of the security checkpoint system can be considered
an impediment to taking a meal period or as discouraging employees from taking a meal period, resolution of
the claim would be advanced significantly. This is because, as counsel pointed out, the emphasis is on the
action of the employer...")



*Chelsea Hamilton et al. v. Walmart Stores, Inc. et al.* • Expert Report of Brian Kriegler, Ph.D.
# EXHIBIT A

**D 048**

9/21/2018

25.   Plaintiffs have an alternative legal theory that pertains to "short" meal periods.
Walmart determined meal period time using their timekeeping system. For
employees who left the facility for their meal period, some of this break time was
spent going through the security checkpoint. Time spent waiting in line and/or
undergoing a security check cut into employees' allotted 30-minute meal periods.
Thus Plaintiffs allege that Walmart had a widespread practice of not providing at least
30-minute uninterrupted meal periods for people who took off-site breaks.

26.   For instance, consider an employee who is clocked out for 30 minutes and exits the
facility during his/her break. Some of these 30 minutes will be spent walking through
the facility and the security checkpoint, *i.e.*, while allegedly still under the control of
the employer. Under these circumstances, Plaintiffs contend that the meal period
was uninterrupted for less than 30 minutes.

### D. Wage Statements

#### 1. Understanding of California Laws

27.   My understanding is that California law requires employers to provide employees
with wage statements containing specific information, *e.g.*, all hours worked, all wages
earned, and applicable hourly rates including the regular rate. I further understand
that that penalties are owed for each instance in which this information is not shown
on the wage statement.

#### 2. Plaintiffs' Wage Statement Allegations

28.   Plaintiffs allege that wage statements furnished by Walmart were inaccurate in two
respects. *First*, some wage statements included a retroactive adjustment to overtime
pay resulting from a non-discretionary bonus. Plaintiffs allege that the regular rate of
pay was not correctly stated when these retroactive overtime payments were made.
*Second*, Plaintiffs allege that the wage statements were not accurate under the
assumption that wages and/or break premium pay are owed to putative class
members.



Page 11

*Chelsea Hamilton et al. v. Walmart Stores, Inc. et al.* • Expert Report of Brian Kriegler, Ph.D.

## EXHIBIT A

**D 049**

9/21/2018

### E. Waiting Time Penalties

#### 1. Understanding of California Laws

29. My understanding is that California law requires employers to pay all wages to employees upon termination. I further understand that that waiting time penalties are owed to each former employee who is not paid all of his/her wages upon termination.

#### 2. Plaintiffs' Waiting Time Allegations

30. Plaintiffs allege that class members were not paid all wages upon termination, namely for time spent working off-the-clock, underpaid overtime, and/or for missed meals.

## IV. Preliminary Damages, Pre-Judgment Interest, and Penalty Calculations to Date

31. My analysis to date is based on workweeks in (i) 2015-2016 Timekeeping and (ii) 2017-2018 Timekeeping where all hours worked within each workweek match those in 2017-2018 Timekeeping Corrections.

32. **Attachment 2** lists the formulas and data sources that I have used--or expect to use-- to determine damages, interest, and penalties. I report *classwide* totals in Attachments 3 and 5 (introduced below). In my work papers, I show these *classwide* numbers along with detailed damages, interest, and penalties for each *individual* class member.

### A. Preliminary Principal Damages for the Security Checkpoint and Overtime Subclasses

33. I have calculated preliminary damages per minute of compensable time spent off-the-clock. At the outset I have applied the following three steps:

  a. *First*, I assume one minute of compensable off-the-clock time per employee shift.

  b. *Second*, I multiply each minute by the employee's base rate for that shift.

  c. *Third*, I add the damages for each minute of compensable off-the-clock time across all shifts and employees.



9/21/2018

Using these three steps, classwide damages are $88,935 assuming one minute of compensable off-the-clock time on each employee workday.

### 1. Future Damages Analysis Relating to the Security Checkpoint and Overtime Subclasses

34.   I expect to supplement my analysis and opinions using specific data sources that I currently do not have.

- Timekeeping data showing which timeclock was used to punch in/out

- Surveillance footage

- Ergonomic expert testimony pertaining to expected travel (walking) time

35.   Using these additional data sources along with the existing data production, I expect to update my off-the-clock damages calculations in three respects. *First*, I expect to provide the trier of fact with one or more measurements for compensable off-the-clock time per employee shift. *Second*, for each employee I expect to categorize each compensable minute as straight time, overtime, or double time. *Third*, for each employee I expect to apply the base rate to unpaid straight time and the regular rate to unpaid overtime/double time.

36.   To the extent possible I provide details about the potential approaches for deriving the time it takes (i) to get through the security checkpoint, including waiting in line, and (ii) the amount of time it takes to walk (travel) from the timeclock terminals to the security checkpoint.

### a. Time to Get Through the Security Checkpoint

37.   I expect to use surveillance footage to gauge how long it takes to go through the security checkpoint. This will also be my data source for assessing how long it takes-- and how often--employees are required to wait in line before being allowed to exit. My staff and I have the capacity to review several hundred hours of video.[15]

---

[15] *See* 3rd Decl., § V. I proposed two sampling designs for selecting and producing surveillance footage. These designs call for either 336 or 180 hours of footage.

*Chelsea Hamilton et al. v. Walmart Stores, Inc. et al.* • Expert Report of Brian Kriegler, Ph.D.

## EXHIBIT A

**D 051**

9/21/2018

### b. Walking Time

38. I expect to use one of three methods for determining the time it takes to walk from the timeclock terminals to the security checkpoint.

39. One approach is to rely on the combination of Timekeeping and Turnstile Data. In my 2nd Declaration, I discussed at length how these data could be used to extract certain measurements for walking time.[16] For instance, the time between the facility entrance and timeclocks is:[17]

- At least 1.1 minute 90 percent of the time

- At least 3.6 minutes 75 percent of the time

- At least 8.4 minutes 50 percent of the time

- 15.5 minutes on average

40. Classwide damages attributed to walking time then can be derived by multiplying any of these measurements by (i) each employee's applicable hourly rate and (ii) the number of employee shifts. Ultimately, these measurements may well be more precise per class member if Walmart produces identifiers for the timeclock terminals.

41. A second approach is to utilize both surveillance footage and ergonomic testimony. Surveillance footage can be used to estimate the proportion of employees that use each timeclock terminal. Ergonomic testimony can be used to measure a reasonable amount of time it takes to walk from each timeclock to the security checkpoint.

42. A third approach is to rely on surveillance footage to estimate both (i) the time it takes to walk from the timeclocks to the security checkpoint and (ii) the proportion of employees that use each timeclock terminal.

---

[16] See 2nd Decl., ¶¶ 20-31.

[17] It stands to reason that the time upon entering the facility and clocking in can be used to approximate the reverse commute because the entrance and exit are virtually the same. *See* WM_HAMILTON_001011 (facility schematic showing, among other things, the location of the entrance and exit). *See also*, 2nd Decl., ¶¶ 27-31 (discussion on why "Pre-Shift Time" can be used to infer "Post-Shift Time").



*Chelsea Hamilton et al. v. Walmart Stores, Inc. et al.* • Expert Report of Brian Kriegler, Ph.D.

## EXHIBIT A

**D 052**

9/21/2018

### B. Preliminary Damages and Pre-Judgment Interest for the Alternative Workweek and Meal Break Subclasses

43.   Attachment 3 summarizes my classwide damages and interest calculations pertaining to underpaid overtime and missed meal periods.  In general, pre-judgment interest is calculated for each employee pay period in which there are damages.  Below are additional details about my damages methodologies for the Alternative Workweek and Meal Break Subclasses.

#### 1. Alternative Workweek Subclass

44.   Classwide damages for the Alternative Workweek Subclass entail four steps.  *First*, I identify who was on an AWS based on Shift Pattern Data and patterns in the Timekeeping Data.  *Second*, I calculate the difference between overtime hours in the Timekeeping Data but for the AWS and overtime hours according to the Payroll Data.[18]  *Third*, for each employee pay period I multiply the number of underpaid overtime hours by the employee's hourly rate of pay.  *Fourth*, I add these damages together across employees to arrive at a classwide total.

45.   To date I identified 1,199 employees who were on a morning AWS at some point according to the Shift Pattern Data.  Additionally I identified 1,035 employees who were likely on a morning AWS based on a set of mathematical criteria applied to the Timekeeping Data.[19]  These conditions are described in **Attachment 4**.

##### a. Future Analysis Relating to the Alternative Workweek Subclass

46.   Going forward, I expect to update damages for the Alternative Workweek Subclass using Walmart's electronic data, *i.e.*, between February 2018 and August 21, 2018.  My understanding is that these data have not been produced yet.

---

[18] My underpaid overtime damages are based on employee shifts, which may straddle two calendar days.  In my work papers I also report results whereby each employee workday is based on the number of hours worked on each calendar day.

[19] *See* Alvarado Depo. at 57:23-58:22.  Mr. Alvarado testified that the schedule numbers are not tied to all alternative workweeks.  As a result I rely on both Shift Pattern Data and Timekeeping Data to identify employees on an AWS.


Page 15

*Chelsea Hamilton et al. v. Walmart Stores, Inc. et al.* • Expert Report of Brian Kriegler, Ph.D.

## EXHIBIT A

**D 053**

9/21/2018

### 2. Meal Break Subclass

47.   Meal Break Subclass damages are computed two ways: (i) assuming that all meal periods were non-compliant, and alternatively, (ii) for Net Under 30-Minute Meals, i.e., in which employees took an off-site break.

48.   With respect to (ii), at the outset I have *only* calculated damages when Walmart's data show both of the following to be true:

- The Timekeeping Data show a meal period length of exactly 30 minutes

- The Turnstile Data show that the employee re-entered the facility no more than 15 minutes prior to the meal punch-in, *i.e.*, when the employee concluded his/her meal break

#### a. Future Analysis Relating to the Meal Break Subclass

49.   Going forward, I expect to update damages for the Meal Break Subclass in two respects:

- Using additional electronic data, *i.e.*, between February 2018 and August 21, 2018

- For additional meal periods that may be Net Under-30 Minute Meals

50.   I currently offer no opinion as to whether recorded breaks of 31+ minutes were less than 30 minutes when accounting for off-the-clock travel time and security check time.  In order for me to offer such opinion, I must first analyze some combination of (i) ergonomic expert testimony, (ii) time clock station identifiers in the Timekeeping Data, and/or (iii) surveillance footage.

51.   Nevertheless, I have identified meal periods that *potentially* include fewer than 30 minutes of uninterrupted break time.  These breaks meet both of these conditions:

- The Timekeeping Data show 31-40-minute meal periods

- The Turnstile Data show that the employee re-entered the facility no more than 15 minutes prior to the meal punch-in, *i.e.*, when the employee concluded his/her meal break

*Chelsea Hamilton et al. v. Walmart Stores, Inc. et al.* • Expert Report of Brian Kriegler, Ph.D.

## EXHIBIT A

**D 054**

9/21/2018

52.     **Table 4** below shows how many meal periods fit these criteria.  For reference, I also include the number of 30-minute meal periods in which employees exited the Fulfillment Center.

| Table 4: Distribution of Meal Period Lengths When Employees Exited the Facility* | | | |
|---|---|---|---|
| | Off-Site Meal Periods | | |
| Length of Meal Period (Minutes) | Count | Percent | Cumulative Percent |
| 30 | 20,158 | 64.7 % | 64.7 % |
| 31 | 5,116 | 16.4 % | 81.2 % |
| 32 | 2,740 | 8.8 % | 90.0 % |
| 33 | 1,439 | 4.6 % | 94.6 % |
| 34 | 764 | 2.5 % | 97.0 % |
| 35 | 364 | 1.2 % | 98.2 % |
| 36 | 86 | 0.3 % | 98.5 % |
| 37 | 56 | 0.2 % | 98.7 % |
| 38 | 34 | 0.1 % | 98.8 % |
| 39 | 16 | 0.1 % | 98.8 % |
| 40+ | 364 | 1.2 % | 100.0 % |
| Total | 31,137 | 100.0 % | 100.0 % |

## C. Preliminary Penalties

53.     **Attachment 5** lists waiting time and wage statement penalties for the following people/subclasses:

- All employees

- The Alternative Workweek Subclass

- The Meal Break Subclass

- The Alternative Workweek and/or Meal Break Subclass

54.     Attachment 5 serves as a "lookup" for the Court to utilize based on its liability rulings.  For instance:

a.      Waiting time penalties are $7,708,083 if the Court (i) awards waiting time penalties to all terminated employees, and (ii) decides to apply the

9/21/2018

average daily wage across *all* pay periods for each employee. Alternatively, waiting time penalties are $7,713,572 if the Court wants to use each terminated employee's average daily wage in the *final* pay period.

b.    Wage statement penalties are $1,777,650 for the Alternative Workweek Subclass only if the Court (i) imposes a 3-year statute of limitation and (ii) wants to use both Shift Pattern and Timekeeping Data to identify employees on an AWS. Alternatively, these wage statement penalties are $1,609,850 if the Court imposes a 1-year statute of limitation.

### 1. Additional Details Pertaining to Meal Break Subclass Penalties

55.    Derivative penalties for the Meal Break Subclass are computed two ways: (i) assuming all meal periods are non-compliant, and separately, (ii) for Net Under 30-Minute Meals where the recorded meal break is exactly 30 minutes. These computations correspond to the approaches described in paragraph 47, above.

### 2. Additional Details Pertaining to the Waiting Time Penalty Subclass

56.    My understanding is that the "Average Daily Wage" is an input for determining waiting time penalties. For each employee, I further understand that this amount can be determined either (i) across all pay periods during their employment, or (ii) for the final pay period during their employment. I offer no opinion as to which approach meets the legal standard. Therefore I report classwide waiting time penalties using each approach.

57.    At the outset I have identified any putative class member who last appeared on or before December 22, 2017 in both the Timekeeping Data and the Payroll Data as a former (terminated) employee.

### 3. Additional Details Pertaining to the Wage Statement Subclass

58.    Attachment 5 also lists wage statement penalties for employees who received allegedly non-discretionary overtime adjustments. This is the only stand-alone penalty calculation that is unrelated to the other subclasses.



*Chelsea Hamilton et al. v. Walmart Stores, Inc. et al.* • Expert Report of Brian Kriegler, Ph.D.

## EXHIBIT A

**D 056**

9/21/2018

### 4. Future Analysis Relating to Penalties

59.   Going forward, I expect to update penalty calculations in two respects:

- Using updated results for the aforementioned Security Checkpoint, Overtime, Alternative Workweek, and Meal Break Subclasses

- Using dates of employment for each class member

## V.   Concluding Remarks

60.   My damages calculations are preliminary given my understanding that additional sources of information will be produced in the upcoming months.

61.   Should additional, relevant information become available to me in this class action, I am open to incorporating it into my future calculations and opinions.


I declare the foregoing to be true under penalty of perjury of the laws of the United States of America.  Executed this 21st day of September 2018, at Los Angeles, California.


Brian Kriegler, Ph.D.
September 21, 2018

*Chelsea Hamilton et al. v. Walmart Stores, Inc. et al.* • Expert Report of Brian Kriegler, Ph.D.

## EXHIBIT A

**D 057**

# ATTACHMENT 1

**EXHIBIT A**

**DR. BRIAN KRIEGLER**
*Managing Director*
**Los Angeles, California**
**Tel: 213 624 9600**
**Email: bkriegler@econone.com**



BRIAN KRIEGLER is a Managing Director with expertise in statistics, sampling, survey data, econometrics, and data analysis. He has extensive experience collecting, maintaining, and analyzing data sets in both consulting and academic research capacities. He has authored and co-authored multiple papers and has presented his research to the American Statistical Association, of which he is a member.

Dr. Kriegler has given expert testimony as a statistician in litigation proceedings involving civil rights, the False Claims Act, breach of contract, consumer products, and various employment issues. He also has analyzed large transactional databases and constructed damage models in multiple antitrust class action lawsuits. Specifically in employment cases, Dr. Kriegler has testified about unpaid overtime, off-the-clock claims, punch card rounding, reimbursement, and misclassification. He has consulted with a national restaurant chain to analyze survey data for its kitchen managers in order to assess the extent to which they were conducting supervisorial versus non-supervisorial tasks. Those survey results were relied upon for purposes of reaching a settlement in a class action lawsuit relating to misclassification.

## EDUCATION

Ph.D., Statistics, University of California, Los Angeles
M.S., Statistics, University of California, Los Angeles
B.A., Mathematics-Economics, Claremont McKenna College

## WORK EXPERIENCE

*Econ One Research, Inc.*
Managing Director, January 2015 to Present
Statistician, August 2008 - December 2014

*Claremont McKenna College (Silicon Valley Program),* Guest Lecturer
Econ 123, Quantitative Data Analysis, *March 2016*
Econ 123, Quantitative Data Analysis, *October 2015*

*University of Pennsylvania Department of Statistics,* Post Doctoral
Researcher, 2007 - 2008

*UCLA Department of Statistics,* Lecturer
Statistics 10, Introduction to Statistical Reasoning, Winter 2008
Statistics 130B, Statistical Analysis with SAS, Summer 2007

# EXHIBIT A

**DR. BRIAN KRIEGLER**
*Managing Director*

*Self-Employed*, Statistical Consultant, 2004 - 2008

*Claremont McKenna College Reed Institute for Applied Statistics*, Post Doctoral Researcher, 2007

*RAND Corporation*, Summer Associate, 2006

*UCLA Department of Statistics*, Graduate Student Researcher, 2004 - 2006

*UCLA Department of Statistics*, Technology Teaching Assistant Coordinator, 2004 - 2005

*Lockheed Martin Missiles and Space*, Associate Reliability Engineer, 2001 - 2003

## INVITED PRESENTATIONS

"*Representative Evidence in Class Actions after Tyson Foods*," 11th Annual ABA Labor and Employment Law Conference, Washington, DC.

"*Effective Use of Statistical Evidence in Employment Class Action Litigation: Practical Guide in 2017*," Webinar presentation through The Knowledge Network, with Eric Savage, Dubravka Tosic, Ph.D., and Paul White, Ph.D.

"*Counting the Homeless in Los Angeles County*," Joint Statistical Meetings, Seattle, WA, August 2006.

"*A Southpaw Secret: Are Their Salaries Consistent with Their Contributions to Team Performance?*" Claremont McKenna College, Claremont, CA, March 2002.

"*Mixing Component and System Data in Reliability Assessment*," United States Navy Complex, Washington, DC, July 2001.

## PUBLISHED ARTICLES & PAPERS

"*Practitioner's Guide to Statistical Sampling.*" Law360. (Jan 8-11, 2018)
*Part 1*: Validating Random Sampling and the Central Limit Theorem
*Part 2*: Resampling and Bootstrapping: A Method for Determining Confidence Intervals from Small Datasets
*Part 3*: Making Valid Statistical Inferences When Sample Selections Are Missing
*Part 4*: Three Myths About Random Sampling Requirements

"*Delving Deeper Into Duran.*" Law360. (Oct 1, 2014).

# EXHIBIT A

**DR. BRIAN KRIEGLER**
*Managing Director*

> *"Small Area Estimation of the Homeless Population in Los Angeles County: An Application of Cost-Sensitive Stochastic Gradient Boosting,"* Annals of Applied Statistics. Vol. 4 (3), 1234-1255, with Berk, R. (2010).

> *"Counting the Homeless in Los Angeles County."* IMS Collections. Probability and Statistics: Essays in Honor of David A. Freedman, Vol. 2. 127-141, with Berk, R. and Ylvisaker, D. (2008).

> *"Cost-Sensitive Stochastic Gradient Boosting Within a Quantitative Regression Framework,"* Ph.D. Dissertation, Committee Chair: Richard Berk. Portions of this research have been implemented into the "gbm" library in R (open source statistical software) available at www.r-project.org (2007).

> *"Forecasting Dangerous Inmate Misconduct: An Application of Ensemble Statistical Procedures."* Journal of Quantitative Criminology, 22(2). 131-145, with Berk, R. and Baek, J.H. (2006).

> *"Comparison of Achievement of 8th Graders Who Used the MathScape Curriculum to Those Who Used a More Traditional Curriculum,"* Creative Publications (2001).

> *"Estimation of Component and System Reliabilities Using Binomial and Exponential Data and Various Test Methods,"* Undergraduate Senior Thesis, Chair: Janet Myhre (2001).

## REPRESENTATIVE ENGAGEMENTS

### Employment

In a misclassification wage and hour class action, worked with survey experts to design and implement a questionnaire to estimate the length of time it took to complete various job activities.  Calculated damages using survey results, activity logs, and payroll records.  Submitted one expert report and calculated damages for settlement purposes.

In a misclassification wage and hour class action, worked with restaurant industry expert to develop a survey of kitchen managers to analyze how long various job activities took to complete.  Analyzed survey data and assisted defendant's counsel at mediation.

In an off-the-clock wage and hour class action, worked with survey expert to design and implement a questionnaire to determine the extent to which potential class members were subjected to off-the-clock security checks. Analyzed timekeeping data to calculate damages for settlement purposes.

In a missed meal/rest break and off-the-clock wage and hour class action, analyzed timekeeping and payroll data to estimate extent to which

# EXHIBIT A

**DR. BRIAN KRIEGLER**
*Managing Director*

potential class members were missing meal breaks and working off-the-clock.  Submitted four declarations and provided deposition testimony.

In a misclassification wage and hour class action, evaluated declarations and deposition testimony of potential class members prior to class certification.  Opined on plaintiffs' experts' approach regarding the proposed use of surveying and sampling.  Submitted one declaration and provided deposition testimony.

In a missed meal/rest break and unpaid overtime wage and hour class action, analyzed employee activity logs, timekeeping data, and payroll data at class certification stage.  Submitted one declaration and provided deposition testimony.

In a single plaintiff misclassification wage and hour case, calculated damages based on payroll records and timekeeping logs.

In a single plaintiff age discrimination case, conducted a statistical analysis of hiring and terminating practices at a charter school.

In a single plaintiff age discrimination case, conducted a statistical analysis of hiring and terminating practices at a logistics company.

## Civil Rights

In an inmate over-detention and strip search case, analyzed inmate database to identify potential class members.  Constructed a sampling design for selecting inmate files that were analyzed by a criminal justice expert.  Extrapolated the number of over-detentions and number of post-release strip-searched inmates based on the analysis of the sample.  Submitted multiple expert reports and declarations, and provided testimony at deposition and trial.

In an inmate strip search class action, analyzed large inmate database to identify individuals who were subjected to strip searches prior to their arraignment, after being ordered released, and in large groups.  Collaborated with system administrators and officers from the law enforcement agency to construct criteria for identifying class members.  Assisted plaintiffs' counsel at mediation with damages calculations.

## False Claims Act

In a qui tam case where the relator alleged that a pharmaceutical company offered illegal kickbacks to doctors for prescribing specific drugs, thereby inflating the pharmaceutical company's revenue and market share.  Constructed damages model that was used for settlement proceedings.

# EXHIBIT A

**DR. BRIAN KRIEGLER**
*Managing Director*

In a qui tam case where the relator alleged that the medical provider submitted claims to Medicare that were improperly up-coded, extrapolated damages based on a random sample of patient files,  Opined on the number of allegedly false claims and ineligible reimbursement amounts. Submitted one expert report and provided deposition testimony.

In a qui tam case where the relator alleged that the medical provider submitted claims to Medicare that violated the Florida Patient Self Referral Act, extrapolated damages based on a stratified random sample of patient files.  Opined on the number of allegedly false claims and ineligible reimbursement amounts.  Submitted one expert report.

### Antitrust

Managed approximately one billion proprietary debit card transactions in order to calculate class member and classwide damages.  Collaborated with class administrator to calculate damages for settlement purposes.

### Consumer Class Actions

Designed damages model for calculating overcharges on prescription eye medicine.  Submitted one expert report and provided deposition testimony.

# EXHIBIT A

Econ One Research, Inc.
Los Angeles, California

**DR. BRIAN KRIEGLER**
*Prior Testimony/Reports*

| Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Reports | Date | On Behalf Of |
|---|---|---|---|---|---|
| **Employment** | | | | | |
| 1. Richard Fairfield v. Advantage Rent-A-Car | Superior Court of the State of California, for the County of Los Angeles | BC342461 | Declaration Declaration Declaration Deposition Supplemental Declaration | December 2006 February 2007 March 2007 March 2007 May 2007 | Plaintiff |
| 2. Elveta Louise Francis v. State of California Department of Corrections | Superior Court of the State of California, for the County of Los Angeles | BC302856 | Declaration Declaration | January 2007 May 2010 | Plaintiff |
| 3. David Lubocki v. ZipRealty, Inc. | U.S. District Court, Central District of California | CV 07 2959 SJO (JCx) | Declaration | September 2007 | Plaintiff |
| 4. Eric Moore v. Roadway Express, Inc. et al. | U.S. District Court, Central District of California | 2:09-CV-01588 RBL (Opx) | Declaration | May 2010 | Plaintiff |
| 5. Maria Martinez, v. Jatco, Inc. | Superior Court of the State of California, for the County of Alameda | RG08397316 | Deposition Trial | September 2011 December 2011 | Defendant |

# EXHIBIT A

**D 064**

Econ One Research, Inc.
Los Angeles, California

**DR. BRIAN KRIEGLER**
*Prior Testimony/Reports*

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Reports | Date | On Behalf Of |
|---|---|---|---|---|---|---|
| 6. | Valerie Alberts v. Aurora Behavioral Health Care | Superior Court of the State of California, for the County of Los Angeles | BC419340 | Declaration Deposition Deposition Supplemental Declaration Declaration Deposition Reply Declaration | May 2012 July 2012 October 2012 April 2013 December 2017 February 2018 April 2018 | Plaintiff |
| 7. | Patrick Santiago v. Amdocs, Inc. | U.S. District Court, Northern District of California | 3:10-CV-04317 SI | Declaration Deposition | April 2013 May 2013 | Plaintiff |
| 8. | Christina Espinoza v. East West Bank | Superior Court of the State of California, for the County of Los Angeles | BC502166 | Declaration Deposition | November 2014 February 2015 | Defendant |
| 9. | Crystal Brock v. Living Spaces Furniture; and Ronald Monroe v. Living Spaces Furniture | Superior Court of the State of California, for the County of Los Angeles | BC498415 / BC521299 | Declaration | December 2014 | Plaintiff |
| 10. | Marie Minns, Kemberly Briggs v. Advanced Clinical Employment Staffing LLC, et al. | U.S. District Court, Northern District of California | 3:13-03249-SI | Declaration Supplemental Declaration | February 2015 March 2015 | Plaintiff |
| 11. | Kimberly Murphy v. CVS Caremark Corporation, et al. | Superior Court of the State of California, for the County of Los Angeles | BC464785 | Declaration Deposition | March 2015 April 2015 | Plaintiff |

**EXHIBIT A**

Econ One Research, Inc.
Los Angeles, California

**DR. BRIAN KRIEGLER**
*Prior Testimony/Reports*

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Reports | Date | On Behalf Of |
|---|---|---|---|---|---|---|
| 12. | Lorenzo Benton v. Telecom Network Specialists | Superior Court of California, for the County of Los Angeles | BC354230 | Declaration Deposition Declaration Supplemental Declaration Supplemental Declaration Supplemental Declaration Reply Declaration | March 2015 May 2015 July 2017 November 2017 March 2018 April 2018 August 2018 | Plaintiff |
| 13. | Connie Capon v. Temecula Preparatory School, et al. | Superior Court for the State of California, for the County of Riverside | MCC 1300098 | Declaration | April 2015 | Plaintiff |
| 14. | Terry P. Boyd v. LandSafe, et al. | U.S. District Court, Central District of California | SA13-CV-00561 DOC (JPRx) | Expert Report | July 2015 | Plaintiff |
| 15. | Valerie Horvath v. Western Refining Wholesale | Superior Court for the State of California, for the County of San Bernardino | CIVDS1311846 | Declaration Deposition | November 2015 January 2016 | Plaintiff |
| 16. | David Kaanaana v. Barrett Business Services, Inc., et al. | Superior Court for the State of California, for the County of Los Angeles | BC496090 | Deposition Declaration Trial | December 2015 January 2016 February 2016 | Plaintiff |
| 17. | James Cole v. CRST, Inc. | U.S. District Court, Central District of California | EDCV 06-1570-VAP(SPx) | Declaration Deposition Expert Report Declaration | January 2016 February 2016 December 2016 February 2017 | Plaintiff |

**EXHIBIT A**

**D 066**

Econ One Research, Inc.
Los Angeles, California

**DR. BRIAN KRIEGLER**
*Prior Testimony/Reports*

| Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Reports | Date | On Behalf Of |
|---|---|---|---|---|---|
| 18. | Christopher Williams v. Allstate Insurance Company | Superior Court for the State of California, for the County of Los Angeles | BC382577 | Declaration | March 2016 | Plaintiff |
| 19. | Larry Loffredo v. Astro Spar, Inc. | Superior Court for the State of California, for the County of Los Angeles | BC559611 | Declaration Deposition | March 2016 April 2016 | Plaintiff |
| 20. | Aaron Senne v. Office of the Commissioner of Baseball, et al. | United States District Court, Northern District of California | 3:14-CV-00608-JCS / 3:14-CV-03289-JCS | Declaration Declaration Supplemental Declaration Expert Report Rebuttal Declaration | March 2016 April 2016 April 2016 August 2016 October 2016 | Plaintiff |
| 21. | Annette Blackwell v. Steve's Plating Corporation | Superior Court for the State of California, for the County of Los Angeles | BC531129 | Deposition | March 2016 | Defendant |
| 22. | Bertha Sanchez v. St. Mary Medical Center | Superior Court for the State of California, for the County of San Bernardino | CIVDS 1304898 | Declaration Deposition Rebuttal Declaration Rebuttal Declaration Deposition Declaration | April 2016 May 2016 July 2016 April 2018 April 2018 May 2018 | Plaintiff |

# EXHIBIT A

Econ One Research, Inc.
Los Angeles, California

**DR. BRIAN KRIEGLER**
*Prior Testimony/Reports*

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Reports | Date | On Behalf Of |
|---|---|---|---|---|---|---|
| 23. | Antoaneta Vatraleva v. Sears, Robuck & Co. | Superior Court for the State of California, for the County of Los Angeles | BC515650 | Declaration | August 2016 | Plaintiff |
| 24. | Donald Harrington v. Marten Transport | United States District Court, Central District of California | 15-CV-01419-MWF-ASx | Declaration | October 2016 | Plaintiff |
| 25. | Roderick Wright v. Renzenberger, Inc. | United States District Court, Central District of California | 2:13-CV-06642-FMO-AGR | Expert Report | April 2017 | Plaintiff |
| 26. | Holly Attia v. The Neiman Marcus Group, Inc. | United States District Court, Central District of California | 8:16-CV-00504 DOC (FFM) | Declaration | April 2017 | Plaintiff |
| 27. | Clayton Dezan v. Dignity Health | Superior Court for the State of California, for the County of Los Angeles | CIVDS1516658 | Declaration Deposition Rebuttal Declaration | April 2017 June 2017 September 2017 | Plaintiff |
| 28. | Darel D. Woods v. JFK Memorial Hospital, Inc. | Superior Court for the State of California, for the County of Riverside | INC 1205209 | Declaration Deposition Rebuttal Declaration Supplemental Declaration | May 2017 August 2017 December 2017 June 2018 | Plaintiff |
| 29. | Isaac Rodriquez v. Nike Retail Services, Inc. | United States District Court, Northern District of California | 5:14-CV-1508 BLF | Declaration Deposition Supplemental Declaration | June 2017 June 2017 August 2017 | Plaintiff |

**EXHIBIT A**

Econ One Research, Inc.
Los Angeles, California

**DR. BRIAN KRIEGLER**
*Prior Testimony/Reports*

| Proceeding | Court/Commission/Agency | Docket or File | Deposition/Trial/Reports | Date | On Behalf Of |
|---|---|---|---|---|---|
| 30. Eric Chavez v. Converse, Inc. | United States District Court, Northern District of California | 15-CV-03746 NC | Declaration Expert Report Declaration Deposition Supplemental Declaration | June 2017 September 2017 September 2017 September 2017 | Plaintiff |
| 31. Segundina Morin v. Physicians' Surgery Center of Downey, Inc. | Superior Court of California, for the County of Los Angeles | BC625567 | Deposition | July 2017 | Plaintiff |
| 32. Amber Stewart v. Hat World, Inc. | Superior Court of the California, for the County of San Mateo | CIV 533617 | Declaration Declaration | August 2017 April 2018 | Plaintiff |
| 33. Safeway Wage and Hour Cases | Superior Court of the State of California, for the County of Los Angeles | JCCP 4772 | Rebuttal Declaration Deposition | August 2017 September 2017 | Plaintiff |
| 34. Robyn James and Tiffany Belle v. American Corporate Security, Inc. | Superior Court of the State of California, for the County of Los Angeles | BC525388 | Declaration | August 2017 | Plaintiff |
| 35. Janae Brown v. Blazin' Wings, Inc. | Superior Court of the State of California, for the County of Los Angeles | BC620185 | Declaration Declaration | October 2017 July 2018 | Plaintiff |

# EXHIBIT A

**D 069**

Econ One Research, Inc.
Los Angeles, California

**DR. BRIAN KRIEGLER**
*Prior Testimony/Reports*

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Reports | Date | On Behalf Of |
|---|---|---|---|---|---|---|
| 36. | Te'quonna Lampkins et al. v. JP Morgan Chase Bank | United States District Court, Central District of California | 11-CV-03428-PSG (PLAx) | Expert Report Supplemental Expert Report Expert Report Errata Supplemental Expert Report Errata Deposition | February 2018 March 2018 March 2018 March 2018 | Plaintiff |
| 37. | Juan Garcia v. Walmart Stores, Inc. | United States District Court, Central District of California | 5:16-CV-01645 TJH (RAOx) | Declaration Reply Declaration | February 2018 May 2018 | Plaintiff |
| 38. | Landon Fulmer, Jr. v. Golden State Drilling | Superior Court of the State of California, for the County of Kern | S-1500-CV-279707 | Deposition | April 2018 | Plaintiff |
| 39. | Emmy Song v. THC-Orange County | United States District Court, Central District of California | 8:17-cv-00965-JLS-DFMx | Declaration Deposition | April 2018 May 2018 | Plaintiff |
| 40. | Chelsea Hamilton v. Walmart Stores, Inc. | United States District Court, Central District of California | 5:17-CV-01415 | Declaration Deposition Reply Declaration Declaration | June 2018 July 2018 August 2018 September 2018 | Plaintiff |
| 41. | Nicole Woodworth v. Loma Linda University Medical Center | Superior Court of the State of California, for the County of San Bernardino | CIVDS1408640 | Declaration Declaration | June 2018 June 2018 | Plaintiff |

## EXHIBIT A

Econ One Research, Inc.
Los Angeles, California

**DR. BRIAN KRIEGLER**
*Prior Testimony/Reports*

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Reports | Date | On Behalf Of |
|---|---|---|---|---|---|---|
| 42. | Roderick Magadia v. Walmart Associates, Inc. | United States District Court, Northern District of California | 17-CV-00062-LHK | Expert Report Deposition | July 2018 September 2018 | Plaintiff |
| 43. | Christopher Wilson v. Harbor Rail Services | Superior Court of the State of California, for the County of Los Angeles | BC598348 | Declaration | July 2018 | Plaintiff |
| 44. | Candice Ritenour v. Carrington Mortgage Services, LLC | United States District Court, Central District of California | 8:16-CV-02011-CJC-DFM | Declaration | August 2018 | Plaintiff |
| **Civil Rights** | | | | | | |
| 45. | Dianna Johnson v. United States Marshals | U.S. District Court, District of Columbia | 02-2364 (RMC) | Declaration Declaration | July 2007 April 2010 | Plaintiff |
| 46. | Marsial Lopez v. Sheriff Donny Youngblood | U.S. District Court, Eastern District of California | CV-F-07-0474 DLB | Declaration | June 2008 | Plaintiff |
| 47. | Thomas Lee Goldstein v. City of Long Beach, John Henry Miller, William Collette, and Logan Wren | U.S. District Court, Central District of California | CV 04-9692 AHM (Ex) | Expert Report Deposition Declaration | November 2009 February 2010 June 2010 | Plaintiff |

# EXHIBIT A

**D 071**

Econ One Research, Inc.
Los Angeles, California

**DR. BRIAN KRIEGLER**
*Prior Testimony/Reports*

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Reports | Date | On Behalf Of |
|---|---|---|---|---|---|---|
| 48. | Carl A. Barnes v. District of Columbia | U.S. District Court, District of Columbia | 06-315 (RCL) | Declaration<br>Expert Report<br>Expert Report<br>Deposition<br>Declaration<br>Expert Report<br>Declaration<br>Expert Report<br>Deposition<br>Expert Report<br>Trial | March 2010<br>November 2010<br>December 2010<br>December 2010<br>November 2011<br>February 2012<br>March 2012<br>June 2012<br>October 2012<br>November 2012<br>March 2013 | Plaintiff |
| 49. | Eric Jones v. Baltimore City Police Department, et al. | U.S. District Court, District of Maryland | CCB 05 CV 1267 | Declaration<br>Deposition<br>Declaration | July 2010<br>October 2010<br>January 2011 | Plaintiff |
| 50. | Mary Amador v. Sheriff Leroy Baca, et al. | U.S. District Court, Central District of California | CV 10-1649 SVW (JEMx) | Declaration<br>Declaration<br>Declaration<br>Declaration<br>Declaration | October 2010<br>January 2011<br>June 2013<br>July 2013<br>February 2016 | Plaintiff |
| 51. | C. Alen Powell v. Jacqueline H. Barrett, et al. | U.S. District Court, Northern District of Georgia, Atlanta Division | 1:04-CV-1100 (RWS) | Declaration | October 2011 | Plaintiff |

# EXHIBIT A

Econ One Research, Inc.
Los Angeles, California

**DR. BRIAN KRIEGLER**
*Prior Testimony/Reports*

| Proceeding | Court/Commission/Agency | Docket or File | Deposition/Trial/Reports | Date | On Behalf Of |
|---|---|---|---|---|---|
| 52. | Duncan Roy v. Sheriff Leroy Baca, et al. | U.S. District Court, Central District of California | CV 12-09012 BRO (FFMx) | Declaration Declaration Rebuttal Declaration Declaration Declaration | July 2014 May 2016 July 2016 May 2018 May 2018 | Plaintiff |
| **False Claims Act** | | | | | |
| 53. | U.S. ex rel. Carlo Santa Ana v. Winter Park Urology Associates, P.A., et al. | U.S. District Court, Middle District of Florida | 6:10-CV-806-28TBS | Expert Report Deposition | December 2012 February 2013 | Plaintiff |
| 54. | U.S. ex rel. Misty Wall v. VistaCare Hospice Care, et al. | U.S. District Court, Northern District of Texas | 3-07-CV-0604-M | Declaration Declaration Expert Report Rebuttal Report Deposition Declaration | August 2014 September 2014 July 2015 January 2016 January 2016 April 2016 | Plaintiff |
| 55. | U.S. ex rel. Laura Lovett and Lisa Mayhew v. Hotzer Clinic | U.S. District Court, Southern District of Ohio, Eastern Division | 2:08-CV-312 | Expert Report | March 2015 | Plaintiff |
| **Breach of Contract** | | | | | |
| 56. | In the Matter of City of Moss Point v. FEMA | U.S. Civilian Board of Contract Appeals | CBCA 2346-FEMA | Arbitration Hearing | June 2012 | Plaintiff |

# EXHIBIT A

Econ One Research, Inc.
Los Angeles, California

**DR. BRIAN KRIEGLER**
*Prior Testimony/Reports*

| Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Reports | Date | On Behalf Of |
|---|---|---|---|---|---|
| 57. Amtrust North America, Inc., v. SquareTrade Inc. | Judicial Arbitration and Mediation Services, San Francisco Office | 1100079447 | Expert Report Supplemental Expert Report Declaration Arbitration Hearing Rebuttal Declaration | April 2015 May 2015 June 2015 June 2015 July 2015 | Claimant |
| 58. Michael Nozzi v. Housing Authority of the City of Los Angeles, et al. | United States District Court, Central District of California | CV07-00380-PA (FFMx) | Declaration Expert Report Supplemental Expert Report Declaration | April 2016 February 2017 March 2017 March 2017 | Plaintiff |
| 59. Amtrust North America, Inc. v. SquareTrade, Inc. | Judicial Arbitration and Mediation Services, San Francisco Office | 1100086491 | Expert Report | March 2018 | Claimant |
| **Consumer Class Actions** | | | | | |
| 60. Christopher O'Shea v. Epson America, Inc., et al. | U.S. District Court, Central District of California | CV09-8063 PSG (CWx) | Declaration | February 2011 | Plaintiff |
| 61. Manny Villanueva v. Fidelity National Title Company | Superior Court of the State of California, for the County of Santa Clara | 1-10-CV-173356 | Deposition Declaration Deposition Trial | March 2014 April 2014 April 2014 April 2014 | Plaintiff |
| 62. Charlene Eike v. Allergan, Inc., et al. | U.S. District Court, East St. Louis Division | 3:12-CV-01141-DRH-DGW | Expert Report Deposition | May 2014 August 2014 | Plaintiff |

# EXHIBIT A

Econ One Research, Inc.
Los Angeles, California

**DR. BRIAN KRIEGLER**
*Prior Testimony/Reports*

| Proceeding | Court/Commission/Agency | Docket or File | Deposition/Trial/Reports | Date | On Behalf Of |
|---|---|---|---|---|---|
| 63. Ronald McAllister v. The St. Louis Rams, LLC | U.S. District Court, Eastern District of Missouri | 4:16-CV-00172-SNLJ | Rebuttal Report Deposition | August 2017 September 2017 | Plaintiff |
| **Miscellaneous** | | | | | |
| 64. 2009 Aircraft Tax Refund Cases: American Airlines, Inc. v. County of Los Angeles, et al, and United Airlines, Inc. v. County of Los Angeles | Superior Court of the State of California, for the County of Orange | JCCP 4603 / BC547243 / BC550656 | Declaration | July 2017 | Court Appointed |

**EXHIBIT A**

**D 075**

# ATTACHMENT

# 2

**EXHIBIT A**

**Formulas and Data Sources Used to Calculate Damages, Pre-Judgment Interest, and Penalties**

| Subclass(es) / Description | Computation | Timekeeping Data | Payroll Data | Turnstile Data | Surveillance Footage | Shift Patterns | Ergonomical Analysis | Dates of Employment |
|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
| **Damages** | | | | | | | | |
| Security Checkpoint / Overtime Subclasses | Time Off-the-Clock x Applicable Rate of Pay | X | X | X | X | | X | |
| Alternative Workweek Subclass | Underpaid Overtime Hours x Regular Rate of Compensation x 0.5 | X | X | | | X | | |
| Meal Break Subclass (assuming all meal periods are non-compliant) | Number of Workdays on which a Missed Meal Premium is Owed x Regular Rate of Compensation | X | X | | | | | |
| Meal Break Subclass (for Not Under 30-Minute Meals only) | Number of Workdays on which a Missed Meal Premium is Owed x Regular Rate of Compensation | X | X | X | X | | X | |
| **Pre-Judgment Interest and Penalties** | | | | | | | | |
| Pre-Judgment Interest | *For each pay period:* Interest Rate x Wages Owed x Number of Years Since Pay Period | | X | | | | | |
| Waiting Time Penalty Subclass | *For each former employee:* 30 Days x Average Daily Wage* | X | X | | | | | X |
| Wage Statement Penalty Subclass (attributed to OVERTIME/INCT payments) | *For each class member:* Number of Pay Periods in which Wages are Owed x $100 - $50, not to exceed $4,000 | | X | | | | | |
| Wage Statement Penalty Subclass (attributed to unpaid wages or meal premiums) | *For each class member:* Number of Pay Periods in which Wages are Owed x $100 - $50, not to exceed $4,000 | X | X | | | | | |

* - The "Average Daily Wage" is computed one of two ways: using the average across the entire tenure of employment, and alternatively, using the average across the final pay period of employment.

**EXHIBIT A**

Econ One
9/21/2018

# ATTACHMENT
# 3

**EXHIBIT A**

D 078

## Summary of Classwide Damages and Pre-Judgment Interest
## Through February 2018*

|  |  | Count /<br>Dollar Amount |
|---|---|---:|
| **1. Alternative Workweek Subclass – Using Only Shift Pattern Data** | | |
| a. Number of Class Members with Underpaid Overtime | | 1,115 |
| b. Number of Underpaid Overtime Hours | | 131,506 |
| c. Principal Damages | $ | 962,473 |
| d. Pre-Judgment Interest | $ | 195,736 |
| **2. Alternative Workweek Subclass – Using Shift Pattern Data and Imputed Shift Assignments** | | |
| a. Number of Class Members with Underpaid Overtime | | 1,840 |
| b. Number of Underpaid Overtime Hours | | 179,226 |
| c. Principal Damages | $ | 1,333,340 |
| d. Pre-Judgment Interest | $ | 272,469 |
| **3. Meal Break Subclass (assuming all meal periods are non-compliant)** | | |
| a. Number of Class Members with Missed Meal Premiums Owed | | 3,753 |
| b. Number of Missed Meal Premiums Owed | | 319,416 |
| c. Principal Damages | $ | 4,820,043 |
| d. Pre-Judgment Interest | $ | 943,293 |
| **4. Meal Break Subclass (for Net Under 30-Minute Meals)**\*\* | | |
| a. Number of Class Members with Missed Meal Premiums Owed | | 1,803 |
| b. Number of Missed Meal Premiums Owed | | 20,158 |
| c. Principal Damages | $ | 300,280 |
| d. Pre-Judgment Interest | $ | 60,298 |

\* - The last day in Walmart's timekeeping data production is February 16, 2018.
The last payroll run date in Walmart's payroll data production is February 18, 2018.
\*\* - For recorded meal breaks of exactly 30 minutes only.

Econ One
9/21/2018

# EXHIBIT A

# ATTACHMENT 4

**EXHIBIT A**

D 080

### Criteria for Determining Shift Assignments

| Step | Description | Percent of Workweeks Categorized | Cumulative Percent |
|:---:|:---|:---:|:---:|
| (1) | (2) | (3) | (4) |
| 1. | Assign weeks as a "Weekday Morning," "Weekday Night," "Weekend Morning," or "Weekend Night" using the Shift Pattern Data. | 45.46 % | 45.46 % |
| 2. | Apply the shift assignment to the overall employee if they only ever have one kind of shift as defined in step (1) above and the employee never meets the criteria for a 5 x 8 workweek.[a] | 8.89 % | 54.34 % |
| 3. | Assign weeks a shift assignment in the following way:<br>a. Weekend morning:<br>  i. Three shifts of between 10.75 and 11.75 hours that start before 10am on Saturday, Sunday, and Monday<br>  ii. Fewer than 3 weekend night shifts<br>  iii. Fewer than 4 weekday morning shifts<br>  iv. Fewer than 4 weekday night shifts<br>b. Weekend night:<br>  i. Three shifts of between 10.75 and 11.75 hours that start at 3pm or later on Saturday, Sunday, and Monday<br>  ii. Fewer than 3 weekend morning shifts<br>  iii. Fewer than 4 weekday morning shifts<br>  iv. Fewer than 4 weekday night shifts<br>c. Weekday morning:<br>  i. Four shifts of between 9.5 and 10.5 hours long that start before 10am on Tuesday, Wednesday, Thursday, and Friday<br>  ii. Fewer than 3 weekend morning shifts<br>  iii. Fewer than 3 weekend night shifts<br>  iv. Fewer than 4 weekday night shifts<br>d. Weekday night:<br>  i. Four shifts of between 9.5 and 10.5 hours long that start at 3pm or later on Tuesday, Wednesday, Thursday, and Friday<br>  ii. Fewer than 3 weekend morning shifts<br>  iii. Fewer than 3 weekend night shifts<br>  iv. Fewer than 4 weekday morning shifts | 12.34 % | 66.68 % |
| 4. | Use the most common shift in each week if the shift type accounts for more than 50% of the shifts in the week. | 3.04 % | 69.73 % |
| 5. | Define all remaining weeks as "Other." | 30.27 % | 100.00 % |

[a] A 5 x 8 workweek is defined as a workweek with shifts of less than 9 hours and shifts on Monday, Tuesday, Wednesday, Thursday, and Friday.

# EXHIBIT A

Econ One
9/21/2018

D 081

# ATTACHMENT 5

**EXHIBIT A**

D 082

**Summary of Classwide Waiting Time and Wage Statement Penalties**
**Through February 2018\***

| | Number of Employees | Classwide Penalties |
|---|---|---|
| Waiting Time Penalty Subclass Using Each Employee's Average Daily Wage during Their Entire Tenure | | |
| 1. All Employees Terminated Between June 8, 2014 and August 21, 2018 | 2,038 | $ 7,708,083 |
| a. Within the Alternative Workweek Subclass Using Only Shift Pattern Data | 507 | 2,039,014 |
| b. Within the Alternative Workweek Subclass Using Shift Pattern and Timekeeping Data | 812 | 3,265,976 |
| c. Within the Meal Break Subclass (assuming all meal periods are non-compliant) | 2,007 | 7,647,205 |
| d. Within the Meal Break Subclass (for Net Under 30-Minute Meals)\*\* | 864 | 3,653,850 |
| e. Within [1a] and/or [1c] | 2,007 | 7,647,205 |
| f. Within [1a] and/or [1d] | 1,107 | 4,399,578 |
| g. Within [1b] and/or [1c] | 2,007 | 7,647,205 |
| h. Within [1b] and/or [1d] | 1,287 | 5,161,109 |
| | | |
| Waiting Time Penalty Subclass Using Each Employee's Average Daily Wage during Their Last Pay Period | | |
| 2. All Employees Terminated Between June 8, 2014 and August 21, 2018 | 2,038 | $ 7,713,572 |
| a. Within the Alternative Workweek Subclass Using Only Shift Pattern Data | 507 | 2,007,605 |
| b. Within the Alternative Workweek Subclass Using Shift Pattern and Timekeeping Data | 812 | 3,284,158 |
| c. Within the Meal Break Subclass (assuming all meal periods are non-compliant) | 2,007 | 7,653,349 |
| d. Within the Meal Break Subclass (for Net Under 30-Minute Meals)\*\* | 864 | 3,381,052 |
| e. Within [2a] and/or [2c] | 2,007 | 7,653,349 |
| f. Within [2a] and/or [2d] | 1,107 | 4,354,402 |
| g. Within [2b] and/or [2c] | 2,007 | 7,653,349 |
| h. Within [2b] and/or [2d] | 1,287 | 5,102,918 |
| | | |
| Wage Statement Penalty Subclass – 3-Year SOL | | |
| 3. All Employees Between June 8, 2014 and August 21, 2018 | 3,821 | $ 4,884,700 |
| a. Within the Alternative Workweek Subclass Using Only Shift Pattern Data | 1,115 | 1,349,450 |
| b. Within the Alternative Workweek Subclass Using Shift Pattern and Timekeeping Data | 1,840 | 1,777,650 |
| c. Within the Meal Break Subclass (assuming all meal periods are non-compliant) | 3,753 | 4,779,300 |
| d. Within the Meal Break Subclass (for Net Under 30-Minute Meals)\*\* | 1,803 | 759,850 |
| e. Within [3a] and/or [3c] | 3,753 | 4,779,300 |
| f. Within [3a] and/or [3d] | 2,321 | 1,830,550 |
| g. Within [3b] and/or [3c] | 3,753 | 4,779,300 |
| h. Within [3b] and/or [3d] | 2,694 | 2,296,450 |
| i. With OVERTIME/INCT Payments | 2,668 | 489,100 |

Econ One
9/21/2018

# EXHIBIT A

**D 083**

**Summary of Classwide Waiting Time and Wage Statement Penalties**
**Through February 2018\***

| | Number of Employees | Classwide Penalties |
|---|---|---|
| Wage Statement Penalty Subclass - 1-Year SOL | | |
| 4. All Employees Between June 8, 2016 and August 21, 2018 | 3,776 | $ 4,686,700 |
| a. Within the Alternative Workweek Subclass Using Only Shift Pattern Data | 1,010 | 1,153,200 |
| b. Within the Alternative Workweek Subclass Using Shift Pattern and Timekeeping Data | 1,795 | 1,609,850 |
| c. Within the Meal Break Subclass (assuming all meal periods are non-compliant) | 3,710 | 4,579,700 |
| d. Within the Meal Break Subclass (for Net Under 30-Minute Meals)\*\* | 1,756 | 698,400 |
| e. Within [4a] and/or [4c] | 3,709 | 4,579,700 |
| f. Within [4a] and/or [4d] | 2,269 | 1,705,200 |
| g. Within [4b] and/or [4c] | 3,709 | 4,579,700 |
| h. Within [4b] and/or [4d] | 2,655 | 2,310,300 |
| i. With OVERTIME/INCT Payments | 2,656 | 441,800 |

\* - The last day in Walmart's timekeeping data production is February 16, 2018.
The last payroll run date in Walmart's payroll data production is February 18, 2018.
\*\* - For recorded meal breaks of exactly 30 minutes only.

Page 2 of 2

**EXHIBIT A**

Econ One
9/21/2018

D 084

# EXHIBIT 4

D 085

Filed 5/30/18

## **CERTIFIED FOR PARTIAL PUBLICATION\*\***

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| FABIO CANALES et al., | B276127 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC502826) |
| v. | |
| WELLS FARGO BANK, N.A., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, John Shepard Wiley, Jr., Judge.  Affirmed.

Law Offices of Sherry Jung and Larry W. Lee; Hyun Legal, Dennis S. Hyun for Plaintiffs and Appellants.

Kading Briggs, Glenn L. Briggs, Theresa A. Kading and Nisha Verma, for Defendant and Respondent.

_____

\*\*  Pursuant to California rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts III(B) and III(C).

**D 086**

# I.  INTRODUCTION

Plaintiffs Fabio Canales and Andy Cortes, on behalf of themselves and class members, appeal from a summary judgment.  Plaintiffs were former or current non-exempt employees of defendant Wells Fargo Bank, N.A.  Plaintiffs alleged that their wage statements failed to include information required under Labor Code[1] section 226, subdivision (a)(9).  Specifically, plaintiffs argued that a line on the wage statement, "OverTimePay-Override," should, but did not, include hourly rates and hours worked.  Plaintiffs also alleged defendant violated section 226 by failing to provide a wage statement concurrently with the terminated employees' final wages paid in-store.  Plaintiffs moved for summary adjudication on the section 226 cause of action.

Defendant in its summary judgment motion argued that OverTimePay-Override reflected additional overtime pay that was owed for work performed on a previous pay period, but could not be calculated because it was based on a nondiscretionary bonus not yet earned.  Under subdivision (a)(9), defendant contended OverTimePay-Override did not have corresponding hourly rates or hours worked for the current pay period.  As to plaintiffs' second theory, defendant asserted it complied with the statute by furnishing the wage statement by mail.  The trial court found in favor of defendant and against plaintiffs.

---

[1]      Further statutory references are to the Labor Code unless otherwise indicated.

2

Plaintiffs contend the trial court erred by denying their summary adjudication motion and by granting defendant's motion.  We affirm.

## II.  BACKGROUND

A.  *Factual Background*[2]

Plaintiffs are current or former non-exempt California employees of defendant.  Defendant would in some instances issue a paycheck and wage statement that contained nondiscretionary incentive compensation[3] (the bonus) to employees who worked during the period covered by the incentive compensation.  These bonus periods would be monthly, quarterly, or annually.  For employees who worked overtime during those bonus periods, the wage statements contained a line item called "OverTimePay-Override," formerly called "OT-Flat." OverTimePay-Override listed incremental additional overtime paid to the employee for overtime hours worked during the bonus

---

[2]     All facts are considered undisputed for purposes of summary judgment.

[3]     Teresa Swanson, defendant's person most knowledgeable, stated that a nondiscretionary bonus was "given to a team member, based on some sort of preset work definition, goal, something that they have to meet.  And then they earn that bonus."  It appears this bonus was a production or piecework bonus.

3

period under the "Earnings" column.[4]  For the OverTimePay-
Override line on the wage statements, no hourly rates or hours
worked was identified.

In certain situations, defendant issued final wages to
employees at the time of their termination through "in-store
payments" made by cashier's check.  Defendant's payroll
department would then create the wage statement either the
same day or the next day and mail it to the terminated employee
by United States mail.[5]  During their employment, employees
had online access to their itemized wage statements.  Employees
lost such online access the day after termination.

---

[4]     To calculate the amount to be entered on the OverTimePay-
Override line:  (1) take the bonus earned during the bonus period,
whether it be by year, quarter, or month; (2) divide the bonus by
the total number of hours worked during the bonus period; (3)
multiply the resulting number by 0.5; (4) multiply the resulting
number by the total number of overtime hours worked during the
bonus period.

Our Supreme Court in a recent decision concerning flat
sum bonuses under California law decided that the proper
method for calculating the rate of overtime pay when an
employee receives both an hourly wage and a flat sum bonus is to
divide the bonus by the number of nonovertime hours actually
worked during the bonus period.  (*Alvarado v. Dart Container
Corp. of California* (2018) 4 Cal.5th 542, 562 (*Alvarado*).)  The
Supreme Court specifically excluded production or piecework
bonuses or a commission from its holding.  (*Id.* at p. 561, fn. 6.)

[5]     Plaintiffs asserted in their opening brief, without citation to
the record, that they never received their wage statements.  We
will disregard such assertions as meritless.  (*Susag v. City of
Lake Forest* (2002) 94 Cal.App.4th 1401, 1416.)

4

B. *First Amended Complaint*

Plaintiffs filed their first amended complaint, the operative pleading, on June 20, 2013.  Plaintiffs sued on behalf of themselves and a class composed of (1) current or former non-exempt California employees of defendant who received OverTimePay-Override from March 13, 2012 to present and (2) all former California employees of defendant who were terminated from March 13, 2012 to present and were paid their final wages through the "in-store payment" procedure.  In their first cause of action, plaintiffs alleged defendant violated section 226[6] by failing to identify the hourly rates and the hours worked

_____

[6]     At the time of the alleged offenses, section 226, subdivision (a)(9) provided in pertinent part: "(a) Every employer shall, semimonthly or at the time of each payment of wages, furnish each of his or her employees, either as a detachable part of the check, draft, or voucher paying the employee's wages, or separately when wages are paid by personal check or cash, an accurate itemized statement in writing showing . . . (9) all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee . . . ." (Stats. 2012, ch. 844, § 1.7.)  Subdivision (a)(9) was added by the Legislature in 2000.  (Stats. 2000, ch. 876, § 6.)

Section 226, subdivision (a) was amended by the Legislature in 2016 to read in pertinent part: "An employer, semimonthly or at the time of each payment of wages, shall furnish to his or her employee, either as a detachable part of the check, draft, or voucher paying the employee's wages, or separately if wages are paid by personal check or cash, an accurate itemized statement in writing . . . ." (Stats. 2016, ch. 77, § 1, eff. Jan 1, 2017.)  Subdivision (a)(2) was also amended, and subdivision (j) was added.  (*Ibid.*)  The 2016 amendment does not substantively affect our opinion.

D 090

that corresponded to OverTimePay-Override.  Plaintiffs also
alleged defendant violated section 226 by failing to provide
terminated employees with wage statements immediately upon
termination.  Plaintiffs alleged a second cause of action pursuant
to the Private Attorneys General Act (§ 2698 et seq.) (PAGA) for
violation of section 226.[7]

C.  *Summary Adjudication/Judgment Motions*

On December 15, 2015, plaintiffs moved for summary
adjudication.[8]  Much like the allegations in their amended
complaint, plaintiffs argued that defendant violated section 226,
subdivision (a)(9) by failing to specify the hourly rates and
number of hours worked for the OverTimePay-Override
adjustment on the itemized wage statements.  Plaintiffs also
argued defendant violated section 226 by failing to provide to
terminated employees an itemized wage statement concurrently
with their final wages that were paid in-store by cashier's check.
Defendant filed its own summary judgment motion on
December 15, 2015.  Defendant asserted it did not violate section
226, subdivision (a)(9) because OverTimePay-Override
represented an increase in overtime pay, based on a periodic

--------

[7]    A third plaintiff, Luciano Gonzales, was initially part of
this action.  However, Gonzales was not named as a class
representative in plaintiffs' motion for class certification and is
not an appellant.  The class was certified on March 20, 2015.

[8]    Though plaintiffs categorized their motion as one for
summary judgment or in the alternative, summary adjudication,
plaintiffs sought only summary adjudication as to their first
cause of action for violation of section 226.

6

bonus, for overtime hours worked in previous pay periods. Defendant argued there were no "applicable **hourly rates** in effect **during the pay period**" that corresponded to OverTimePay-Override and thus defendant did not have to provide such information on the wage statement.  As to plaintiffs' second theory, defendant contended it furnished the itemized statement as required under section 226 by mailing it to the terminated employee's last known address either the same day or the next day.  Finally, defendant argued plaintiffs' PAGA cause of action failed because it was wholly derivative of a violation based on section 226 and because plaintiffs failed to exhaust administrative remedies.  Plaintiffs do not dispute their PAGA cause of action is derivative of the section 226 claims.

On May 26, 2016, the trial court issued its order granting defendant's motion and denying that of plaintiffs.  As to defendant's first argument, the trial court agreed that section 226, subdivision (a)(9) did not apply to OverTimePay-Override because there was no applicable hourly rate for the pay period reflected in the wage statement.  For defendant's second argument, the trial court found that defendant complied with the "furnish" requirement under section 226 by mailing the wage statement.

## III.  DISCUSSION

A.  *Standard of Review*

"[F]rom commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to

7

judgment as a matter of law.  That is because of the general principle that a party who seeks a court's action in his favor bears the burden of persuasion thereon.  [Citation.]  There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof. . . .  [¶]  [T]he party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact. . . .  A prima facie showing is one that is sufficient to support the position of the party in question.  [Fns. omitted.]"  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850-851.)

We review an order granting summary judgment de novo. (*Coral Construction, Inc. v. City and County of San Francisco* (2010) 50 Cal.4th 315, 336.)  The trial court's stated reasons for granting summary judgment are not binding because we review its ruling not its rationale.  (*Ibid.*)  In addition, a summary judgment motion is directed to the issues framed by the pleadings.  (*Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1252.)  These are the only issues a motion for summary judgment must address.  (*Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244, 1250.)

This appeal solely involves statutory interpretation.  "The proper interpretation of a statute, and its application to undisputed facts, presents a question of law that is . . . subject to de novo review."  (*Morgan v. United Retail Inc.* (2010) 186

8

Cal.App.4th 1136, 1142 (*Morgan*).)  "'As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose.' [Citation.]  The well-established rules for performing this task require us to begin by examining the statutory language, giving it a plain and commonsense meaning. [Citation.]  We do not, however, consider the statutory language in isolation; rather, we look to the statute's entire substance in order to determine its scope and purposes.  [Citation.]  That is, we construe the words in question in context, keeping in mind the statute's nature and obvious purposes.  [Citation.]  We must harmonize the statute's various parts by considering it in the context of the statutory framework as a whole.  [Citation.]  If the statutory language is unambiguous, then its plain meaning controls.  If, however, the language supports more than one reasonable construction, then we may look to extrinsic aids, including the ostensible objects to be achieved and the legislative history." (*Los Angeles County Metropolitan Transportation Authority v. Alameda Produce Market, LLC* (2011) 52 Cal.4th 1100, 1106-1107; *Morgan, supra*, 186 Cal.App.4th at pp. 1142-1143.)

B.  *Nondiscretionary Bonuses and Overtime Pay*

We first discuss the nature of nondiscretionary bonuses and how they relate to overtime pay under the Labor Code.  Pursuant to section 510, subdivision (a), an employer must pay one and a half times an employee's "regular rate of pay" if he or she works more than 40 hours per week or more than 8 hours per day. Nondiscretionary bonuses are considered part of the "regular rate

9

of pay." (*Marin v. Costco Wholesale Corp.* (2008) 169 Cal.App.4th 804, 807 (*Marin*); see 29 C.F.R. § 778.209 (2012) [federal method of explaining regular rate of pay calculation for bonuses].)

In order to calculate overtime pay for an employee paid at an hourly rate, an employer must allocate the bonus over the period in which it was earned.   (*Marin, supra*, 169 Cal.App.4th at p. 807; Chin et al., Cal. Practice Guide: Employment Litigation (The Rutter Group 2017) ¶ 11:906 ["A bonus or prize paid in cash is allocated *over the period during which it was earned* to determine the increase in the average hourly rate for each week of the period"].)   To explain this using an example, take a hypothetical employee wage statement for the period of January 7 to January 20, 2018.[9]   This hypothetical wage statement would include an hourly regular rate, the number of regular hours worked during the pay period of January 7 to January 20, the hourly overtime rate, and the number of overtime hours worked during the pay period of January 7 to January 20.   The hypothetical employee earned a $360 monthly bonus for work performed during the previous month of December, from December 1 to December 31, 2017.   This bonus would be reflected on the January 7 to January 20, 2018 wage statement.[10]   To calculate the OverTimePay-Override line, the

_____

[9]      We have provided these dates, but defendant used the hours and bonus figures in their respondent's brief as an illustration to calculate OverTimePay-Override.   Plaintiffs have not disputed the accuracy of defendant's method.

[10]      Section 204, subdivision (b)(1) provides, "all wages earned for labor in excess of the normal work period shall be paid no later than the payday for the next regular payroll period."

10

hours worked in December 2017 would be used because that is the time period in which the bonus was earned.  In this hypothetical, the employee had worked 160 regular hours and 20 overtime hours in December 2017, for a total of 180 hours.  First, divide $360 by 180, which results in $2.  This number represents the increase to the regular hourly rate.  Multiply $2 by 0.5 and the result, $1, represents the increase to the overtime hourly rate.  Then, take $1 and multiply it by 20, the overtime hours worked during December 2017, and the result, $20, is the overtime pay adjustment, which would be identified as the OverTimePay-Override line on the wage statement.  This allocation, at least for production or piecework bonuses, is calculated by using the method described above in footnote 4.

C. *Section 226, Subdivision (a)(9) Does Not Require Hourly Rate and Hours Worked to be Identified For OverTimePay-Override*

The Court of Appeal in *Morgan* discussed the purpose of section 226, subdivision (a)(9):  "The 2000 amendment [which added subdivision (a)(9)] . . . expanded the scope of information to be included by employers in the itemized wage statements furnished to employees.  Following the amendment, an employer

---

Plaintiffs contend that pursuant to *Peabody v. Time Warner Cable, Inc.* (2014) 59 Cal.4th 662, 669, defendant was prevented from paying OverTimePay-Override for wages earned in prior pay periods.  *Peabody v. Time Warner Cable, Inc.*, is inapposite. In that case, our Supreme Court held an employer could not attribute wages paid in one period to a prior pay period in order to meet an exemption for minimum wages.  (*Ibid.*)  It has no application to the OverTimePay-Override line at issue here.

11

that previously listed the total hours worked by an employee in a single category [as required under subdivision (a)(2)] was now required to list both the total regular hours worked and the total overtime hours worked, along with the corresponding hourly rates.  It appears that by adding this more specific requirement, the statute made it easier for employees to determine whether they were being paid for all hours worked at the appropriate rates of pay."  (*Morgan, supra*, 186 Cal.App.4th at p. 1148.)

Subdivision (a)(6) requires that the wage statement show "the inclusive dates of the period for which the employee is paid." Applying the standards of statutory construction, in the context of section 226 as a whole, the "pay period" discussed in subdivision (a)(9), which requires that the wage statement include "all applicable hourly rates in effect during the pay period," refers to the period described in subdivision (a)(6).  In our hypothetical wage statement above, we interpret the pay period to refer to the two-week period covered by the wage statement, January 7 to January 20, 2018.

Defendant argues it was not required to provide on the wage statement hourly rates or hours worked related to OverTimePay-Override.  Defendant has met its initial burden of production.  (Code Civ. Proc., § 437c, subd. (p)(2).)  Based on the above statutory construction and the method by which OverTimePay-Override was calculated, there were no "applicable **hourly rates** in effect **during the pay period**" that corresponded to OverTimePay-Override.  Accordingly, there was also no "corresponding number of hours worked at each hourly rate by the employee" for the pay period that applied to OverTimePay-Override.  As discussed above, OverTimePay-Override represented additional wages that were earned as

12

overtime pay based on nondiscretionary bonuses being spread
over the hours worked during the bonus period.  Moreover, based
on how OverTimePay-Override was calculated, the overtime
hours were worked in *previous* pay periods for which employees
had already received their standard overtime pay.  The itemized
wage statement issued by an employer need only provide the
applicable hourly rates and the corresponding number of hours
worked "in effect during the pay period."  In other words, the
employer need only identify on the wage statement the hourly
rate in effect during the pay period for which the employee was
*currently* being paid, and the corresponding hours worked.

Plaintiffs argue to the contrary, but have failed to meet
their burden.  (Code Civ. Proc., § 437c, subd. (p)(2).)  "[S]ection
226, subdivision (a) is highly detailed, containing nine separate
categories that must be included on wage statements . . . .  When
a statute omits a particular category from a more generalized list,
a court can reasonably infer a legislative intent not to include
that category within the statute's mandate."  (*Soto v. Motel 6
Operating, L.P.* (2016) 4 Cal.App.5th 385, 391.)  The purpose of
spreading the bonus over the hours worked during the bonus
period is to calculate the "regular rate of pay" for overtime under
section 510.  Defendant's wage statements included the regular
rate of pay, the overtime rate of pay, and the hours worked at
each rate.  Each of these was "in effect during the pay period,"
January 7 to January 20 in our example.  The OverTimePay-
Override was an adjustment to the overtime payment due to an
employee, based on bonuses earned by the employee for work
performed during prior pay periods.  Accordingly, there were no
applicable hourly rates in effect during the pay period which
defendant was required to include in the wage statement.

13

D 098

Plaintiffs contend a federal district court case, *Ontiveros v. Safelite Fulfillment, Inc.* (C.D.Cal. 2017) 231 F.Supp.3d 531 (*Ontiveros*) is directly on-point and supports their position.  In *Ontiveros*, the district court found that the employer's wage statements were deficient for failing to report overtime wages associated with an installation bonus.  (*Id.* at pp. 540-541.)  The district court reasoned:  "It is undisputed that Plaintiff earned additional overtime wages if he worked overtime during the same period that an installation bonus was earned, as this bonus would lead to an increase in his regular rate under 29 C.F.R. § 778.109. . . . It is also undisputed that when Plaintiff earned installation bonuses, his wage statements reflected both the underlying bonus earned and the additional overtime wages owed as a single line item. . . . Finally, it is undisputed that the wage statement does not have information from which Plaintiff could calculate the additional overtime owed as a result of participation in the installation bonus program. . . . The Court concludes that the 'regular rate' is an 'applicable hourly rate.'  As such, the law requires that the regular rate appear on the face of the wage statement or else be ascertainable from the information included therein.  Because it was not possible to promptly and easily determine the regular rate from the wage statements when an employee was enrolled in the installation bonus program, the statements were deficient. [Fn. omitted.]"  (*Ibid.*)

*Ontiveros* is distinguishable.  *Ontiveros* involved a piece-rate compensation, paid weekly.  (231 F.Supp.3d at p. 535.)  Additionally, the bonus earned and additional overtime wages were reflected on the wage statement on one line, rather than being separated.  (*Id.* at p. 540.)  Finally, the bonus was based on

14

D 099

work performed during the pay period reflected in the wage statement. (See *id.* at p. 534.)

Plaintiffs also cite a May 17, 2002 opinion letter from the Division of Labor Standards Enforcement (DLSE). That letter concerned a unique situation in which an employer continually listed 86.67 hours as the hours worked by its employees during each pay period, regardless of whether it was true. The DLSE was concerned with an employer's failure to list all hours worked during the pay period, including overtime. To the extent the DLSE determined an employer must comply with section 226 when making additional overtime payments for work performed in prior pay periods, we conclude the DLSE opinion letter is not applicable. Accordingly, we find defendant should prevail as a matter of law on this theory.

D.  *No Violation for not Providing an Itemized Statement at Time of Termination*

Defendant argues it is in compliance with section 226, subdivision (a) because it "furnished" the wage statement to the discharged employee by United States mail. As noted, section 226, subdivision (a) provided, "[e]very employer shall, semimonthly or at the time of each payment of wages, furnish each of his or her employees, either as a detachable part of the check, draft, or voucher paying the employee's wages, or separately when wages are paid by personal check or cash, an accurate itemized statement in writing . . . ." It is undisputed defendant provided some discharged employees with their last wages in-store by cashier's check, in compliance with the Labor Code. (See §§ 201, subd. (a) ["[i]f an employer discharges an

15

employee, the wages earned and unpaid at the time of discharge are due and payable immediately"], 208 ["[e]very employee who is discharged shall be paid at the place of discharge"].)  "Furnish" means to "provide with what is needed," or to "supply" or "give." (Merriam-Webster's Collegiate Dict. (10th ed. 1993) p. 474, col. 1.)  Section 226 provides that an employer must furnish the wage statement as either "a detachable part of the check, draft, or voucher paying the employee's wages," or separately when the wages are paid by personal check or cash.  Other than that one provision, section 226 describes no other specific means by which an employer is to furnish the itemized statement to an employee. Thus, mailing the wage statement is a viable means to "furnish." Defendant could also furnish the wage statement separately because paying discharged employees by cashier's check was the equivalent of paying them by cash.[11]  However, the Legislature also provided for *when* an employer was to furnish the wage statement to the employee:  "semimonthly or at the time of each payment of wages."

---

[11]     As argued by defendant, a cashier's check was the equivalent of paying by cash.  (See *Gray1 CPB, LLC v. SCC Acquisitions, Inc.* (2015) 233 Cal.App.4th 882, 893-894, 896 [citing U. Com. Code, § 3310, cashier's check taken for obligation has same effect as cash].)  Plaintiffs argue for the first time in their reply brief that a cashier's check is not the equivalent of a personal check or cash for purposes of section 226.  This issue was not raised in the opening brief nor before the trial court and is therefore waived and forfeited.  (*Tellez v. Rich Voss Trucking, Inc.* (2015) 240 Cal.App.4th 1052, 1066; *SCI California Funeral Services, Inc. v. Five Bridges Foundation* (2012) 203 Cal.App.4th 549, 573, fn. 18; *Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739, 767.)

We first find that for purposes of the Labor Code, "at the time of each payment of wages" for discharged employees means "immediately."  As noted, a discharged employee's unpaid earned wages are due and payable "immediately."  (§ 201, subd. (a).)  When construing section 226 in relation to the Labor Code, the most logical construction of "at the time of each payment of wages" in section 226 for discharged employees is whenever the discharged employee receives his or her unpaid earned wages, which is "immediately."  Because defendant in some instances did not provide wage statements immediately to discharged employees, but rather mailed the statement to the employee's last known address the same day or the next day, defendant did not furnish the wage statement to these discharged employees "at the time of each payment of wages."

However, by the plain meaning of the statute, defendant also had the option of furnishing the wage statement semimonthly.  (§ 226, subd. (a).)  Additionally, nothing in section 226 suggests that an employer cannot furnish the wage statement prior to the semimonthly date.  For example, suppose an employer furnishes wage statements on the first and the fifteenth of each month.  The employer discharges an employee on the second of the month.  Per the statute's plain language, if an employer pays the final wages by personal check or cash, it has the option of furnishing the discharged employee with the wage statement on the fifteenth.  We find it illogical to conclude an employer violates section 226 by furnishing a wage statement *before* the semimonthly date has been reached.  If the employer furnishes the wage statement to the discharged employee on the fifth of the month, the employer has complied with the requirement that it furnish the wage statement to the employee

17

"semimonthly" because the employee would have ostensibly been furnished with the wage statement by the semimonthly date.

For purposes of section 226, if an employer furnishes an employee's wage statement before or by the semimonthly deadline, the employer is in compliance. Thus, we interpret "semimonthly or at the time of each payment of wages" as representing the outermost deadlines by which an employer is required to furnish the wage statement. Since defendant mailed the wage statement to certain discharged employees paid in-store by the same day as or the next day after termination, defendant was in compliance with section 226 because the employee was "furnished" with the wage statement semimonthly. Defendant has met its initial burden of production. (Code Civ. Proc., § 437c, subd. (p)(2).)

Plaintiffs contend the wage statement must be furnished immediately for a discharged employee. Plaintiffs cite the DLSE Policies and Interpretations Manual (DLSE Manual), section 14.1.1, which provides, "[a] California employer must furnish a statement showing the following information to each employee at the time of payment of wages (or at least semimonthly, whichever occurs first)," and section 14.1.2, which provides, "[s]ection 226 . . . sets out the employer's responsibilities in connection with the wage statement which must accompany the check or cash payment to the employee."

Plaintiffs have not met their burden. (Code Civ. Proc., § 437c, subd. (p)(2).) There is no evidence in the record that the DLSE adopted this interpretation in accordance with the Administrative Procedure Act (Gov. Code, § 11340 et seq.). Thus, it is the equivalent of a void underground regulation. (*Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 576-

18

577.)  As our Supreme Court held, "when an agency like the
DLSE sets forth an interpretive policy in a void underground
regulation, the deference that the agency's interpretation would
normally enjoy is absent, but in its place the agency has its power
to persuade."  (*Alvarado, supra,* 4 Cal.5th 542, 559.)

The DLSE's interpretation is not persuasive.  The term
"whichever occurs first" is not in section 226.  The plain meaning
of the statute indicates the Legislature specifically intended a
choice for employers as to when to furnish the wage statement.
There is also no requirement in section 226 that the wage
statement "must accompany" the personal check or cash payment
to the employee.  As noted, the wage statement must be a
detachable part of the check, draft, or voucher, *unless* payment is
by personal check or cash; in such instance the wage statement
may be furnished separately.  (§ 226, subd. (a).)  Accordingly, we
decline to follow the DLSE's interpretation.

Plaintiffs cite several cases that purportedly determined
that section 226, subdivision (a) requires employers to furnish a
wage statement to each employee "at the time wages are paid."
(See *Zavala v. Scott Brothers Dairy, Inc.* (2006) 143 Cal.App.4th
585, 591 (*Zavala*); *Reinhardt v. Gemini Motor Transport*
(E.D.Cal. 2012) 879 F.Supp.2d 1138, 1141 (*Reinhardt*); *In re
Bimbo Bakeries USA FLSA Actions* (N.D.Cal. Oct. 24, 2008, No.
C 05-00829 JW) 2008 WL 10850153, at *7, 2008 U.S. Dist. Lexis
125068, at *23 (*Bimbo Bakeries*).)  Such statements were dicta as
the cases concerned issues unrelated to the one here.  (*Zavala,
supra*, 143 Cal.App.4th at pp. 592-593 [whether collective
bargaining agreement required arbitration of Labor Code claims];
*Reinhardt, supra*, 879 F.Supp.2d at pp. 1141-1142 [whether
plaintiffs sufficiently alleged Labor Code violations were

19

**D 104**

"'knowing and intentional'" for recovery under § 226, subd. (e)];
*Bimbo Bakeries, supra*, 2008 WL 10850153, at *7, 2008 U.S. Dist.
Lexis 125068, at *24 [whether defendant's violation was
"knowing and intentional" for summary judgment purposes].)
They are thus unpersuasive.

Defendant should prevail on this theory.  Because there are
no triable issues of material fact and defendant is entitled to
judgment as a matter of law, summary judgment was properly
granted in its favor.

## IV.  DISPOSITION

The judgment is affirmed.  Defendant Wells Fargo Bank,
N.A. is entitled to recover its costs on appeal from plaintiffs Fabio
Canales and Andy Cortes.

CERTIFIED FOR PARTIAL PUBLICATION


KIM, J.*


We concur:


KRIEGLER, Acting P.J.          BAKER, J.

---

*       Judge of the Los Angeles Superior Court, assigned by the
Chief Justice pursuant to article VI, section 6 of the California
Constitution.

20

# EXHIBIT 5

1              UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3          HONORABLE ANDRÉ BIROTTE JR., U.S. DISTRICT JUDGE

4

5    CHELSEA HAMILTON,                )
     INDIVIDUALLY AND ON BEHALF OF   )
6    ALL OTHERS SIMILARLY SITUATED,  )
     AND ALYSSA HERNANDEZ,            )
7    INDIVIDUALLY AND ON BEHALF OF   )
     ALL OTHERS SIMILARLY SITUATED,  )
8                                     )
                    PLAINTIFFS,       )
9                                     )
            vs.                       ) No. CV 17-1415-AB
10                                    )
     WAL-MART STORES, INC., A         )
11   CORPORATION, WAL-MART            )
     ASSOCIATES, INC., A              )
12   CORPORATION AND DOES 1 THROUGH   )
     50, INCLUSIVE,                   )
13                                    )
                    DEFENDANTS.       )
14   _____)

15

16

17            REPORTER'S TRANSCRIPT OF PROCEEDINGS

18               FRIDAY, AUGUST 17, 2018

19                    10:26 A.M.

20               LOS ANGELES, CALIFORNIA

21

22   _____

23        **CHIA MEI JUI, CSR 3287, CCRR, FCRR**
             FEDERAL OFFICIAL COURT REPORTER
24          350 WEST FIRST STREET, ROOM 4311
             LOS ANGELES, CALIFORNIA 90012
25              cmjui.csr@gmail.com

```
 1    APPEARANCES OF COUNSEL:

 2    FOR THE PLAINTIFFS:

 3           YOON LAW, APC
              BY:  KENNETH H. YOON, ATTORNEY AT LAW
 4            AND  STEPHANIE E. YASUDA, ATTORNEY AT LAW
              ONE WILSHIRE BOULEVARD
 5            SUITE 2200
              LOS ANGELES, CALIFORNIA 90017
 6            213-612-0988

 7
       FOR THE PLAINTIFFS:
 8
              LAW OFFICES OF G. SAMUEL CLEAVER
 9            BY:  G. SAMUEL CLEAVER, ATTORNEY AT LAW
              5670 WILSHIRE BOULEVARD
10            18TH FLOOR
              LOS ANGELES, CALIFORNIA 90036
11            310-388-7289

12
       FOR THE DEFENDANTS:
13
              GREENBERG TRAURIG, LLP
14            BY:  ROBERT J. HERRINGTON, ATTORNEY AT LAW
              1840 CENTURY PARK EAST
15            SUITE 1900
              LOS ANGELES, CALIFORNIA 90067
16            310-586-7816

17

18    ALSO PRESENT:

19            NAOMI BEER, ATTORNEY AT LAW

20

21

22

23

24

25
```

CHIA MEI JUI, CSR 3287, CRR, FCRR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1            LOS ANGELES, CALIFORNIA; FRIDAY, AUGUST 17, 2018

 2                            10:26 A.M.

 3                            - - -

 4            THE CLERK:  Calling ED CV 17-1415-AB, Chelsea

 5    Hamilton versus Wal-Mart Stores, Inc., et al.

 6            Counsel, please step forward and state your

 7    appearances.

 8            MR. YOON:  Good morning, Your Honor.  Kenneth Yoon

 9    for plaintiffs.

10            MS. YASUDA:  Stephanie Yasuda also on behalf of

11    plaintiffs.

12            MR. CLEAVER:  Sam Cleaver on behalf of plaintiffs.

13            MR. HERRINGTON:  Good morning.  Rob Herrington on

14    behalf of defendants.

15            Your Honor, I have just a brief request.  She is

16    not appearing and she's not admitted pro hac vice, but my

17    partner from our Denver office is here, Naomi Beer; and I

18    would ask the Court's permission that she be allowed to sit

19    at counsel table.

20            THE COURT:  Certainly.  Want to justify the flight

21    from the Rocky Mountains; so come on down.

22            MR. HERRINGTON:  Thank you, Your Honor.

23            THE COURT:  Tell me your name again.

24            MR. HERRINGTON:  Her name is Naomi and then beer

25    as in the beverage.
```

4

```
 1              THE COURT:  How fitting from the Rocky Mountains.
 2              MS. BEER:  Thank you, Your Honor.
 3              THE COURT:  Welcome.  And so we have Miss Yasuda,
 4    Mr. Yoon, and Mr. Cleaver.
 5              MR. CLEAVER:  Yes, Your Honor.
 6              THE COURT:  Mr. Lee and Mr. Mankin have not joined
 7    us?
 8              MR. YOON:  They are behind me.
 9              THE COURT:  You are going to leave the basketball
10    team on the bench, the remainder of the team on the bench.
11    Fair enough.
12              So the Court has issued a proposed order in this
13    case.  Have the parties had an adequate time to review the
14    order?
15              I will start with Mr. Yoon.
16              MR. YOON:  Yes, Your Honor, we have.
17              THE COURT:  Mr. Herrington?
18              MR. HERRINGTON:  Yes, Your Honor.  Thank you.
19              THE COURT:  All right.  So as with most cases, one
20    side thinks I am brilliant, the other side doesn't
21    understand how I even passed the Bar.
22              With that, let's hear from the plaintiffs.  I have
23    a couple questions.  Obviously, I will give both sides an
24    opportunity to be heard as it relates to the order and any
25    issues they wish to highlight or focus or any issues that I
```

1    didn't address, I will give you that opportunity as well.

2         But I guess the one question I had for you,

3    Mr. Yoon, I just wanted, if you could, help me clarify what

4    theories of liability from your perspective apply to the

5    overtime subclass.  I don't know if I was clear on that.

6         MR. YOON:  Okay.  So employees on the alternative

7    workweek are not paid overtime from eight and ten hours.  We

8    believe they should be because over eight hours is overtime,

9    and it's really as simple as that.

10        In addition, employees who have to go through the

11   security checkpoint at the end of the day, the time until

12   they leave the facility should be paid because it's

13   subject --

14        THE COURT:  From the time they go to the

15   checkpoint until the time they leave the facility.

16        MR. YOON:  Well, there's two components.  There's

17   the part where they start the lineup and they finish the

18   lineup -- or finish the security checkpoint process, and

19   then there is the time from when they check out until they

20   get to the lineup.  That's another separate area of

21   potential common uniform unpaid time that should have been

22   paid.

23        THE COURT:  Okay.  All right.

24        MR. YOON:  And then, of course, the corresponding

25   time when a meal break -- it occurs for both meal breaks

```
 1    which are unpaid time as well as when you are clocked out
 2    for the day unpaid time.
 3            THE COURT:  Thank you.  I appreciate.
 4            Now I will allow you an opportunity to be heard.
 5    Anything that you take issue with with the order that you
 6    wish me to focus on?
 7            MR. YOON:  Yes, Your Honor.  But I think this one
 8    has been denied in part and granted in part; so I guess both
 9    of us have some points to make.
10            THE COURT:  Right.  Both of you think I'm an
11    idiot.  That's okay.
12            MR. YOON:  Anyways, but just picking that up --
13    okay.  So on the third rest break, I think the part that
14    we'd like to focus the Court on is that there is literally
15    no evidence, not even a single witness, who says on a 4/10
16    schedule they got a third rest break.  We have provided
17    declarants, they provided declarants, nobody says that even
18    existed ever.
19            Amongst thousands of employees, there is not a
20    single witness to say that ever happened.  The reason for
21    that is because it didn't happen, and it's uniform and
22    common amongst everybody.
23            Theoretically, there is a policy that allows for
24    it, but as a practical matter, the defendant's policy is
25    that the managers must ensure the breaks.
```

1          THE COURT:  You are saying it just never happens.

2          MR. YOON:  The declarants say that they got two

3   rest breaks.  So the language for a regular person is, "I

4   got two rest breaks on a 4/10 or ten-hour shift."

5          Now, there is again no evidence of a third rest

6   break on a 4/10 shift.  If there is a declarant that talks

7   about three rest breaks, that declarant worked an 11.25-hour

8   shift, and we are not claiming for the 11.25-hour shift.

9          We are just claiming for the 4/10 schedule, the

10  ten-hour shift that there was simply no such thing as a

11  third rest break.

12          THE COURT:  In that ten-hour shift.

13          MR. YOON:  And then the way it becomes

14  individualized is that the defendant says that, even though

15  not a single one ever took it, it's every single person

16  voluntarily waived it.  Every single one every single time

17  every single day waived the third rest break, which is, by

18  the way, a paid 10-minute rest break under the law.  There

19  is the separate 15 gross 10 net issue.  I will address that

20  in a second.

21          But what they are saying is every single person

22  every single day waived their third rest break on the

23  10-hour shift.  We think that's a common issue that should

24  go to the trier of fact.

25          In any event -- I'm sorry.  Never mind.

 1          The other issue I would like to address on the

 2    rest breaks is this idea of the 15 gross 10 net.  We believe

 3    that simply the policy is wrong.

 4          But to go further, the concept that the break can

 5    start wherever you like simply isn't what the company's

 6    policy is.  We think we have unique facts with this company,

 7    that they provide a 15-minute break but that it starts from

 8    your station and you are required to take the break in the

 9    break room.

10          There is this issue about how long it takes to get

11    to the break room.  And I think that's where the Court's

12    focused on with respect to finding that there is a

13    predominance of individualized issues.

14          What we would say is that there is a safe walking

15    speed required in this facility.  It's a distribution

16    center.  There is a lot of moving parts.  There is a lot of

17    vehicles, and there is a safe walking speed required by the

18    company that's in the evidence.

19          We can take simply a faster time, but the bottom

20    line of it is there is some employees -- and the defendant's

21    declarants testified to this as well -- that there are some

22    areas of the facility that simply are outside because there

23    is just too many football field distance to walk to get to

24    the designated break rooms in time, the nearest break room

25    in time.

1          We would ask that, understanding this issue, we

2     think it would be certified as it is, but we currently have

3     some discovery disputes about the facility.  We haven't had

4     a chance to look at the video.  We haven't had a chance to

5     actually enter the facility with our experts to measure

6     these distances and these times.

7          We think that, if the Court is inclined to decline

8     this rest break, 15 gross versus ten-net issue, that issue

9     be without prejudice because we have those discovery issues

10    teed up.  We have even given the defendant additional time

11    because of this briefing to allow for additional time to

12    brief the discovery disputes.

13         We expect to have that resolved in a few weeks,

14    maybe a month, and that might -- with that discovery, we

15    might be able to provide more clarity on exactly how we will

16    prove that there are at least some employees who simply

17    can't get to any break room to get themselves a 10-minute

18    break.

19         THE COURT:  It's interesting.  Even as you

20    describe it, you are saying "some employees."  Like, I mean,

21    just by virtue of, sort of, the comments you make, "safe

22    walking speed," how are we going to know -- that strikes me

23    as very individualized.  Some people walk faster, some

24    people walk slower.  How are you going to deal with that?

25         MR. YOON:  If a person runs to their break, that

1    is similar to stealing a break.  You can get fired for

2    running to your break here because -- and I am not disputing

3    that running in this facility might not be the safest thing

4    to do.  There might be some Workers' Comp issues with that.

5              So an employer can discipline employees for doing

6    things that they believe are not -- they don't want to

7    happen and -- which is a control issue but, without going

8    into that, there is a safe walking speed, and I think we can

9    measure that --

10             THE COURT:  How do you do that?  I guess that's

11   the question.  How do you measure a safe walking speed?

12   What's safe for one person versus another person?  And I

13   guess that leads me to be concerned that it strikes me as

14   very individualized.

15             MR. YOON:  I think in terms of a workplace like

16   this where there are thousands of workers -- where there is

17   thousands of employees, I think there is a common safe

18   walking speed an expert can testify to.

19             A jury can say, "You know what?  I disagree, and

20   it can be faster," and that range of speeds can be factored

21   into an expert opinion to give the trier of fact an

22   understanding of, well, if you go this speed, then it's this

23   many minutes, this many people are affected, et cetera.

24             In terms of where the employees are -- because the

25   Court was also focused on the "some."  There are in

```
 1   particular two types of jobs in this facility.  The
 2   facilities are very, sort of, wide -- it's three times
 3   across as far as it is deep.  And the two break rooms are in
 4   the front and the back in the middle of the facility.
 5           There are mostly two positions.  There are other
 6   positions that are -- the facility is very large, and
 7   certain positions have a wide area where they work in.
 8           But the shipping and receiving departments are in
 9   a very specific -- fixed locations, and those two locations
10   are from what we understand because we haven't been able to
11   go inside are so far away from the middle of the facility
12   where the breaks are that they can't get there in five
13   minutes round-trip.
14           And the defendant's declarants testified to this
15   because, if you parse through the declarants and their job
16   titles, the ones who say they do shipping and receiving are
17   the ones who say it takes three minutes to get to the break
18   room, which round-trip is six minutes.
19           So that's where, at a minimum, we believe there is
20   a certain positions that simply can't get to the break rooms
21   in time because, again, this facility is over a million
22   square feet, it's multiple football fields in size.  It's
23   hard to even fathom a facility this large.  The best example
24   is a football stadium or even larger -- I can't imagine
25   what -- but this is a huge facility.
```

```
 1              Just to get -- physically get from your workplace
 2   to the break room -- the company requires the breaks to be
 3   there.  That's the policy.  So we believe that, at the very
 4   least, deny this without prejudice so that with this
 5   additional discovery we can go and tighten up exactly who is
 6   inside and outside of this five-minute distance to --
 7   round-trip to get to the break rooms.
 8              THE COURT:  Anything further, Counsel?
 9              MR. YOON:  With respect to the meals, there is two
10   issues on the meals.  First is the general idea the meals
11   are discouraged because of the breaks -- I'm sorry.  Because
12   of the exiting facility security check.
13              I think the Court's focused on whether a person
14   was discouraged or not is individualized.  What we would
15   like to present as our theory of the case to the trier of
16   fact is that the fact of this discouragement, that you have
17   to go through security checkpoint, violates the law; and
18   it's up to the jury to decide or trier of fact to decide is
19   that enough discouragement so that the company --
20              THE COURT:  The mere fact they have to go through
21   a security check?
22              MR. YOON:  Well, there is going to be a lot of
23   evidence of exactly what the security check is.  The
24   defendant says it is just walking through, it's a high five
25   and you are out, and we believe there is upwards of 20
```

1    minutes to get out of the facility, depending on the day,

2    depending on the witness.  Their witnesses, obviously, say

3    it's shorter.  Other witnesses say it's a little bit longer.

4            We have the video.  We'll be able to actually see

5    how long it takes.  But all this facts about that security

6    check process will be provided to the trier of fact.

7            It's not that difficult seeing that process

8    whether as a person in the -- sitting -- deciding whether

9    this meal break was provided or not, whether the 35 minutes

10   was enough to comply with the law.  Because knowing that

11   there is a security checkpoint, did that 35 minutes count as

12   a compliant meal break in the sense that you could leave the

13   facility?

14           And the trier of fact can simply, understanding

15   what they know about security checks, say does this count as

16   compliant meal break?  Or is it not a compliant meal break

17   because of this discouragement to leave the facility?

18           It doesn't matter if one person -- some people

19   will never be discouraged.  You could have whatever you

20   want, and they will never leave because some people just

21   don't like to leave their office or their workplace.

22           And it really doesn't matter what you do.  They

23   just aren't going to leave.  But that doesn't mean that it's

24   individualized.  It just means those people have a strong

25   preference one way or the other.

1          The question is, as a policy of the company, did

2     it comply with the law?  And that's not, we believe,

3     individualized.  It's a simple legal question based upon the

4     facts of the security check.

5          With respect to the second meal break I would like

6     to focus on is that there are -- there is a 99.94 percent no

7     second meal break on a shift over 10.  I think that's a

8     tremendous fact showing uniformity.

9          I would like to focus on the second meal period

10    waiver.  I understand the Court's position on the -- whether

11    you can -- on the waiver itself.  But the fact is that our

12    plaintiffs didn't sign a waiver.  They didn't waive, and

13    they never received a second meal break.

14          And there are 26,115 shifts where the employees

15    worked 10 to 12 hours without a signed waiver and not having

16    a second meal break.

17          Well, I am -- last fact might be 99.94 percent

18    didn't receive a second meal break.  I don't have that exact

19    number.  But there are 26,115 shifts.

20          This is very narrow, very specific.  I think that

21    all it requires is looking at that waiver, which the company

22    relied on and determining that there is 26,115 meal premiums

23    that need to be paid.

24          THE COURT:  Okay.

25          MR. YOON:  The last point -- and I could save this

```
 1    for later -- is based upon the Court's tentative, we have a
 2    few dates coming up; and the most pressing initial deadline
 3    is the September 21st initial expert disclosure.  So I don't
 4    know what the Court's procedure is for that.
 5            We can, of course, make any of these deadlines,
 6    but, if the Court had an opinion or would like to share
 7    something on how the Court likes to handle this
 8    post-certification, that would be helpful.
 9            THE COURT:  We'll discuss that at the end.  Thank
10    you, Counsel.
11            Let me hear from Mr. Herrington.
12            MR. HERRINGTON:  Your Honor, first of all, thank
13    you for the detailed tentative.  It's incredibly helpful to
14    receive these.
15            I was going to, I think, focus on a couple of
16    points affirmatively that we wanted to address with the
17    tentative.  And then if it's okay with Your Honor, I will
18    come back and address the points that Mr. Yoon --
19            THE COURT:  That's fine.
20            MR. HERRINGTON:  So the point I wanted to address
21    specifically related to the -- this theory that plaintiffs
22    have -- it's discussed on page 8 of the Court's tentative
23    ruling, and it is the theory that the time spent between the
24    time clock and getting in line for the security check, it
25    presents a common issue on which -- common issues
```

1    predominate.  That's what I wanted to focus on.

2          The theory here seems to be that, simply because

3    the person is in the building, they are thus subject to the

4    control of the employer and that that would present a common

5    issue, and, if you can measure that walking time, you can

6    present that theory.

7          Every facility where the time clock -- I'm not

8    talking about Wal-Mart -- I am talking about every business

9    where you have a time clock inside, there is a certain

10   distance between the time clock and the exit of the

11   building.

12         This theory doesn't, at least in our view, make

13   any sense.  It doesn't seem consistent with California law.

14   There isn't a presumption that just because someone is in

15   the building that there is -- that they're under the control

16   of the employer.

17         Part of "under the control" depends on what the

18   person is doing.  A person who comes into the facility, for

19   example, in the morning and is socializing or having

20   breakfast before their shift or just waiting, those are

21   individualized questions that go to whether the person was

22   under the control.

23         On the back end after you clock out, people -- and

24   we have this in the record.  This is -- we summarize it in

25   Exhibit 2, at Section 7.  But people are doing different

things.   Some are using the restroom; some are socializing;

some are having -- eating something before they go home.

        The question of what people are doing matters to

whether they're under the control of the employer and

presents, based on the evidence that we've presented, an

individualized question.

        Plaintiffs have not presented a common method to

address the issue of what people were doing between the time

that they clock out and the time that they get to the

security line.

        What they have done is they have submitted a

declaration from an expert who proposes to, basically, graft

the time between someone's swiping in a badge and the time

the person then clocks in and assuming that that's the same

after the shift.

        And the evidence specifically in Exhibit 2,

Section 7, shows that there isn't a correlation between the

two and people are doing different things.

        So we think that fundamentally there just isn't

any common glue on this theory that will hold it together to

allow it to be adjudicated on a common basis.  And we would

respectfully request that the Court take a look at this

issue, and we submit that it -- I don't even think it

presents a common issue, but I certainly think

individualized issues predominate.

```
 1            I think, Your Honor, I will turn at this point to
 2   responding to the couple of the points Mr. Yoon made.
 3            THE COURT:  Before you do that, I had one question
 4   I had for you is if you could address what you believe it is
 5   about Miss Hamilton's prior complaints that make it, as you
 6   describe, subject to unique defenses.
 7            MR. HERRINGTON:  Make sure I understand the
 8   question.  We had pointed out, I believe, in our brief,
 9   Your Honor, that Miss Hamilton had -- let's just call it an
10   issue that had nothing to do with anything in this case that
11   was elevated all the way to the CEO of the company.  And the
12   question I think Your Honor is asking me is how is that
13   relevant to anything in terms of adequacy here?
14            I think the one word answer is -- is an argument
15   regarding bias and credibility.  It is not a massive focus,
16   candidly, of our opposition.  We did believe it is certainly
17   relevant to adequacy and potentially typicality.  But that's
18   trying to be as direct as I can.
19            THE COURT:  I appreciate it.  And before -- before
20   I forget, I am going to assume -- and maybe I am wrong on
21   this -- that you weren't necessarily the author of this
22   brief, the primary author.
23            And if you could let Mr. Gershman know that 47
24   footnotes is a bit much.  And I am going to speculate --
25   could be wrong -- from my time at a law firm, that this was
```

```
 1   done in part to meet the 25-page time limit.  I get it, but

 2   let's try to avoid that going forward.

 3              MR. HERRINGTON:  Absolutely, and I will

 4   communicate with Mr. Gershman.

 5              THE COURT:  He doesn't need to be demoted.  I just

 6   want to make sure he knows that I know -- that I noticed

 7   this.

 8              MR. HERRINGTON:  Yes, Your Honor.

 9              THE COURT:  Go ahead.  Please continue.

10              MR. HERRINGTON:  The first issue -- the issue

11   Mr. Yoon raised related to the third rest break; and one of

12   the things, the comments, I believe, I wrote down was that

13   this was a theory that is limited to the 4/10 shift.

14              And the way we read the brief and the Notice of

15   Motion, I think that's not correct.  If we look at the

16   definite -- proposed Definition E on the rest break claim,

17   it is not so limited.

18              And I -- so it seems that perhaps there is an

19   attempt here, sort of, to be arguing something different

20   than is presented on the record.

21              In addition to that, I think -- again, we

22   submitted the summary in Exhibit 2 -- this was in

23   Section 6 -- showing that there is significant variability

24   regarding what associates are told, apparently, and what

25   they do in terms of taking their rest breaks.
```

1        We know, for example -- and, again, Mr. Yoon will

2    say, "Well, she worked the 11.25 shift" -- but we know that

3    one of their plaintiffs took -- knew about and took third

4    rest breaks.  Miss Hamilton testifies to that.

5        And the policy is -- I think it was

6    acknowledged -- is on its face compliant.  And we had

7    several, at least three, declarants -- again, this is

8    described in Exhibit 2, Section 6, associates who were told

9    about both the policy and the ability to take each of the

10   different rest breaks, including the third rest break.

11       So based on the fact that we have a facially

12   compliant policy that the evidence in the record shows

13   variability amongst the declarants, we believe that the

14   Court is correct, that this is a question on which

15   individualized issues predominate -- or common issues do not

16   predominate.

17       Briefly, the second issue Mr. Yoon addressed was

18   this question of the rest break claim and the idea that

19   there is some common way to demonstrate that people didn't

20   get their full rest break because of how long it takes to

21   walk different places.

22       I was going to comment on this.  I think the

23   Court's analysis on predominance of this is right on.  This

24   is an issue where they did not present any evidence in their

25   motion, and then I guess they're now relying on another new

1    declaration from another new expert in their Reply which we

2    haven't had a chance to even respond to or take their

3    deposition.

4           But even that -- even if the Court were to

5    consider that new expert testimony, the individualized

6    questions of how long it takes people to walk and to where

7    is individualized.

8           THE COURT:  I think Mr. Yoon also suggests, if I

9    understood correctly, look.  Give them time to conduct some

10   more discovery.  What if -- and I don't know this to be

11   true.  What if a diagram demonstrates just on first look

12   that the distance between the break room, the security

13   checkpoint is such that it's going to chip away at that rest

14   break period?  And what's your response to that?

15          MR. HERRINGTON:  My response to that is if -- my

16   first response is, if that was going to be the theory, that

17   should have been presented with the motion.

18          THE COURT:  All right.

19          MR. HERRINGTON:  The discovery dispute that I

20   believe is going to be or is in the process of being briefed

21   relates to a request to come on site and to do an

22   inspection.  And I -- that the relevance of that in terms of

23   how it's going to answer how long it would take any given

24   individual to walk from Point A to Point B or where any

25   individual was at the beginning of the rest break, I am

```
1    struggling to understand how that's going to answer that
2    question.
3           THE COURT:  Could it perhaps present another
4    question -- or at least suggest that just by an eye's look
5    at the distance that there is no way that an employee is
6    going to be able to get their 10-minute break because the
7    scanning point is, you know, way off in the distance and the
8    break room is on the other side?
9           Again, I don't know what the interior looks like
10   but assuming -- I guess, could the inspection present that
11   issue?
12          MR. HERRINGTON:  Let's assume, just for sake of
13   discussion that that is what it shows, I think the answer is
14   still "no" because, as this record that has been developed
15   shows -- and I will point to Exhibit 2, our summary
16   Section 3 -- the declarations of the people show widely
17   different practices in terms of what they were doing when a
18   rest break was called; and, more importantly perhaps, that
19   there were at least some declarants that testified, no
20   matter how long it took them to walk to the rest break room,
21   they looked at the clock and they spent 10 minutes in the
22   restroom or -- I'm sorry -- in the rest break room.
23          People were cognizant of the time that they were
24   supposed to be getting because we have a compliant policy
25   that they were trained on, and they were sitting in the rest
```

```
1   break room for at least 10 minutes and then walking back to
2   wherever their work location was.
3           So to be direct, no, I don't think that that
4   proposal or this discovery dispute is going to provide any
5   additional way or additional question that could be
6   theoretically certified given the record.
7           THE COURT:  All right.
8           MR. HERRINGTON:  The other issue that Mr. Yoon
9   raised related to the theory that meals are discouraged
10  because there is the existence of the security.  And I --
11  Mr. Yoon -- I tried to write it.  I said, "Some people will
12  never be discouraged."  I think that's true, and the record
13  here we have simply supports that.
14          The question here, of course, is under law did the
15  employer provide the opportunity for an uninterrupted
16  30-minute meal break?  And this question -- I look at
17  Judge Selna's opinion in the Gonzalez versus OfficeMax case
18  where he was presented with a very similar record where he,
19  basically, relying on declarant testimony about why they
20  were taking short breaks or not taking a break -- and he
21  said --
22                  (Reading:)  Based on this record,
23              since OfficeMax is liable only for missed meal
24              periods that it forced the employees to forgo,
25              the reason that any particular employee missed
```

```
 1              any particular break requires, ineluctably,

 2              individualized fact findings.

 3              It's Gonzalez vs. OfficeMax we cited in our brief.

 4   I think that same analysis applies here as well.

 5              The idea that liability is going to theoretically

 6   turn on the question of why, the question of whether someone

 7   felt discouraged is, as I believe the Court's tentative

 8   indicates, an inherently individualized question.

 9              With that, Your Honor, I would thank you, and I

10   will sit down.

11              THE COURT:  All right.  Thank you, Counsel.

12              I will allow Mr. Yoon a brief opportunity to

13   respond.  Is there anything further you wish to add to this

14   discussion?

15              MR. YOON:  Thank you, Your Honor.

16              I think on the question about the rest breaks, the

17   4/10 issue, we limit it in our brief, Docket Entry 95,

18   page 17, line 11, which is page 27 of 35 of the Docket Entry

19   95.  We focus specifically on the 4/10s as for this

20   particular third rest break issue.

21              And, again, I would like to say that the disparity

22   with respect to the third rest break or the second rest

23   break is completely correlated to the 11.25-hour shift and

24   the 10-hour shift.  Whereas the 11.25-hour shift, I think

25   the declarants will say three rest breaks, including
```

1    Miss Hamilton who was on that 3/11.25 schedule. And the

2    people that work the 4/10 schedule uniformly say two rest

3    breaks. And I think that's just because that's the fact.

4    And amongst thousands of employees, that's all we have heard

5    as is presented to the Court.

6         On the rest breaks, I think the other issue that

7    we are still negotiating is and still meeting and conferring

8    and getting it ready for a motion or joint stipulation is

9    the video.

10        The video will also highlight with the expert

11   opinion, and expert will have a chance to look at the video,

12   what the walking speeds are.

13        One of the issues -- well, I won't go into

14   discovery disputes. But whether a person ends up getting

15   the 10 in the rest break room has a separate issue -- that's

16   whether they were stealing the break. They could steal the

17   break by simply sitting in the rest break for 10 minutes.

18        THE COURT: Why do you say it's stealing the

19   break?

20        MR. YOON: You get a 15 gross at this location.

21   If you take a 20 gross, you stole a break. If you didn't

22   get back to your station in time and you didn't get caught,

23   you just stole some time. That has nothing to do with

24   what's provided by the employer.

25        THE COURT: I just want to make sure I understand.

```
 1   You say "and stole some time."  How would you steal it?

 2   Don't you have to scan back in?

 3          MR. YOON:  For the rest breaks, there is no

 4   record.  So, no.  You just have to not get caught.  There is

 5   no way to -- there is no clock-in like there is for a meal

 6   break.

 7          And running as well.  Running would be another

 8   violation of policy.  If you ran to the break room and

 9   nobody saw you run, then I guess you could get 10 minutes

10   sometimes.  But that doesn't mean you are getting the

11   provided rest break.

12          The key here is the defense is focusing on what

13   the employees did.  But the law under Brinker is what the

14   employers did.

15          If the employers didn't provide it and the

16   employee got it, it doesn't really matter.  The employers

17   have to provide it, and here the employers have a policy to

18   ensure it.

19          With respect to the meals, again, there is the

20   part about being discouraged is that the law says that --

21   did the employer provide the meal break -- and there is a

22   bunch of other criteria, but the basic idea is it's employer

23   focused -- and per Brinker, did the employer impede or

24   discourage the break because that also would violate the

25   law.
```

```
 1              THE COURT:  You think just by having -- your

 2    contention is having the security checkpoint impedes or

 3    discourages the break?

 4              MR. YOON:  Yes.

 5              THE COURT:  Why?

 6              MR. YOON:  Because in order to -- one of the

 7    requirements of the break is the ability to leave the

 8    facility, and one of the ways to impede the leaving of the

 9    facility is by putting a blocker on the ability for the

10    employee to leave the facility.

11              We believe this is enough of a blocker so that it

12    effectively impedes the meal break such that it violates the

13    law.

14              The employee's point of view really is irrelevant.

15    It's whether on a objective basis does this impede or

16    discourage per Brinker?  And either it does or it doesn't,

17    and it does or it doesn't for everybody whether they left or

18    didn't leave or whatever.  Whether they leave or don't

19    leave, whatever they choose to do, it's on the employer, the

20    question is on the employer.  Did their actions serve to

21    impede or discourage as the Brinker standard holds.

22              THE COURT:  Mr. Yoon, I just want to make sure I'm

23    clear on this.  So your view is the mere -- the existence of

24    the security checkpoint is illegal, they should not have it

25    because you believe that the existence of it impedes or
```

```
 1    discourages the meal breaks?
 2              MR. YOON:  I think that it's a more holistic
 3    approach.  You can't just look at one particular
 4    identifiable fact, which I do believe there is a security
 5    check, I do believe it takes time, I do believe it does
 6    impede and discourage.  Whether it's enough I think is for
 7    the trier of fact as there are other factors there as well.
 8              But if the security check at other places was
 9    simply you walk out, and, as you walk out, you badge out,
10    that would be a different fact pattern, still be some kind
11    of a security point, but it would be a different fact
12    pattern.
13              I think with this fact pattern, with what they
14    have, I think I should have a chance to present that as a
15    common classwide issue.  We might win; we might lose.
16    That's a separate merits based inquiry.
17              THE COURT:  All right.
18              MR. YOON:  On the issue of the -- actually, the
19    question -- just to backtrack on this idea of walking
20    because the walking from the time clock as you enter the
21    security check, that period of time, the defendant is
22    focused on what the employees can do.
23              I think that it's not what they can do that's
24    relevant.  It's what they cannot do because the employer's
25    preventing them from doing it that is relevant because it's
```

```
 1    the control.

 2             If a person is in a car, under Morillion, and they

 3    can make phone calls or read a book, that doesn't mean that

 4    that is not time worked.  They are still in the vehicle of

 5    the employer, they are subject to their control enough that

 6    that time is paid.

 7             And here is what they are not doing, and we know

 8    what they are not doing is they're not using their cell

 9    phones because they're not allowed to use the cell phones in

10    the facility.  They're not doing whatever they want because

11    there is a safety protocol for anybody in the facility.

12             And what they are doing, if we want to look at

13    that, is they are walking to the mandatory security check,

14    which, if they don't go through, they don't have a job.

15             So what they are doing is they are walking in a

16    specific direction because there is a requirement for

17    additional work when they get to that security checkpoint.

18    This is a theory.  Whether we win or not is a separate

19    issue.

20             Whether that time is working time is a common

21    legal defense.  The defendant can raise their points of what

22    the employees can do, and we can raise our points what they

23    can't do, and the trier of fact can determine if that's work

24    or not work.

25             THE COURT:  Fair enough.
```

```
 1              Help me understand.  You said there is a
 2   scheduling issue.  Just walk me through.  What is the
 3   question that you ultimately have?  You said there is some
 4   dates that are coming up.
 5              MR. YOON:  Current schedule, Your Honor, is we
 6   have April 2nd trial date next year.  And from that there is
 7   a series of deadlines.  But the main one is the
 8   November 16th, nonexpert discovery cut off to December 21st,
 9   last date to hear motions, and then the September 21st,
10   initial expert disclosure.
11              THE COURT:  What's your question?
12              MR. YOON:  We can -- obviously, we have been
13   litigating this case to meet all deadlines.  But if the
14   Court has any type of common way the Court likes to do
15   things after certification, then we'd like to know.  If the
16   Court believes these deadlines are firm, then we won't spend
17   any time to --
18              THE COURT:  I can answer that question.  The
19   deadlines are firm.
20              MR. YOON:  Then that makes it easier on us.
21              THE COURT:  The deadlines are firm.  I want -- I
22   have a heavy calendar.  I would like to keep the deadlines
23   as they are.  I hope that answers your question.
24              MR. YOON:  Yes, that answers the question
25   completely, yes, Your Honor.
```

```
1          THE COURT:  Thank you.
2          Okay.  If there is nothing further, I am going to
3  take this matter under submission in light of the comments
4  on both sides.  It's not likely that I will issue a final
5  order on this case probably till next Wednesday or Thursday;
6  so the matter will remain under submission until the Court
7  issues its final order.
8          Thank you, counsel.  Have a good weekend.
9          MR. YOON:  Thank you, Your Honor.
10          MR. HERRINGTON:  Thank you, Your Honor.
11     (Proceedings concluded at 11:04 a.m.)
12                    --oOo--
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1                           CERTIFICATE

2

3       I hereby certify that pursuant to Section 753,

4   Title 28, United States Code, the foregoing is a true and

5   correct transcript of the stenographically reported

6   proceedings held in the above-entitled matter and that the

7   transcript page format is in conformance with the

8   regulations of the Judicial Conference of the United States.

9

10  Date:  August 30, 2018.

11

12

13

14                    __/S/ CHIA MEI JUI_____

15                    Chia Mei Jui, CSR No. 3287

16

17

18

19

20

21

22

23

24

25
```

**MR. CLEAVER: [2]** 3/11 4/4
**MR. HERRINGTON: [15]** 3/12 3/21 3/23 4/17 15/11 15/19 18/6 19/2 19/7 19/9 21/14 21/18 22/11 23/7 31/9
**MR. YOON: [27]** 3/7 4/7 4/15 5/5 5/15 5/23 6/6 6/11 7/1 7/12 9/24 10/14 12/8 12/21 14/24 24/14 25/19 26/2 27/3 27/5 28/1 28/17 30/4 30/11 30/19 30/23 31/8
**MS. BEER: [1]** 4/1
**MS. YASUDA: [1]** 3/9
**THE CLERK: [1]** 3/3
**THE COURT: [41]**

**-**

**--oOo [1]** 31/12

**0**

**0988 [1]** 2/6

**1**

**10 [16]** 6/15 7/4 7/6 7/9 7/19 8/2 14/7 14/15 19/13 22/21 23/1 24/17 25/2 25/15 25/17 26/9
**10-hour [2]** 7/23 24/24
**10-minute [3]** 7/18 9/17 22/6
**10:26 [2]** 1/19 3/2
**10s [1]** 24/19
**11 [1]** 24/18
**11.25 [2]** 20/2 25/1
**11.25-hour [4]** 7/7 7/8 24/23 24/24
**11:04 [1]** 31/11
**12 [1]** 14/15
**15 [4]** 7/19 8/2 9/8 25/20
**15-minute [1]** 8/7
**16th [1]** 30/8
**17 [3]** 1/18 3/1 24/18
**17-1415-AB [2]** 1/9 3/4
**1840 [1]** 2/14
**18TH [1]** 2/10
**1900 [1]** 2/15

**2**

**20 [2]** 12/25 25/21
**2018 [3]** 1/18 3/1 32/10
**213-612-0988 [1]** 2/6
**21st [2]** 30/8 30/9
**2200 [1]** 2/5
**25-page [1]** 19/1
**26,115 [3]** 14/14 14/19 14/22
**27 [1]** 24/18
**28 [1]** 32/4
**2nd [1]** 30/6

**3**

**3/11.25 [1]** 25/1
**30 [1]** 32/10
**30-minute [1]** 23/16
**310-388-7289 [1]** 2/11
**310-586-7816 [1]** 2/16
**3287 [2]** 1/23 32/15
**35 [3]** 13/9 13/11 24/18
**350 [1]** 1/24

**4**

**4/10 [7]** 6/15 7/4 7/6 7/9 19/13 24/17 25/2
**4/10s [1]** 24/19
**4311 [1]** 1/24
**47 [1]** 18/23

**5**

**50 [1]** 1/12
**5670 [1]** 2/9

**7**

**7289 [1]** 2/11
**753 [1]** 32/3
**7816 [1]** 2/16

**9**

**90012 [1]** 1/24
**90017 [1]** 2/5
**90036 [1]** 2/10
**90067 [1]** 2/15
**95 [2]** 24/17 24/19
**99.94 percent [2]** 14/6 14/17

**A**

**AB [2]** 1/9 3/4
**ability [3]** 20/9 27/7 27/9
**able [4]** 9/15 11/10 13/4 22/6
**Absolutely [1]** 19/3
**acknowledged [1]** 20/6
**across [1]** 11/3
**actions [1]** 27/20
**add [1]** 24/13
**addition [2]** 5/10 19/21
**additional [6]** 9/10 9/11 12/5 23/5 23/5 29/17
**address [8]** 5/1 7/19 8/1 15/16 15/18 15/20 17/8 18/4
**addressed [1]** 20/17
**adequacy [2]** 18/13 18/17
**adequate [1]** 4/13
**adjudicated [1]** 17/21
**admitted [1]** 3/16
**affected [1]** 10/23
**affirmatively [1]** 15/16
**after [3]** 16/23 17/15 30/15
**again [9]** 3/23 7/5 11/21 19/21 20/1 20/7

**22**/9 24/21 26/19
**ahead [1]** 19/9
**al [1]** 3/5
**allow [4]** 6/4 9/11 17/21 24/12
**allowed [2]** 3/18 29/9
**allows [1]** 6/23
**alternative [1]** 5/6
**ALYSSA [1]** 1/6
**amongst [2]** 6/19 6/22 20/13 25/4
**analysis [2]** 20/23 24/4
**ANDRÉ [1]** 1/3
**ANGELES [6]** 1/20 1/24 2/5 2/10 2/15 3/1 20/25 21/1 22/3 26/7
**another [5]** 5/20 10/12 20/25 21/1 22/3 26/7
**answer [5]** 18/14 21/23 22/1 22/13 30/18
**answers [2]** 20/23 30/24
**Anyways [1]** 6/12
**APC [1]** 2/3
**apparently [1]** 19/24
**appearances [2]** 2/1 3/7
**appearing [1]** 3/16
**applies [1]** 19/24
**apply [1]** 5/4
**appreciate [2]** 6/3 18/19
**approach [1]** 28/3
**April [1]** 30/6
**April 2nd [1]** 30/6
**area [2]** 5/20 11/7
**areas [1]** 8/22
**aren't [1]** 13/23
**arguing [1]** 19/19
**argument [1]** 18/14
**asking [1]** 13/4
**associates [3]** 1/11 19/24 20/8
**assume [2]** 18/20 22/12
**assuming [2]** 17/14 22/10
**attempt [1]** 19/19
**AUGUST [3]** 1/18 3/1 32/10
**author [2]** 18/21 18/22
**avoid [1]** 19/2
**away [2]** 11/11 21/13

**B**

**back [6]** 11/4 15/18 16/23 23/1 25/22 26/2
**backtrack [1]** 28/19
**badge [2]** 17/13 28/9
**Bar [1]** 4/21
**based [6]** 14/3 15/1 17/5 20/11 23/22 28/16
**basic [1]** 26/22
**basically [2]** 17/12 23/19
**basis [2]** 17/21 27/15

**basketball [1]** 4/9
**becomes [1]** 7/13
**beer [3]** 2/19 3/17 3/24
**before [5]** 16/20 17/2 18/3 18/19 18/19
**beginning [1]** 21/25
**behalf [5]** 1/5 1/7 3/10 3/12 3/14
**behind [1]** 4/8
**believe [19]** 5/8 8/2 10/6 11/19 12/3 12/25 14/2 18/14 18/8 18/16 19/12 20/13 21/20 24/7 27/11 27/25 28/4 28/5 28/5
**believes [1]** 30/16
**bench [2]** 4/10 4/10
**best [1]** 11/23
**between [6]** 15/23 16/10 17/8 17/13 17/17 21/12
**beverage [1]** 3/25
**bias [1]** 18/15
**BIROTTE [1]** 1/3
**bit [2]** 13/3 18/24
**blocker [2]** 27/9 27/11
**book [1]** 29/3
**both [6]** 4/23 5/25 6/8 6/10 20/9 31/4
**bottom [1]** 8/19
**BOULEVARD [2]** 2/4 2/9
**break [69]**
**breakfast [1]** 16/20
**breaks [19]** 5/25 6/25 7/3 7/4 7/7 8/2 11/12 12/2 12/11 19/25 20/4 20/10 23/20 24/16 24/25 25/3 25/6 26/3 28/1
**brief [8]** 3/15 9/12 18/8 18/22 19/14 24/3 24/12 24/17
**briefed [1]** 21/20
**briefing [1]** 9/11
**Briefly [1]** 20/17
**brilliant [1]** 4/20
**Brinker [4]** 26/13 26/23 27/16 27/21
**building [3]** 16/3 16/11 16/15
**bunch [1]** 26/22
**business [1]** 16/8

**C**

**calendar [1]** 30/22
**CALIFORNIA [8]** 1/2 1/20 1/24 2/5 2/10 2/15 3/1 16/13
**call [1]** 18/9
**called [2]** 22/18
**Calling [1]** 3/4
**calls [1]** 29/3
**candidly [1]** 18/16
**car [1]** 29/2
**cases [1]** 4/19
**caught [2]** 25/22 26/4

**CCRR [1]** 1/23
**cell [2]** 29/8 29/9
**center [1]** 8/16
**CENTRAL [1]** 1/2
**CENTURY [1]** 2/14
**CEO [1]** 18/11
**certain [3]** 11/7 11/20 16/9
**certainly [3]** 3/20 17/24 18/16
**CERTIFICATE [1]** 32/1
**certification [2]** 15/8 30/15
**certified [2]** 9/2 23/6
**certify [1]** 32/3
**cetera [1]** 10/23
**chance [5]** 9/4 9/4 21/2 25/11 28/14
**check [11]** 5/19 12/12 12/21 12/23 13/6 14/4 15/24 28/5 28/8 28/21 29/13
**checkpoint [9]** 5/11 5/15 5/18 12/17 13/11 21/13 27/2 27/24 29/17
**checks [1]** 13/15
**CHELSEA [1]** 1/5 3/4
**CHIA [3]** 1/23 32/14 32/15
**chip [1]** 21/13
**choose [1]** 27/19
**cited [1]** 24/3
**claim [2]** 19/16 20/18
**claiming [2]** 7/8 7/9
**clarify [1]** 5/3
**clarity [1]** 9/15
**classwide [1]** 28/15
**clear [2]** 5/5 27/23
**CLEAVER [4]** 2/8 2/9 3/12 4/4
**clock [9]** 15/24 16/7 16/9 16/10 16/23 17/9 22/21 26/5 28/20
**clock-in [1]** 26/5
**clocked [1]** 6/1
**clocks [1]** 17/14
**cmjui.csr [1]** 1/25
**Code [1]** 32/4
**cognizant [1]** 22/23
**comes [1]** 16/18
**coming [2]** 15/2 30/4
**comment [1]** 20/22
**comments [3]** 9/21 19/12 31/3
**common [16]** 5/21 6/22 7/23 10/17 15/25 15/25 16/4 17/7 17/20 17/21 17/24 20/15 20/19 28/15 29/20 30/14
**communicate [1]** 19/4
**Comp [1]** 10/4
**company [7]** 8/6 8/18 12/2 12/19 14/1 14/21 18/11
**company's [1]** 8/5

**C**

complaints [1]  18/5
completely [2]  24/23
  30/25
compliant [6]  13/12
  13/16 13/16 20/6
  20/12 22/24
comply [2]  13/10 14/2
components [1]  5/16
concept [1]  8/4
concerned [1]  10/13
concluded [1]  31/11
conduct [1]  21/9
Conference [1]  32/8
conferring [1]  25/7
conformance [1]  32/7
consider [1]  21/5
consistent [1]  16/13
contention [1]  27/2
continue [1]  19/9
control [8]  10/7 16/4
  16/15 16/17 16/22
  17/4 29/1 29/5
CORPORATION [2]
  1/11 1/12
correctly [1]  21/9
correlated [1]  24/23
correlation [1]  17/17
corresponding [1]
  5/24
counsel [7]  2/1 3/6
  3/19 12/8 15/10 24/11
  31/8
count [2]  13/11 13/15
couple [4]  4/23 15/15
  18/2
course [3]  5/24 15/5
  23/14
Court's [7]  3/18 8/11
  12/13 14/10 15/1 15/4
  15/22 20/23 24/7
credibility [1]  18/15
criteria [1]  26/22
CSR [2]  1/23 32/15
Current [1]  30/5
currently [1]  9/2
cut [1]  30/8
CV [2]  1/9 3/4

**D**

date [3]  30/6 30/9
  32/10
dates [2]  15/2 30/4
day [5]  5/11 6/2 7/17
  7/22 13/1
deadline [1]  15/2
deadlines [7]  15/5
  30/7 30/13 30/16
  30/19 30/21 30/22
deal [1]  9/24
December [1]  30/8
December 21st [1]
  30/8
decide [2]  12/18
  12/18
deciding [1]  13/8
declarant [3]  7/6 7/7
  23/19

declarants [10]  6/17
  6/17 7/2 8/21 11/14
  11/15 20/7 20/13
  22/19 24/25
declaration [2]  17/12
  21/1
declarations [1]  22/16
decline [1]  9/7
deep [1]  11/3
defendant [5]  7/14
  9/10 12/24 28/21
  29/21
defendant's [3]  6/24
  8/20 11/14
defendants [3]  1/13
  2/12 3/14
defense [2]  26/12
  29/21
defenses [1]  18/6
definite [1]  19/16
Definition [1]  19/16
demonstrate [1]
  20/19
demonstrates [1]
  21/11
demoted [1]  19/5
denied [1]  6/8
Denver [1]  3/17
deny [1]  12/4
departments [1]  11/8
depending [2]  13/1
  13/2
depends [1]  16/17
deposition [1]  21/3
describe [2]  9/20 18/6
described [1]  20/8
designated [1]  8/24
detailed [1]  15/13
determine [1]  29/23
determining [1]  14/22
developed [1]  22/14
diagram [1]  21/11
different [8]  16/25
  17/18 19/19 20/10
  20/21 22/17 28/10
  28/11
difficult [1]  13/7
direct [2]  18/18 23/3
direction [1]  29/16
disagree [1]  10/19
discipline [1]  10/5
disclosure [2]  15/3
  30/10
discourage [4]  26/24
  27/16 27/21 28/6
discouraged [7]  12/11
  12/14 13/19 23/9
  23/12 24/7 26/20
discouragement [3]
  12/16 12/19 13/17
discourages [2]  27/3
  28/1
discovery [10]  9/3 9/9
  9/12 9/14 12/5 21/10
  21/19 23/4 25/14 30/8
discuss [1]  15/9
discussed [1]  15/22
discussion [2]  22/13

24/14
disparity [1]  24/21
dispute [2]  21/19 23/4
disputes [1]  9/3 9/12
  25/14
disputing [1]  10/2
distance [6]  8/23 12/6
  16/10 21/12 22/5 22/7
distances [1]  9/6
DISTRICT [3]  1/1 1/2
  1/3
DIVISION [1]  1/2
Docket [2]  24/17
  24/18
down [3]  3/21 19/12
  24/10

**E**

each [1]  20/9
easier [1]  30/20
EAST [1]  2/14
eating [1]  17/2
ED [1]  3/4
effectively [1]  27/12
eight [2]  5/7 5/8
either [1]  27/16
elevated [1]  18/11
employee [4]  22/5
  23/25 26/16 27/10
employee's [1]  27/14
employees [15]  5/6
  5/10 6/19 8/20 9/16
  9/20 10/5 10/17 10/24
  14/14 23/24 25/4
  26/13 28/22 29/22
employer [12]  10/5
  14/6 16/16 17/4 23/15
  25/24 26/21 26/22
  26/23 27/19 27/20
  29/5
employer's [1]  28/24
employers [4]  26/14
  26/15 26/16 26/17
end [3]  5/11 15/9
  16/23
ends [1]  25/14
enough [7]  4/11 12/19
  13/10 27/11 28/6 29/5
  29/25
ensure [2]  6/25 26/18
enter [2]  9/5 28/20
Entry [2]  24/17 24/18
Entry 95 [1]  24/17
entitled [1]  32/6
even [12]  4/21 6/15
  6/17 7/14 9/10 9/19
  11/23 11/24 17/23
  21/2 21/4 21/4
event [1]  7/25
everybody [2]  6/22
  27/17
evidence [8]  6/15 7/5
  8/18 12/23 17/5 17/16
  20/12 20/24
exact [1]  14/18
exactly [3]  9/15 12/5
  12/23

example [3]  11/23
  16/19 20/1
Exhibit 2 [4]  16/25
  17/16 19/22 22/15
existed [1]  6/18
existence [3]  23/10
  27/23 27/25
exit [1]  16/10
exiting [1]  12/12
expect [1]  9/13
expert [9]  10/18 10/21
  15/3 17/12 21/1 21/5
  25/10 25/11 30/10
experts [1]  9/5
eye's [1]  22/4

**F**

face [1]  20/6
facially [1]  20/11
facilities [1]  11/2
facility [25]  5/12 5/15
  8/15 8/22 9/3 9/5 10/3
  11/1 11/4 11/6 11/11
  11/21 11/23 11/25
  12/12 13/1 13/13
  13/17 16/7 16/18 27/8
  27/9 27/10 29/10
  29/11
fact [20]  7/24 10/21
  12/16 12/16 12/18
  12/20 13/6 13/14 14/8
  14/11 14/17 20/11
  24/2 25/3 28/4 28/7
  28/10 28/11 28/13
  29/23
factored [1]  10/20
factors [1]  28/7
facts [3]  8/6 13/5 14/4
Fair [2]  4/11 29/25
far [2]  11/3 11/11
faster [3]  8/19 9/23
  10/20
fathom [1]  11/23
FCRR [1]  1/23
FEDERAL [1]  1/23
feet [1]  11/22
felt [1]  24/7
few [2]  9/13 15/2
field [1]  8/23
fields [1]  11/22
final [2]  31/4 31/7
finding [1]  8/12
findings [1]  24/2
fine [1]  15/19
finish [2]  5/17 5/18
fired [1]  10/1
firm [4]  18/25 30/16
  30/19 30/21
first [6]  1/24 12/10
  15/12 19/10 21/11
  21/16
fitting [1]  4/1
five [3]  11/12 12/6
  12/24
five-minute [1]  12/6
fixed [1]  11/9
flight [1]  3/20
FLOOR [1]  2/10

focus [9]  4/25 6/6
  6/14 14/6 14/9 15/15
  16/1 18/15 24/19
focused [5]  8/12
  10/25 12/13 26/23
  28/22
focusing [1]  26/12
football [3]  8/23 11/22
  11/24
footnotes [1]  18/24
forced [1]  23/24
foregoing [1]  32/4
forget [1]  18/20
forgo [1]  23/24
format [1]  32/7
forward [2]  3/6 19/2
FRIDAY [2]  1/18 3/1
front [1]  11/4
full [1]  20/20
fundamentally [1]
  17/19
further [4]  8/4 12/8
  24/13 31/2

**G**

general [1]  12/10
Gershman [2]  18/23
  19/4
getting [5]  15/24
  22/24 25/8 25/14
  26/10
give [4]  4/23 5/1 10/21
  21/9
given [3]  9/10 21/23
  23/6
glue [1]  17/20
gmail.com [1]  1/25
Gonzalez [2]  23/17
  24/3
good [3]  3/8 3/13 31/8
graft [1]  17/12
granted [1]  6/8
GREENBERG [1]  2/13
gross [5]  7/19 8/2 9/8
  25/20 25/21
guess [2]  5/2 6/8
  10/10 10/13 20/25
  22/10 26/9

**H**

hac [1]  3/16
HAMILTON [5]  1/5 3/5
  18/9 20/4 25/1
Hamilton's [1]  18/5
handle [1]  15/7
happen [2]  6/21 10/7
happened [1]  6/20
happens [1]  7/1
hard [1]  11/23
having [5]  14/15
  16/19 17/2 27/1 27/2
hear [2]  4/22 15/11
  30/9
heard [2]  4/24 6/4
  25/4
heavy [1]  30/23
held [1]  32/6
help [2]  5/3 30/1

**H**

helpful [2]  15/8 15/13
hereby [1]  32/3
HERNANDEZ [1]  1/6
HERRINGTON [4]
2/14 3/13 4/17 15/11
high [1]  12/24
highlight [2]  4/25
25/10
hold [1]  17/20
holds [1]  27/21
holistic [1]  28/2
home [1]  17/2
HONORABLE [1]  1/3
hope [1]  30/23
hour [9]  7/4 7/7 7/8
7/10 7/12 7/23 24/23
24/24 24/24
hours [3]  5/7 5/8
14/15
huge [1]  11/25

**I**

idea [6]  8/2 12/10
20/18 24/5 26/22
28/19
identifiable [1]  28/4
idiot [1]  6/11
illegal [1]  27/24
imagine [1]  11/24
impede [5]  26/23 27/8
27/15 27/21 28/6
impedes [3]  27/2
27/12 27/25
importantly [1]  22/18
INC [3]  1/10 1/11 3/5
inclined [1]  9/7
including [2]  20/10
24/25
INCLUSIVE [1]  1/12
incredibly [1]  15/13
indicates [1]  24/8
individual [2]  21/24
21/25
individualized [15]
7/14 8/13 9/23 10/14
12/14 13/24 14/3
16/21 17/6 17/25
20/15 21/5 21/7 24/2
24/8
INDIVIDUALLY [2]  1/5
1/7
ineluctably [1]  24/1
inherently [1]  24/8
initial [3]  15/2 15/3
30/10
inquiry [1]  28/16
inside [3]  11/11 12/6
16/9
inspection [2]  21/22
22/10
interesting [1]  9/19
interior [1]  22/9
irrelevant [1]  27/14
issue [30]  6/5 7/19
7/23 8/1 8/10 9/1 9/8
9/8 10/7 15/25 16/5
17/8 17/23 17/24

18/10 19/10 19/10
20/17 20/24 22/11
23/8 24/17 24/20 25/6
25/15 28/15 28/18
29/19 30/2 31/4
issued [1]  4/12
issues [12]  4/25 4/25
8/13 9/9 10/4 12/10
15/25 17/25 20/15
20/15 25/13 31/7
itself [1]  14/11

**J**

job [2]  11/15 29/14
jobs [1]  11/1
joined [1]  4/6
joint [1]  25/8
JR [1]  1/3
JUDGE [2]  1/3 23/17
Judge Selna's [1]
23/17
Judicial [1]  32/8
JUI [3]  1/23 32/14
32/15
justify [1]  3/20

**K**

keep [1]  30/22
KENNETH [2]  2/3 3/8
key [1]  26/12
kind [1]  28/10
knew [1]  20/3
knowing [1]  13/10
knows [1]  19/6

**L**

language [1]  7/3
large [2]  11/6 11/23
larger [1]  11/24
last [3]  14/17 14/25
30/9
later [1]  15/1
law [18]  2/3 2/3 2/4
2/8 2/9 2/14 2/19 7/18
12/17 13/10 14/2
16/13 18/25 23/14
26/13 26/20 26/25
27/13
leads [1]  10/13
least [7]  9/16 12/4
16/12 20/7 22/4 22/19
23/1
leave [13]  4/9 5/12
5/15 13/12 13/17
13/20 13/21 13/23
27/7 27/10 27/18
27/18 27/19
leaving [1]  27/8
Lee [1]  4/6
left [1]  27/17
legal [2]  14/3 29/21
let [2]  15/11 18/23
liability [2]  5/4 24/5
liable [1]  23/23
light [1]  31/3
like [15]  6/14 8/1 8/5
9/20 10/15 12/15
13/21 14/5 14/9 15/6

22/9 24/21 26/5 30/15
30/22
likely [1]  31/4
likes [2]  15/7 30/14
limit [2]  19/1 24/17
limited [2]  19/13
19/17
line [4]  8/20 15/24
17/10 24/18
line 11 [1]  24/18
lineup [3]  5/17 5/18
5/20
literally [1]  6/14
litigating [1]  30/13
little [1]  13/3
LLP [1]  2/13
location [2]  23/2
25/20
locations [2]  11/9
11/9
long [6]  8/10 13/5
20/20 21/6 21/23
22/20
longer [1]  13/3
look [10]  9/4 17/22
19/15 21/9 21/11 22/4
23/16 25/11 28/3
29/12
looked [1]  22/21
looking [1]  14/1
looks [1]  22/9
LOS [6]  1/20 1/24 2/5
2/10 2/15 3/1
lose [1]  28/15
lot [3]  8/16 8/16 12/22

**M**

made [1]  18/2
main [1]  30/7
make [10]  6/9 9/21
15/5 16/12 18/5 18/7
19/6 25/25 27/22 29/3
makes [1]  30/20
managers [1]  6/25
mandatory [1]  29/13
Mankin [1]  4/6
many [3]  8/23 10/23
10/23
MART [4]  1/10 1/11
3/5 16/8
massive [1]  18/15
matter [8]  6/24 13/18
13/22 22/20 26/16
31/3 31/6 32/6
matters [1]  17/3
maybe [2]  9/14 18/20
meal [19]  5/25 5/25
13/9 13/12 13/16
13/16 14/5 14/7 14/9
14/13 14/16 14/18
14/22 23/16 23/23
26/5 26/21 27/12 28/1
meals [5]  12/9 12/10
12/10 23/9 26/19
mean [4]  9/20 13/23
26/10 29/3
means [1]  13/24
measure [4]  9/5 10/9

10/11 16/5
meet [2]  19/1 30/13
meeting [1]  25/7
MEI [3]  1/23 32/14
32/15
mere [2]  12/20 27/23
merits [1]  28/16
method [1]  17/7
middle [2]  11/4 11/11
might [7]  9/14 9/15
10/3 10/4 14/17 28/15
28/15
million [1]  11/21
mind [1]  7/25
minimum [1]  11/19
minute [6]  7/18 8/7
9/17 12/6 22/6 31/16
minutes [11]  10/23
11/13 11/17 11/18
13/1 13/9 13/11 22/21
23/1 25/17 26/9
Miss [5]  4/3 18/5 18/9
20/4 25/1
Miss Hamilton [3]
18/9 20/4 25/1
Miss Hamilton's [1]
18/5
Miss Yasuda [1]  4/3
missed [2]  23/23
23/25
month [1]  9/14
more [4]  9/15 21/10
22/18 28/2
Morillion [1]  29/2
morning [3]  3/8 3/13
16/19
most [2]  4/19 15/2
mostly [1]  11/5
motion [4]  19/15
20/25 21/17 25/8
motions [1]  30/9
Mountains [2]  3/21
4/1
moving [1]  8/16
Mr. Cleaver [1]  4/4
Mr. Gershman [2]
18/23 19/4
Mr. Herrington [2]
4/17 15/11
Mr. Lee [1]  4/6
Mr. Mankin [1]  4/6
Mr. Yoon [13]  4/4 4/15
5/3 15/18 18/2 19/10
20/1 20/17 21/8 23/8
23/11 24/12 27/22
much [1]  18/24
multiple [1]  11/22
must [1]  6/25

**N**

name [3]  3/23 3/24
NAOMI [3]  2/19 3/17
3/24
narrow [1]  14/20
nearest [1]  8/24
necessarily [1]  18/21
need [4]  14/23 19/5
negotiating [1]  25/7

net [3]  7/19 8/2 9/8
never [6]  7/1 7/25
13/19 13/20 14/13
23/12
new [3]  20/25 21/1
21/5
next [2]  30/6 31/5
nobody [2]  6/17 26/9
nonexpert [1]  30/8
nothing [3]  18/10
25/23 31/2
Notice [1]  19/14
noticed [1]  19/6
November [1]  30/8
November 16th [1]
30/8
number [1]  14/19

**O**

objective [1]  27/15
obviously [3]  4/23
13/2 30/12
occurs [1]  5/25
off [2]  22/7 30/8
office [2]  3/17 13/21
OfficeMax [3]  23/17
23/23 24/3
OFFICES [2]  2/8
OFFICIAL [1]  1/23
one [18]  2/4 4/19 5/2
6/7 7/15 7/16 10/12
13/18 13/25 18/3
18/14 19/11 20/3
25/13 27/6 27/8 28/3
30/7
ones [2]  11/16 11/17
only [1]  23/23
oOo [1]  31/12
opinion [4]  10/21 15/6
23/17 25/11
opportunity [5]  4/24
5/1 6/4 23/15 24/12
opposition [1]  18/16
order [7]  4/12 4/14
4/24 6/5 27/6 31/5
31/7
OTHERS [2]  1/6 1/7
out [10]  5/19 6/1
12/25 13/1 16/23 17/9
18/8 28/9 28/9 28/9
outside [2]  8/22 12/6
over [3]  5/8 11/21
14/7
overtime [3]  5/5 5/7
5/8

**P**

page [5]  15/22 19/1
24/18 24/18 32/7
page 17 [1]  24/18
page 27 [1]  24/18
page 8 [1]  15/22
paid [6]  5/7 5/12 5/22
7/18 14/23 29/6
PARK [1]  2/14
parse [1]  11/15
part [7]  5/17 6/8 6/8
6/13 16/17 19/1 26/20

**P**

**particular [5]** 11/1 23/25 24/1 24/20 28/3
**parties [1]** 4/13
**partner [1]** 3/17
**parts [1]** 8/16
**passed [1]** 4/21
**pattern [2]** 28/10 28/12 28/13
**people [17]** 9/23 9/24 10/23 13/18 13/20 13/24 16/23 16/25 17/3 17/8 17/18 20/19 21/6 22/16 22/23 23/11 25/2
**per [2]** 26/23 27/16
**percent [2]** 14/6 14/17
**perhaps [3]** 19/18 22/3 22/18
**period [3]** 14/9 21/14 28/21
**periods [1]** 23/24
**permission [1]** 3/18
**person [16]** 7/3 7/15 7/21 9/25 10/12 10/12 12/13 13/8 13/18 16/3 16/18 16/18 16/21 17/14 25/14 29/2
**perspective [1]** 5/4
**phone [1]** 29/3
**phones [2]** 29/9 29/9
**physically [1]** 12/1
**picking [1]** 6/12
**places [2]** 20/21 28/8
**plaintiffs [11]** 1/8 2/2 2/7 3/9 3/11 3/12 4/22 14/12 15/21 17/7 20/3
**please [2]** 3/6 19/9
**point [9]** 14/25 15/20 18/1 21/24 21/24 22/7 22/15 27/14 28/11
**pointed [1]** 18/8
**points [6]** 6/9 15/16 15/18 18/2 29/21 29/22
**policy [12]** 6/23 6/24 8/3 8/6 12/3 14/1 20/5 20/9 20/12 22/24 26/8 26/17
**position [1]** 14/10
**positions [4]** 11/5 11/6 11/7 11/20
**post [1]** 15/8
**post-certification [1]** 15/8
**potential [1]** 5/21
**potentially [1]** 18/17
**practical [1]** 6/24
**practices [1]** 22/17
**predominance [2]** 8/13 20/23
**predominate [4]** 16/1 17/25 20/15 20/16
**preference [1]** 13/25
**prejudice [2]** 9/9 12/4
**premiums [1]** 14/22
**present [8]** 2/18 12/15 16/4 16/6 20/24 22/3

22/10 28/14
**presented [6]** 17/5 17/7 19/20 21/17 23/18 25/5
**presents [3]** 15/25 17/5 17/24
**pressing [1]** 15/2
**presumption [1]** 16/14
**preventing [1]** 28/25
**primary [1]** 18/22
**prior [1]** 18/5
**pro [1]** 3/16
**pro hac vice [1]** 3/16
**probably [1]** 31/5
**procedure [1]** 15/4
**proceedings [3]** 1/17 31/11 32/6
**process [4]** 5/18 13/6 13/7 21/20
**proposal [1]** 23/4
**proposed [4]** 4/12 19/16
**proposes [1]** 17/12
**protocol [1]** 29/11
**prove [1]** 9/16
**provide [7]** 8/7 9/15 23/4 23/15 26/15 26/17 26/21
**provided [6]** 6/16 6/17 13/6 13/9 25/24 26/11
**pursuant [1]** 32/3
**putting [1]** 27/9

**Q**

**question [27]** 5/2 10/11 14/1 14/3 17/3 17/6 18/3 18/8 18/12 20/14 20/18 22/2 22/4 23/5 23/14 23/16 24/6 24/6 24/8 24/16 27/20 28/19 30/3 30/11 30/18 30/23 30/24
**questions [3]** 4/23 16/21 21/6

**R**

**raise [2]** 29/21 29/22
**raised [2]** 19/11 23/9
**ran [1]** 26/8
**range [1]** 10/20
**read [2]** 19/14 29/3
**Reading [1]** 23/22
**ready [1]** 25/8
**really [4]** 5/9 13/22 26/16 27/14
**reason [2]** 6/20 23/25
**receive [2]** 14/18 15/14
**received [1]** 14/13
**receiving [2]** 11/8 11/16
**record [9]** 16/24 19/20 20/12 22/14 23/6 23/12 23/18 23/22 26/4
**regarding [2]** 18/15 19/24

**regular [1]** 7/3
**regulations [1]** 32/8
**related [5]** 15/21 19/11 23/9
**relates [2]** 4/24 21/21
**relevance [1]** 21/22
**relevant [4]** 18/13 18/17 28/24 28/25
**relied [1]** 14/22
**relying [2]** 20/25 23/19
**remain [1]** 31/6
**remainder [1]** 4/10
**Reply [1]** 21/1
**reported [1]** 31/5
**REPORTER [1]** 1/23
**REPORTER'S [1]** 1/17
**request [3]** 3/15 17/22 21/21
**required [3]** 8/8 8/15 8/17
**requirement [1]** 29/16
**requirements [1]** 27/7
**requires [3]** 12/2 14/21 24/1
**resolved [1]** 9/13
**respect [5]** 8/12 12/9 14/5 24/22 26/19
**respectfully [1]** 17/22
**respond [2]** 21/2 24/13
**responding [1]** 18/2
**response [3]** 21/14 21/15 21/16
**rest [37]**
**restroom [2]** 17/1 22/22
**review [1]** 4/13
**right [8]** 4/19 5/23 6/10 20/23 21/18 23/7 24/11 28/17
**Rob [1]** 3/13
**ROBERT [1]** 2/14
**Rocky [2]** 3/21 4/1
**room [14]** 1/24 8/9 8/11 8/24 9/17 11/18 12/2 21/12 22/8 22/20 22/22 23/1 25/15 26/8
**rooms [4]** 8/24 11/3 11/20 12/7
**round [3]** 11/13 11/18 12/7
**round-trip [3]** 11/13 11/18 12/7
**ruling [1]** 15/23
**run [1]** 26/9
**running [4]** 10/2 10/3 26/7 26/7
**runs [1]** 9/25

**S**

**safe [7]** 8/14 8/17 9/21 10/8 10/11 10/12 10/17
**safest [1]** 10/3
**safety [1]** 29/11
**sake [1]** 22/12
**Sam [1]** 3/12

**same [2]** 17/14 24/4
**SAMUEL [2]** 2/8 2/9
**save [1]** 14/25
**saying [3]** 7/1 7/21 9/20
**scan [1]** 26/2
**scanning [1]** 22/7
**schedule [5]** 6/16 7/9 25/1 25/2 30/5
**scheduling [1]** 30/2
**second [9]** 7/20 14/5 14/7 14/9 14/13 14/16 14/18 20/17 24/22
**second meal [1]** 14/7
**Section [6]** 16/25 17/17 19/23 20/8 22/16 32/3
**Section 3 [1]** 22/16
**Section 6 [2]** 19/23 20/8
**Section 7 [2]** 16/25 17/17
**security [22]** 5/11 5/18 12/12 12/17 12/21 12/23 13/5 13/11 13/15 14/4 15/24 17/10 21/12 23/10 27/2 27/24 28/4 28/8 28/11 28/21 29/13 29/17
**see [1]** 13/4
**seeing [1]** 13/7
**seem [1]** 16/13
**seems [2]** 16/2 19/18
**Selna's [1]** 27/17
**sense [2]** 13/12 16/13
**separate [5]** 5/20 7/19 25/15 28/16 29/18
**September [2]** 15/3 30/9
**September 21st [1]** 30/9
**September 21st initial [1]** 15/3
**series [1]** 30/7
**serve [1]** 27/20
**several [1]** 20/7
**share [1]** 15/6
**shift [15]** 7/4 7/6 7/8 7/8 7/10 7/12 7/23 14/7 16/20 17/15 19/13 20/2 24/23 24/24 24/24
**shifts [2]** 14/14 14/19
**shipping [2]** 11/8 11/16
**short [1]** 23/20
**shorter [1]** 13/3
**show [1]** 22/16
**showing [1]** 14/8 19/23
**shows [4]** 17/17 20/12 22/13 22/15
**side [3]** 4/20 4/20 22/8
**sides [2]** 4/23 31/4
**sign [1]** 14/12
**signed [1]** 14/15
**significant [1]** 19/23

**similar [2]** 10/1 23/18
**SIMILARLY [2]** 1/6 1/7
**simple [2]** 5/9 14/3
**simply [12]** 7/10 8/3 8/5 8/19 8/22 9/16 11/20 13/14 16/2 22/13 25/17 28/9
**since [1]** 23/23
**single [9]** 6/15 6/20 7/15 7/15 7/16 7/16 7/17 7/21 7/22
**sit [2]** 3/18 24/10
**site [1]** 21/21
**sitting [3]** 13/8 22/25 25/17
**SITUATED [2]** 1/6 1/7
**six [1]** 11/18
**size [1]** 11/22
**slower [1]** 9/24
**socializing [2]** 16/19 17/1
**someone [2]** 16/14 24/6
**someone's [1]** 17/13
**something [3]** 15/7 17/2 19/19
**sometimes [1]** 26/10
**sorry [3]** 7/25 12/11 22/22
**sort [3]** 9/21 11/2 19/19
**specific [3]** 11/9 14/20 29/16
**specifically [3]** 15/21 17/16 24/19
**speculate [1]** 18/24
**speed [7]** 8/15 8/17 9/22 10/8 10/11 10/18 10/22
**speeds [1]** 10/20 25/12
**spend [1]** 30/16
**spent [2]** 15/23 22/21
**square [1]** 11/22
**stadium [1]** 11/24
**standard [1]** 27/16
**start [3]** 4/15 5/17 8/5
**starts [1]** 8/7
**state [1]** 3/6
**STATES [1]** 1/1 32/4 32/8
**station [2]** 8/8 25/22
**steal [2]** 25/16 26/1
**stealing [3]** 10/1 25/16 25/18
**stenographically [1]** 32/5
**step [1]** 3/6
**STEPHANIE [2]** 2/4 3/10
**Stephanie Yasuda [1]** 3/10
**stipulation [1]** 25/8
**stole [3]** 25/21 25/23 26/1
**STORES [2]** 1/10 3/5
**STREET [1]** 1/24
**strikes [2]** 9/22 10/13

**S**

**strong [1]** 13/24
**struggling [1]** 22/1
**subclass [1]** 5/5
**subject [4]** 5/13 16/3 18/6 29/5
**submission [2]** 31/3 31/6
**submit [1]** 17/23
**submitted [2]** 17/11 19/22
**such [3]** 7/10 21/13 27/12
**suggest [1]** 22/1
**suggests [1]** 21/8
**SUITE [2]** 2/5 2/15
**summarize [1]** 16/24
**summary [2]** 19/22 22/15
**supports [1]** 23/13
**supposed [1]** 22/24
**sure [4]** 18/7 19/6 25/25 27/22
**swiping [1]** 17/13

**T**

**table [1]** 3/19
**take [9]** 6/5 8/8 8/19 17/22 20/9 21/2 21/23 25/21 31/3
**takes [6]** 8/10 11/17 13/5 20/20 21/6 28/5
**taking [3]** 19/25 23/20 23/20
**talking [2]** 16/8 16/8
**talks [1]** 7/6
**team [2]** 4/10 4/10
**teed [1]** 9/10
**ten [5]** 5/7 7/4 7/10 7/12 9/8
**ten-hour [3]** 7/4 7/10 7/12
**ten-net [1]** 9/8
**tentative [5]** 15/1 15/13 15/17 15/22 24/7
**terms [6]** 10/15 10/24 18/13 19/25 21/22 22/17
**testified [3]** 8/21 11/14 22/19
**testifies [1]** 20/4
**testify [1]** 10/18
**testimony [2]** 21/5 23/19
**thank [13]** 3/22 4/2 4/18 6/3 15/9 15/12 24/9 24/11 24/15 31/1 31/8 31/9 31/10
**them [3]** 21/9 22/20 28/25
**themselves [1]** 9/17
**theoretically [3]** 6/23 23/6 24/5
**theories [1]** 5/4
**theory [11]** 12/15 15/21 15/23 16/2 16/6 16/12 17/20 19/13

21/16 23/9 29/18
**there's [2]** 5/16 5/16
**thing [2]** 7/10 10/3
**things [5]** 10/6 17/1 17/18 19/12 30/15
**think [40]**
**thinks [1]** 4/20
**third [11]** 6/13 6/16 7/5 7/11 7/17 7/22 19/11 20/3 20/10 24/20 24/22
**though [1]** 7/14
**thousands [4]** 6/19 10/16 10/17 25/4
**three [5]** 7/7 11/2 11/17 20/7 24/25
**Thursday [1]** 31/5
**thus [1]** 16/3
**tighten [1]** 12/5
**till [1]** 31/5
**Title [1]** 32/4
**titles [1]** 11/16
**together [1]** 17/20
**told [2]** 19/24 20/8
**too [1]** 8/23
**took [4]** 7/15 20/3 20/3 22/20
**trained [1]** 22/25
**transcript [3]** 1/17 32/5 32/7
**TRAURIG [1]** 2/13
**tremendous [1]** 14/8
**trial [1]** 30/6
**tried [1]** 23/11
**trier [8]** 7/24 10/21 12/15 12/18 13/6 13/14 28/7 29/23
**trip [3]** 11/13 11/18 12/7
**true [3]** 21/11 23/12 32/4
**try [1]** 19/2
**trying [1]** 18/18
**turn [2]** 18/1 24/6
**two [10]** 5/16 7/2 7/4 11/1 11/3 11/5 11/9 12/9 17/18 25/2
**type [1]** 30/14
**types [1]** 11/1
**typicality [1]** 18/17

**U**

**ultimately [1]** 30/3
**under [10]** 7/18 16/15 16/17 16/22 17/4 23/14 26/13 29/2 31/3 31/6
**understand [7]** 4/21 11/10 14/10 18/7 22/1 25/25 30/1
**understanding [3]** 9/1 10/22 13/14
**understood [1]** 21/9
**uniform [2]** 5/21 6/21
**uniformity [1]** 14/8
**uniformly [1]** 25/2
**uninterrupted [1]** 23/15

**unique [2]** 8/6 18/6
**UNITED [3]** 1/1 32/4 32/8
**unpaid [3]** 5/21 6/1 6/2
**until [4]** 5/11 5/15 5/19 31/6
**up [7]** 6/12 9/10 12/5 12/18 15/2 25/14 30/4
**upon [2]** 14/3 15/1
**upwards [1]** 12/25
**us [3]** 4/7 6/9 30/20
**use [1]** 29/9
**using [2]** 17/1 29/8

**V**

**variability [2]** 19/23 20/13
**vehicle [1]** 29/4
**vehicles [1]** 8/17
**versus [4]** 3/5 9/8 10/12 23/17
**vice [1]** 3/16
**video [5]** 9/4 13/4 25/9 25/10 25/11
**view [3]** 16/12 27/14 27/23
**violate [1]** 26/24
**violates [2]** 12/17 27/12
**violation [1]** 26/8
**virtue [1]** 9/21
**voluntarily [1]** 7/16

**W**

**waiting [1]** 16/20
**waive [1]** 14/12
**waived [3]** 7/16 7/17 7/22
**waiver [5]** 14/10 14/11 14/12 14/15 14/21
**WAL [4]** 1/10 1/11 3/5 16/8
**WAL-MART [4]** 1/10 1/11 3/5 16/8
**walk [10]** 8/23 9/23 9/24 20/21 21/6 21/24 22/20 28/9 28/9 30/2
**walking [14]** 8/14 8/17 9/22 10/8 10/11 10/18 12/24 16/5 23/1 25/12 28/19 28/20 29/13 29/15
**wanted [4]** 5/3 15/16 15/20 16/1
**Wednesday [1]** 31/5
**weekend [1]** 31/8
**weeks [1]** 9/13
**Welcome [1]** 4/3
**WEST [1]** 1/24
**WESTERN [1]** 1/2
**wherever [2]** 8/5 23/2
**why [4]** 23/19 24/6 25/18 27/5
**wide [2]** 11/2 11/7
**widely [1]** 22/16
**WILSHIRE [2]** 2/4 2/9
**win [2]** 28/15 29/18

**wish [3]** 4/25 6/6 24/13
**without [4]** 9/9 10/7 12/4 14/15
**witness [3]** 6/15 6/20 13/2
**witnesses [2]** 13/2 13/3
**word [1]** 18/14
**work [6]** 11/7 23/2 25/2 29/17 29/23 29/24
**worked [4]** 7/7 14/15 20/2 29/4
**workers [1]** 10/16
**Workers' [1]** 10/4
**Workers' Comp [1]** 10/4
**working [1]** 29/20
**workplace [3]** 10/15 12/1 13/21
**workweek [1]** 5/7
**write [1]** 23/11
**wrong [2]** 8/3 18/20 18/25
**wrote [1]** 19/12

**Y**

**YASUDA [3]** 2/4 3/10 4/3
**year [1]** 30/6
**YOON [16]** 2/3 2/3 3/8 4/4 4/15 5/3 15/18 18/2 19/11 20/1 20/17 21/8 23/8 23/11 24/12 27/22
**Your Honor [13]** 3/8 4/5 4/16 4/18 6/7 15/12 18/1 18/9 18/12 19/8 24/9 30/5 30/25

# HERNANDEZ
# DECLARATION

## DECLARATION OF ARTURO HERNANDEZ

I, ARTURO HERNANDEZ, based upon my personal knowledge of the facts stated herein, hereby declare that the following facts are true and correct under penalty of perjury:

1.    I am over 18 years of age and a resident of California.  The information contained in my Declaration is true, correct and based upon my personal knowledge.

2.    On July 10 and 12, 2018, I met with Amber Duffy, counsel for Wal-Mart Stores, Inc. and Wal-Mart Associates, Inc. (together "Walmart") from the law firm of Greenberg Traurig, LLP at the Fulfillment Center in Chino, California.   Nobody else was present and I have not discussed this Declaration with anyone at Walmart.  Before speaking to Walmart's counsel, counsel explained to me that she does not represent me, and that my participation in the interview was completely voluntary and would have no impact on my employment.  I was informed that I did not have to answer any questions and could stop the interview at any time.  Counsel for Walmart also explained to me that I may be a member of a putative class in the lawsuit, that the Court has not yet decided whether or not to certify the case as a class action, that I may have the opportunity to participate in the lawsuit if a class is certified, that the information provided in this Declaration could be used by Walmart to be filed in court and defend itself in the lawsuit, and that I am not being3 required to give this Declaration.  With that clear understanding, I agreed to provide this Declaration.

3.    I currently work in Packaging at the Walmart Fulfillment Center in Chino, California.  I have been in this position for about 6 months.  I have worked for Walmart since September, 2017.

4.    I do not work an alternative work week schedule.  I work 10 hours a day, four days a week on the night shift.  I come in at 6:30 p.m. and leave at 5:00 a.m. I also usually work an additional 10 hour shift each week for which I'm paid overtime.

5.    In my typical 10 hour shift, I get two 15-minute rest breaks.  I don't clock out for rest breaks, and I get paid for them. I always take my break in the front break room because it's the closest

1
DECLARATION

to my area. I usually head to the break room right when my break starts, although sometimes I'll head over a minute early and nobody has ever said it was a problem.  It takes me around 2 minutes to get to the break room and back from my area, so I start heading back to my area about 13 minutes into my break. Those extra five minutes of break time leaves enough time for me to get a full ten minutes to sit and relax.

6.     I also get one 30-minute meal period per 10-hour shift. We clock out for lunch. I usually clock out for lunch at the timeclocks by the front break room. Sometimes, if there's a line to clock out, I won't get clocked out until a few minutes after lunch technically "starts," but since I don't have to clock back in until 30 minutes after I clock out, I don't lose any time for that and get my full lunch off the clock. I usually eat my lunch in the front break room. I used to leave for lunch and go to the gas station nearby, and I've never felt like I couldn't leave the facility to eat lunch, or that I wouldn't get my full break if I chose to leave for lunch. When I choose to leave for lunch, I do need to go through security, but it hardly takes any time, maybe 15-20 seconds. After lunch is over, I either clock back in near the break room, or near my area depending on the day. I can use whichever timeclock I want, and nobody from management has ever told me they cared which timeclock I use.

7.     At the end of my shift, I clock out. Then I grab my phone from my locker and head out. Each associate needs to go through security before they leave. The line at the end of a shift can take about 5 minutes to get through, depending on how many people are leaving at the same time and whether they're carrying bags that need to be checked (Walmart gives us clear bags we have the option of using, so that way it speeds things up because security can see into a clear bag). I don't usually bring anything into work with me except my phone, so getting through security is quicker for me than for others who carry bags. I don't even bring in change in my pockets, but instead I leave everything in the car. The time you spend in security is definitely related to the choice you make about how much stuff you're bringing in and out with you.

2

DECLARATION

8.      When I began working at Walmart, I was given an orientation and I was taught that I am responsible for my own time and for taking my rest breaks and meal periods. I was also told that if I worked more than 10 hours in a day, I was entitled to a second meal break and a third rest break, and that if I had not waived my first meal break, then I could waive my second meal break if I wanted to. I chose to waive my second meal break because I don't want an extra unpaid 30 minutes in my day. I want to get paid and then I want to get home. I also don't need to have an extra meal period especially because I already get a paid, on the clock third rest break on those shifts that go over 10 hours.  No one at Walmart pressured me to sign the second meal waiver. It was my choice.

9.      I was provided a full opportunity to review this Declaration and make any and all changes so as to ensure that it is true and correct based on my personal knowledge.

I declare under penalty of perjury that the forgoing is true and correct.

7-12-2018
_____

Date

ARTURO HERNANDEZ

# LIMON DECLARATION

<u>DECLARATION OF LEIGH LIMON</u>

I, Leigh Limon, based upon my personal knowledge of the facts stated herein, hereby declare that the following facts are true and correct under penalty of perjury:

1.      I am over 18 years of age and a resident of Sierra Madre, California.  The information contained in my Declaration is true, correct and based upon my personal knowledge.

2.      On July 10, 2018, I met with Michael Augustin, counsel for Wal-Mart Stores, Inc. and Wal-Mart Associates, Inc. (together "Walmart") from the law firm of Greenberg Traurig, LLP at the Fulfillment Center in Chino, California.  On July 12, 2018, I had another meeting with counsel for Walmart, this time with Ryan Bykerk, also from Greenberg Traurig, LLP.  Nobody else was present at either meeting, and I have not discussed this Declaration with anyone at Walmart.  At both meetings, before speaking to Walmart's counsel, counsel explained to me that he does not represent me, and that my participation in the interview was completely voluntary and would have no impact on my employment.  I was informed that I did not have to answer any questions and could stop the interview at any time.  Counsel for Walmart also explained to me that I may be a member of a putative class in the lawsuit, that the Court has not yet decided whether or not to certify the case as a class action, that I may have the opportunity to participate in the lawsuit if a class is certified, that the information provided in this Declaration could be used by Walmart to be filed in court and defend itself in the lawsuit, and that I am not being required to give this Declaration.  With that clear understanding, I agreed to provide this Declaration.

3.      I currently work as a Receiving Department Associate at the Walmart Fulfillment Center in Chino, California.  I have been in this position since April 2017.

4.      Since I joined Walmart, I work on an alternative Workweek Schedule ("AWS").  Walmart's AWS allows me to work 10 hours per shift, four days a week.  My shift begins at around 6:00 a.m. and ends around 4:30 p.m.  I knew about the AWS schedule when I agreed to work here.  I love Walmart's AWS as it allows me to have three days off, which I would not have if I worked a typical schedule of eight-hour shifts, five days a week.

D 149

5.     I receive two 15-minute rest breaks per 10-hour work shift. Rest breaks are always paid and on the clock. My first break begins around 8:15 a.m., and my second break begins around 2:00 p.m. I choose to take my rest breaks at the break room nearest to my work area. Walking time to (and from) the break room area ranges from two to three minutes. I am not working during my walking time. But whatever time I spend walking to and from the break room, I always have at least 10 or more minutes to myself during my rest breaks.

6.     Per 10-hour work shift, I receive one meal period that lasts 30 minutes. Everyday, I take a meal break at 10:45 a.m. Sometimes, I leave the facility to have lunch. For example, I sometimes have lunch at a nearby Starbucks. Leaving the facility is fairly simple. I go through security, which is very quick, and then head to my car to drive a few miles to the nearby Starbucks. I can exit the facility, make the trip to Starbucks, and return back to the facility within 30 minutes. I have never felt like I could not leave the facility to eat lunch.

7.     If I decide to bring lunch to work, I usually have lunch at a break room that is close to my workstation. I can use whatever punch clock I want, and there are many. That said, I usually just go to the clock nearest to the break room that I go to. There is typically no line to clock in at the end of a meal period.

8.     At the end of my shift, I clock out and exit the facility. I usually grab my belongings from my locker before I exit. There is a security check to exit the facility, but because most of my belongings are in my clear satchel, security allows me to pass through extremely quick. When I go through security, I also unlock my cell phone to show that it's mine. It only takes a second to unlock my phone and show them. On average, it takes me less than a minute to pass through security, and after I exit the facility, it takes maybe only another minute to get to my car because I am a fast walker.

9.     I have never been asked to work off the clock, nor have I done so.

10.     I have at times worked more than 10 hours in a shift. When that happens, I receive overtime pay and I also have always received a third rest break of at least 10 minutes.

11.     Sometimes, on days when it is very slow at work, the managers may ask if associates would like to volunteer to go home early. I usually like to volunteer when they ask me because I like

D 150

ability to leave early while still keeping my Paid Time Off to be used on other days when I want to go home early but nobody is asking for volunteers. When I decide to leave early, I sign a Voluntary Time Off ("VTO") log and clock out to end my shift. I know that I have the option of not signing the VTO form and staying at the facility to work my full shift. I know employees who decide not to sign the VTO log. Those employees stay and continue to work at a different department. I don't know anyone who is forced to go home early.

12. When I began working at Walmart, I went through an orientation process. During orientation, I learned that I was responsible for my own time and for taking my rest breaks and meal periods on time, and for ensuring that I do not work during my meal or rest periods or anytime off the clock. I was told that if I worked more than 10 hours in a day that I was entitled to a second meal break and a third rest break. I was also told that if I had not waived my first meal break, then I could waive my second meal break for shifts over 10 hours if I chose to do so. I thought about what I wanted and ultimately chose to waive my second meal break and signed a waiver form. I did not feel pressured in making this decision, and no one at Walmart instructed me one way or the other. It was my decision.

13. I was provided a full opportunity to review this Declaration and make any and all changes so as to ensure that it is true and correct based on my personal knowledge.

I declare under penalty of perjury that the forgoing is true and correct.

July 12, 2018
_____
Date

_____
Leigh Limon

---

3

DECLARATION

**D 151**

# McNEILL
# DECLARATION

<u>DECLARATION OF MARNITA MCNEILL</u>

I, Marnita McNeill, based upon my personal knowledge of the facts stated herein, hereby declare that the following facts are true and correct under penalty of perjury:

1.     I am over 18 years of age and a resident of San Bernardino, California.  The information contained in my Declaration is true, correct and based upon my personal knowledge.

2.     On June 25, 2018, I met with Adil M. Khan, counsel for Wal-Mart Stores, Inc. and Wal-Mart Associates, Inc. (together "Walmart") from the law firm of Greenberg Traurig, LLP at the Fulfillment Center in Chino, California.  Nobody else was present and I have not discussed this Declaration with anyone at Walmart.  Before speaking to Walmart's counsel, counsel explained to me that he does not represent me, and that my participation in the interview was completely voluntary and would have no impact on my employment.  I was informed that I did not have to answer any questions and could stop the interview at any time.  Counsel for Walmart also explained to me that I may be a member of a putative class in the lawsuit, that the Court has not yet decided whether or not to certify the case as a class action, that I may have the opportunity to participate in the lawsuit if a class is certified, that the information provided in this Declaration could be used by Walmart to be filed in court and defend itself in the lawsuit, and that I am not being required to give this Declaration.  With that clear understanding, I agreed to provide this Declaration.

3.     I currently work as a packer and consolidation worker at the Walmart Fulfillment Center in Chino, California.  I have been in this position since May 2018, and this is my first job at Walmart.

4.     I do <u>not</u> work on an alternative work week schedule.  I am scheduled to work from 6:30 p.m. to 5 a.m., Sunday through Wednesday, which translates to a 10-hour shift (plus a 30-minute meal break), 4 times a week.  For each of those days, I understand that I get paid overtime when I exceed 8 hours on the clock.  I sometimes work an additional day consisting of a 10-hour shift, and I understand that I get paid the appropriate overtime for that extra shift.

5.     In a typical 10-hour shift I get two 15-minute rest breaks. I typically take my first rest break at 8:30 p.m., and my second break at 2 a.m. or 2:30 a.m.  Rest breaks are paid and on the clock. All of my rest breaks are announced over the loudspeaker.  When the announcement gets made, I prefer to finish what I'm doing, and then I walk to my break.  I understand that Walmart builds an extra 5

1

minutes into our break for walking back and forth, and in my experience, that has always been enough time for me to have at least 10 minutes to myself for my break. I understand I can take my break at a break room, or go to my locker or the restroom. Where I take my break depends on the circumstances of that day. For example, if I'm hungry, I may choose to use the break room so I can grab a snack.

6. The amount of time I spend walking to take my break change day to day. For example, the distance I walk to the restroom may change based on which one is available, or the distance may change if I choose to use a break room vs. going to my locker. While walking to and from my breaks, I am not working. Once I get to the break room (or my locker or the restroom), I make sure I'm on my break for 10 minutes before heading back to my work area. In my experience, the company makes sure that we take our full rest break, and I'm encouraged not to go back to my work area until my 10-minute break is finished

7. I also get one 30-minute meal period for each 10-hour shift. I typically take my meal break at either 10:45 p.m. or 11:15 p.m., but in either case, it's before the fifth hour of my shift. My dinner breaks are announced over the loudspeaker. When the announcement gets made, I usually prefer finish the task I'm performing, and then I begin walking to the break room. I have lots of options in choosing where to clock out. For example, there are several time-punch machines right next to our break rooms, but it's my personal preference to use the time-punch machines close to my work area.

8. There are not a lot of eating options in the neighborhood where our facility is located, and I work the night shift, so I prefer to eat my meals here in the break room rather than driving someplace else in the middle of the night. Since I've been working here at Walmart, I have never tried to go off-site for my meal, and I usually eat dinner in the one of the break rooms. The company provides several break rooms as options where I can take my break. I can use any of them that I choose, but I prefer to use the large one. There is typically not a line at the timeclock to punch back in after dinner.

9. There are many options for where I can clock out at the end of my shift, and I prefer to use the machines close to my work area. I then go grab my stuff from my break room, and head to the exit. Each associate needs to go through security before they leave. The line at the end of a shift only takes 3 to 5 minutes to get through, even if there's a big rush. The time it takes can vary depending on how many people are trying to leave at that time, whether they are using the clear bags provided by the

2

DECLARATION

company to expedite security checks, and how fast the security officer at that particular line is screening people.  (Walmart provides clear bags for its associates to carry their belongings in so that the time through security doesn't take as long.)  I personally use the clear plastic bags because it's faster, but there are additional things I could do to make the process go more quickly.  For example, I could leave my cell phone in my car, not wear metallic belts that need to be removed while passing through the metal detector, and use clear Tupperware containers for my food (rather than thermoses that are not see-through).  I also could avoid bringing certain things to work, like my makeup.  That said, I choose to do some of these things out of personal preference, even though it takes me longer to get through security.

10.     I know that people who bring their cell phones into the facility have to turn them on to show that it is theirs and not one taken from the stock. If I do have my phone on me, that may add a few seconds to the security check though.  I make sure that my phone is fully charged so it doesn't slow me down at security.  Recently, I've realized that it would save battery life if I shut my phone off or put it on airplane mode, so I may begin doing that to avoid losing battery life and potentially slowing down the security process as I exit.  I've never seen someone whose cell phone died be forced to plug it in and charge it up so they can turn it on and prove it's theirs.

11.     I have never been asked to work off the clock, nor have I done so.

12.     I have never worked a shift exceed 10 hours of work.

13.     When I began working at Walmart, I was given an orientation.   During orientation, I learned that I was responsible for my own time and for taking my rest breaks and meal periods and ensuring that I do not work off the clock.

14.     I have never been asked to miss my meal, I have never felt pressured to miss a rest break. In fact, my managers have consistently reminded me to take all my breaks at the appropriate times.

15.     I was provided a full opportunity to review this Declaration and make any and all changes so as to ensure that it is true and correct based on my personal knowledge.

I declare under penalty of perjury that the forgoing is true and correct.

June 25, 2018

Marnita McNeill

3
DECLARATION

D 155

# SEGURA DECLARATION

## DECLARATION OF RIVER SEGURA

I, RIVER SEGURA, based upon my personal knowledge of the facts stated herein, hereby declare that the following facts are true and correct under penalty of perjury:

1.    I am over 18 years of age and a resident of California.  The information contained in my Declaration is true, correct and based upon my personal knowledge.

2.    On July 11, 2018, I met with Amber Duffy, counsel for Wal-Mart Stores, Inc. and Wal-Mart Associates, Inc. (together "Walmart") from the law firm of Greenberg Traurig, LLP at the Fulfillment Center in Chino, California.  Nobody else was present and I have not discussed this Declaration with anyone at Walmart.  Before speaking to Walmart's counsel, counsel explained to me that she does not represent me, and that my participation in the interview was completely voluntary and would have no impact on my employment.  I was informed that I did not have to answer any questions and could stop the interview at any time.  Counsel for Walmart also explained to me that I may be a member of a putative class in the lawsuit, that the Court has not yet decided whether or not to certify the case as a class action, that I may have the opportunity to participate in the lawsuit if a class is certified, that the information provided in this Declaration could be used by Walmart to be filed in court and defend itself in the lawsuit, and that I am not being required to give this Declaration.  With that clear understanding, I agreed to provide this Declaration.

3.    I currently work as a Power Equipment Operator at the Walmart Fulfillment Center in Chino, California.  I have been in this position for about six months.  I have worked for Walmart for approximately 2 years.

4.    The shift that I work is Monday-Thursday, 10 hours a day, 4 days a week and I work the night shift, from 5:00 p.m. to 3:30 a.m. I also usually pick up an extra overtime shift on Fridays.

5.    In my typical 10 hour shift I get two 15 minute rest breaks. About 3 minutes before the break starts, they announce it on the overcome system. Then I start making my way to a parking spot for my forklift. Walking from the parking area to the break room takes 2 minutes at the most. Then I have

1    time to sit and relax. I'd estimate I usually have about 12 minutes to sit during break before I head back

2    to my forklift. I start walking back about a minute before my 15-minutes are up.

3         6.    I also get one 30-minute meal period per 10-hour shift. We clock out for lunch breaks,

4    and then clock back in when it's over. Where I clock in and out depends on where I take my lunch.

5    Sometimes I take my lunch in the back break room and sometimes I take my lunch out in my car. If I eat

6    lunch in my car then I clock out near the front break room, because it's closer to the exit. If I eat in the

7    back break room, I'll clock out back there. I can clock in and out of any timeclock in the facility. It

8    doesn't take very long to get from my forklift to either of the timeclock areas I usually use. I'd estimate

9    no more than a minute. If I leave the facility to go to my car I do need to go through security before I

10   exit. The line at security to exit the building at lunch usually takes anywhere from 2 to 3 minutes to get

11   through. It varies depending on how many people are leaving for lunch at the same time. I've never felt

12   like I couldn't leave the facility to eat lunch, or that I wouldn't get my full break if I chose to leave for

13   lunch.

14        7.    At the end of my shift, I clock out. I usually clock out at the timeclock by my locker.

15   Then I get my phone and keys from my locker and start walking to the front of the building. I usually

16   will sit in the break room for 5-10 minutes before I go through security. I have a 30-40 minute drive

17   home after my shift, so I'll get on my phone or watch t.v. to rest up. Sometimes I'll grab a coffee or an

18   energy drink. Then, when I'm ready to head out, I go through security. I don't bring much in with me,

19   so I get through security very quickly. I only have my phone and my keys. It takes associates longer if

20   they have a bag full of stuff when they leave because security will need to go through their bags more

21   thoroughly to see what's in there. That's why I like to travel light.

22        8.    I was provided a full opportunity to review this Declaration and make any and all

23   changes so as to ensure that it is true and correct based on my personal knowledge.

24        I declare under penalty of perjury that the forgoing is true and correct.

25

26   _7/11/18_____                          _____

27   Date                                            RIVER SEGURA

28

---

2

DECLARATION

**D 158**

# TORRES DECLARATION

## DECLARATION OF JOSHUA TORRES

I, JOSHUA TORRES, based upon my personal knowledge of the facts stated herein, hereby declare that the following facts are true and correct under penalty of perjury:

1.      I am over 18 years of age and a resident of California.  The information contained in my Declaration is true, correct and based upon my personal knowledge.

2.      On July 10, 2018, I met with Amber Duffy, counsel for Wal-Mart Stores, Inc. and Wal-Mart Associates, Inc. (together "Walmart") from the law firm of Greenberg Traurig, LLP at the Fulfillment Center in Chino, California.  Nobody else was present and I have not discussed this Declaration with anyone at Walmart.  Before speaking to Walmart's counsel, counsel explained to me that she does not represent me, and that my participation in the interview was completely voluntary and would have no impact on my employment.  I was informed that I did not have to answer any questions and could stop the interview at any time.  Counsel for Walmart also explained to me that I may be a member of a putative class in the lawsuit, that the Court has not yet decided whether or not to certify the case as a class action, that I may have the opportunity to participate in the lawsuit if a class is certified, that the information provided in this Declaration could be used by Walmart to be filed in court and defend itself in the lawsuit, and that I am not being required to give this Declaration.  With that clear understanding, I agreed to provide this Declaration.

3.      I currently work as a Warehouse Associate in the Shipping Department at the Walmart Fulfillment Center in Chino, California.  I have worked in this position since August of 2017.

4.      I work 10 hours a day, four days a week, on the day shift. The shift I work is an Alternative Workweek Schedule ("AWS"). I also usually will work one additional shift every two weeks on a Friday for which I'm paid overtime.

5.      During my typical 10-hour shift I get two 15-minute rest breaks.  Rest breaks are paid and on the clock. When it's time for a break, I head to one of the break rooms.  I usually go to the front

**D 160**

break room because it's closest to my work area, but I've gone to the back break room too. It depends on the people I want to sit with. I'll usually go where they want to go.   The time it takes me to walk to the break room varies based on where I go, but to get to the front break room typically takes about 3 minutes. I leave my seat and start walking back to my area when my 15 minutes are up, I don't leave early. So if my break is from 3:00 p.m. to 3:15 p.m., I leave the break room right at 3:15. I have at least 10 minutes to sit during each break.

6.     I also get one 30-minute meal period per 10-hour shift. My lunch is typically at 12:00 p.m., and I head to lunch then. I clock out by the front break room. I either take my lunch in the front break room, or I'll go out to my car and leave. It depends on where I'm parked. If I get a close parking spot, then I'll leave for lunch, but if I'm parked far away I won't.   If I leave the the building for lunch I do need to go through security before I exit. The line at security during lunch is usually very fast, I'm at my car within about 4 minutes. I also travel light so it doesn't take me very long. I won't bring a bag or anything, so I just need to show them my phone and lift up my hat and I can leave.   I've never felt like I couldn't leave the facility to eat lunch, or that I wouldn't get my full break if I chose to leave for lunch. At times there can be a short line at the timeclock to punch in after lunch, but it's never been an issue because we have a grace-period of 5 minutes to clock back in.

7.     At the end of my shift, I clock out and head back through security. The line at the end of a shift usually takes approximately 3 minutes to get through. Recently the facility implemented separate lanes for people who bring in bags and people who don't. Since I don't bring in a bag I sail right through.

8.     When I began working at Walmart, I was given an orientation.   During orientation, I learned that I was responsible for my own time and for taking my rest breaks and meal periods and ensuring that I do not work off the clock. I was told that if I worked more than 10 hours in a day that I was entitled to a second meal break and a third rest break. I chose to waive my second meal break

2<br>DECLARATION

because I don't really need that second 30 minute break, especially because I get a paid 15 minute break during that time. No one at Walmart pressured me to sign the waiver, it was my choice.

9.    I was provided a full opportunity to review this Declaration and make any and all changes so as to ensure that it is true and correct based on my personal knowledge.

I declare under penalty of perjury that the forgoing is true and correct.

_7/11 / 2018_

Date

JOSHUA TORRES

**D 162**

# VIDANA DECLARATION

## DECLARATION OF ROBERT FRANCIS VIDANA, JR.

I, ROBERT FRANCIS VIDANA, JR., based upon my personal knowledge of the facts stated herein, hereby declare that the following facts are true and correct under penalty of perjury:

1.      I am over 18 years of age and a resident of California.  The information contained in my Declaration is true, correct and based upon my personal knowledge.

2.      On June 25, 2018, I met with Amber Duffy, counsel for Wal-Mart Stores, Inc. and Wal-Mart Associates, Inc. (together "Walmart") from the law firm of Greenberg Traurig, LLP at the Fulfillment Center in Chino, California.  Nobody else was present and I have not discussed this Declaration with anyone at Walmart.  Before speaking to Walmart's counsel, counsel explained to me that she does not represent me, and that my participation in the interview was completely voluntary and would have no impact on my employment.  I was informed that I did not have to answer any questions and could stop the interview at any time.  Counsel for Walmart also explained to me that I may be a member of a putative class in the lawsuit, that the Court has not yet decided whether or not to certify the case as a class action, that I may have the opportunity to participate in the lawsuit if a class is certified, that the information provided in this Declaration could be used by Walmart to be filed in court and defend itself in the lawsuit, and that I am not being required to give this Declaration.  With that clear understanding, I agreed to provide this Declaration.

3.      I currently work as a CSAP Associate at the Walmart Fulfillment Center in Chino, California.  I have been in this position since April, 2016.  I have worked for Walmart for about 2 years.

4.      I do not work an alternative work week schedule.  My scheduled shift is Monday-Friday from 7 a.m. - 3:30 p.m., with a 30 minute meal break. Lately they've been offering overtime, so most days I work until 5:30pm.

5.      Working in Asset Protection is different than working on other parts of the floor.  Our break times and meal periods are determined based on what area we're in. So if I'm working the AP

desk out front my breaks would be at a different time than if I was roving on the floor. But, I always take two 15 minute breaks and one 30 minute lunch when I work an 8 hour shift. Rest breaks are paid and on the clock. When it's time for a break, I stop by my locker to grab my phone and then I head to one of the break rooms. I have the option to go to any of the break rooms, although I always go to the same break room because I like it the best. The time it takes me to walk to my locker and the break room varies, because I'm usually walking from different areas. Even if I'm on the opposite end of the facility, it wouldn't take me longer than 3 minutes to get to that break room. We try to put people's lockers near the area they work, but since I'm in AP and work in many areas, my locker is right by the break room. Although the time it takes to walk to and from my breaks will vary, I have at least 10 minutes to sit in the break room each time.

6.     I also get one 30-minute meal period per 8 hour shift. Again, because I'm in AP my meal period is a little different from others on the floor and is determined based on which area I'm in. When it's time for my meal break, I go to the timeclock and punch out. There are many punch clocks available to use, and the facility has added many in different locations over time. They are located throughout the facility and in different locations, and I can use whichever one I want, although I typically punch out at the timeclocks near the break room. I either eat lunch in the front break room or sometimes I go out to eat. Lately I've been working a lot of overtime so I have less time to cook and I've been going out to eat for lunch more often. If I leave the facility I do need to go through security to exit the building. The line at security to exit the building at lunch usually takes less than 2 minutes to get through. A lot of people choose to stay and eat at the facility, and different areas also have different lunch times so not many people are ever leaving at the same time. I've never felt like I couldn't leave the facility to eat lunch, or that I wouldn't get my full break if I chose to leave for lunch. There is occasionally a small line at the timeclock to punch in after lunch, but we have a 5 minute grace period to clock in and I've never left lunch early to clock in, or had a problem clocking in within those 5 minutes. There are also timeclocks

all down the associate walkway, so if there's a line at one cluster, you can always walk to another. The choice of which time clock to use is up to each individual associate.

7.    At the end of my shift, I clock out. Then I gather my belongings and head to the exit. Each associate needs to go through security before they leave. Because my shift ends at 3:30 there's usually no one in line to get out. But, even when I work overtime and leave at 5:30 with the rest of the shift, the line usually doesn't take more than 5 minutes get through, and typically more like 1-2 minutes. It varies depending on the coverage that AP has that day. If AP has call-outs then there aren't as many people running the metal detectors or checking bags and that can affect the time it takes to get through the line. We keep 5-6 lines open and we also have opened a secondary exit, Door 47, with 4 metal detectors that people can use to leave. That exit is only open at the end of the shift. Walmart provides clear bags for its associates to carry their belongings in so that the time through security doesn't take as long. When we leave, we do have to open our phone to show security that it is ours, and not taken from the facility. I usually bring in my phone and leave it in my locker so I can use it during breaks. I've never had an issue with it being dead when it's time to leave because I'm not on it a lot during the day and I charge it fully while I sleep at night. I have seen people have to plug their phone in at the security line if it's dead so that they can turn it on. But, that doesn't hold up the rest of the line.

8.    When I began working at Walmart, I was given an orientation.  During orientation, I learned that I was responsible for my own time and for taking my rest breaks and meal periods and ensuring that I do not work off the clock. I was told that if I worked more than 10 hours in a day that I was entitled to a second meal break and a third rest break.  I was also told that if I had not waived my first meal break, then I could waive my second meal break if I wanted to. I have never been asked to miss my lunch, and I have not ever missed a lunch. If I'm roving, it's my responsibility to relieve the other AP associates for their breaks, so I help them remember to take them.

3
DECLARATION

D 166

9.   While I usually only work 2 additional hours of overtime, at times I have worked between 10 and 11.5 hours in a day. I remember voluntarily signing a meal waiver for my second meal break for those times when I work over 10 hours per day. I chose to do that because that time is off the clock and unpaid and I am better off staying on the clock and finishing earlier to go home at the end of a shift, plus I get a third paid rest break anyway if I have gone over 10 hours in a day. No one at Walmart instructed me one way or the other. It was my choice.

10.   I was provided a full opportunity to review this Declaration and make any and all changes so as to ensure that it is true and correct based on my personal knowledge.

I declare under penalty of perjury that the forgoing is true and correct.

6.25-18
_____
Date

ROBERT FRANCIS VIDANA JR.

4
DECLARATION

**D 167**