UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHELSEA HAMILTON, et al., | Case No. 5:17-cv-01415-AB (KKx) |
| Plaintiffs, | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO STRIKE [144] AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DECERTIFY THE CLASS ACTION [159]** |
| v. | |
| WAL-MART STORES, INC., et al., Defendants. | |

Pending before the Court are two motions: Defendants Wal-Mart Stores, Inc. and Wal-Mart Associates, Inc.'s (collectively, "Walmart") (1) Motion to Strike the expert reports and bar testimony of Dr. Brian Kriegler and Dr. Stephanie J. Bonin (collectively, "the experts") and (2) Motion to Decertify the class action.[1] (Dkt. No. 144 (hereinafter, "Mot. to Strike"); Dkt. No. 159 (hereinafter, "Decert. Mot.").) Both motions are opposed. Having considered the parties' submissions, the relevant law, and the record in this case, as well as the arguments of counsel at oral argument, the Court hereby (1) **GRANTS** in part and **DENIES** in part Walmart's motion to strike and (2) **GRANTS** in part and **DENIES** in part Walmart's motion for decertification.

---

[1] The parties' cross motions for summary judgment are also before the Court, but will be resolved by separate order.

1    **I.    BACKGROUND**

2         Plaintiffs are former employees of Defendants that worked at Walmart's

3    fulfillment center in Chino, California. (Dkt. No. 121 ("Class Cert. Order") at 1; Dkt.

4    No. 69 ("Compl.") ¶¶ 2-3.) Plaintiffs brought this class action against Walmart

5    alleging Walmart violated various California Labor Code sections and the Unfair

6    Competition Law ("UCL") by failing to (1) pay wages for all hours worked, (2) pay

7    all overtime wages, (3) provide meal periods, (4) provide rest breaks, (5) pay final

8    wages, and (6) provide accurate itemized wage statements.  (*Id.* ¶¶ 38-116.)  Based on

9    these alleged violations, Plaintiffs brought a class action under Rule 23 of the Federal

10   Rules of Civil Procedure[2] and a representative action under the Private Attorneys

11   General Act ("PAGA").

12        In August 2018, the Court certified six subclasses, which are defined as

13   follows:

14        **1.    Security Checkpoint Subclass**: all current and former non-exempt

15               employees employed by Defendants in the State of California and who

16               worked in a Walmart Fulfillment center and who were required to go

17               through a security checkpoint during a meal period and/or at the end of

18               his/her shift during the period from June 8, 2013 to the present;

19        **2.    Overtime Subclass**: all current and former non-exempt employees

20               employed by Defendants in the State of California and who worked in a

21               Walmart Fulfillment center and who worked one or more shifts in excess

22               of eight (8) hours in a day or forty (40) hours in a workweek and who

23               were not properly paid all overtime wages during the period from June 8,

24               2013 to the present;

25        **3.    Alterative Workweek Subclass**: all current and former non-exempt

26               employees employed by Defendants in the State of California and who

27   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

28   [2] All further references are to the Federal Rules of Civil Procedure unless otherwise
     noted.

1   worked in a Walmart Fulfillment center and pursuant to an alternative

2   workweek schedule and were not paid daily overtime for work in excess

3   of eight (8) but less than ten (10) hours;

4   **4.**     **Meal Break Subclass**: all current and former non-exempt employees

5   employed by Defendants in the State of California and who worked in a

6   Walmart Fulfillment center and who worked a shift in excess of six (6)

7   hours during the period from June 8, 2013 to the present;

8   **5.**     **Waiting Time Penalty Subclass**: all current and former non-exempt

9   employees employed by Defendants in the State of California and who

10   worked in a Walmart Fulfillment center and who separated from their

11   employment with Defendants during the period from June 8, 2014 to the

12   present;

13   **6.**     **Wage Statement Penalty Subclass**: all current and former non-exempt

14   employees employed by Defendants in the State of California and who

15   worked in a Walmart Fulfillment center during the period from June 8,

16   2016 to the present.

17       Now, Walmart moves to decertify the security checkpoint subclass, the

18   overtime subclass, the meal break subclass, the wage statement penalty subclass, and

19   the waiting time penalty subclass.[3] Walmart also moves to strike the experts' reports

20   pursuant to Rule 37(c)(1) and to bar the experts from "testifying at trial or otherwise"

21   as noncompliant with Rules 26(a)(2)(B) and 26(a)(2)(D). (Mot. to Strike at 2.)

22   **II.    LEGAL STANDARD**

23       **A.    Motion to Strike Expert Reports**

24       Rule 26 requires that a party must disclose the identity of each expert witness

25   "accompanied by a written report—prepared and signed by the witness." Fed. R. Civ.

26

27   _____

[3] Plaintiffs' evidentiary objections in opposition to Walmart's motion for
decertification are **OVERRULED** as moot because the Court does not rely on the
28   disputed evidence. (Dkt. No. 171-1.)

3.

P. 26(a)(2)(B). Rule 26 requires that the disclosure of an expert witness must be accompanied by the expert's written report setting forth the following information:

> (i) a complete statement of all opinions the witness will express[ and the basis and reasons for them;
> (ii) the facts or data considered by the witness in forming them;
> (iii) any exhibits that will be used to summarize or support them;
> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
> (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
> (vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B). The parties are to submit their expert disclosures "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D).

Rule 37(c)(1) gives teeth to the requirements imposed by Rule 26 by forbidding the use at trial, hearing, or on a motion of any information that is not properly disclosed. *Hoffman v. Construction Protective Servs., Inc.,* 541 F.3d 1175, 1179 (9th Cir. 2008). This is "a 'self-executing,' 'automatic' sanction to 'provide[ ] a strong inducement for disclosure of material.'" *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.,* 259 F.3d 1101, 1106 (9th Cir. 2001) (quoting Fed. R. Civ. P. 37 advisory committee's note (1993)). The harshness of this rule is ameliorated by the express exceptions that the information may be introduced if the failure to disclose the information was substantially justified or harmless. *Id.* The burden is on the party facing the sanction to show that the failure to disclose was harmless. *Id.* at 1107.

The district court has wide latitude in issuing discovery sanctions under Rule 37(c)(1). *Id.* at 1106. A district court's discretion to impose sanctions, however, is limited when the imposition of sanctions would be tantamount to dismissal. *R & R Sails, Inc. v. Ins. Co. of Pa.*, 673 F.3d 1240, 1247 (9th Cir. 2012); *see also Toyrrific, LLC v. Karapetian*, 606 F. App'x 365, 365 (9th Cir. 2015). If the sanction amounts to dismissal of a claim, the district court must "consider whether the claimed

noncompliance involved willfulness, fault, or bad faith," as well as "the availability of lesser sanctions." *R & R Sails*, 673 F.3d at 1247.

### B.   Motion for Decertification

Rule 23(c)(1)(C) permits a court to alter or amend an order granting class certification at any point prior to the entry of final judgment. Fed. R. Civ. P. 23(c)(1)(C); *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) ("Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation."). "In considering the appropriateness of decertification, the standard of review is the same as a motion for class certification: whether the Rule 23 requirements are met." *Marlo v. United Parcel Serv., Inc.*, 251 F.R.D. 476, 479 (C.D. Cal. 2008), *aff'd*, 639 F.3d 942 (9th Cir. 2011). On a motion for decertification, Plaintiff continues to "bear[ ] the burden of demonstrating that the requirements of Rules 23(a) and (b) are met." *Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 947 (9th Cir. 2011) (citation omitted); *see also Negrete v. Allianz Life Ins. Co. of N. Am.,* 287 F.R.D. 590, 598 n.1 (C.D. Cal. 2012) ("To the extent that pre-*Marlo* cases conclude that a defendant bears the burden on a motion to decertify of demonstrating that 'the elements [of] Rule 23 have not been established,' *Gonzales v. Arrow Fin. Servs. LLC,* 489 F. Supp. 2d 1140[, 1153] (S.D. Cal. 2007), these cases are no longer good law.").

## III.   DISCUSSION

### A.   The Court <u>Grants</u> in Part and <u>Denies</u> in Part Defendants' Motion to Strike.

The Court begins with Walmart's motion to strike as it is relevant to Walmart's motion for decertification and the parties' motions for summary judgment. Walmart first argues that Dr. Brian Kriegler and Dr. Stephanie J. Bonin's expert reports, as well as their testimony, should be excluded under Rule 37(c)(1) for failure to comply with Rule 26(a)(2)(B) because Plaintiffs' initial expert disclosures did not contain a

complete statement of all opinions the experts will express and the basis for them. Plaintiffs counter by arguing the preliminary nature of their experts reports was justified because (1) Walmart had not yet produced all surveillance video necessary to calculate class damages and (2) Plaintiffs' were waiting on Walmart's permission to conduct a site inspection of the facility, which was necessary to calculate the average time that it takes employees to walk from each time clock to the security check area at the exit of the facility. Plaintiffs also argue that they are allowed to supplement their reports under Rule 26(e).

The Court will first summarize relevant procedural history and then address the parties' arguments in turn.

## 1. Relevant Procedural History

Plaintiffs filed this action in July 2017. (*See* Dkt. No. 1.) In October 2017, the parties submitted a joint schedule of proposed pretrial and trial dates. (Dkt. No. 48.) The Court adopted the parties' proposed schedule and set the trial for January 29, 2019 with a July 20, 2018 initial expert disclosure deadline and August 31, 2018 expert discovery cut-off date. (Dkt. No. 50 (hereinafter, "Oct. 30, 2017 Scheduling Order") at 3.) In the October 30, 2017 Scheduling Order, the Court informed the parties as follows:

> The cutoff date for discovery is *not* the date by which discovery requests must be served; it is the date by which all discovery, *including all hearings on any related motions*, must be completed. Thus, written discovery must be served, and depositions must begin, sufficiently in advance of the discovery cutoff date to permit the discovering party enough time to challenge via motion practice responses deemed to be deficient. Given the requirements to meet and confer and to give notice, in most cases a planned motion to compel must be discussed with opposing counsel at least six weeks before the cutoff.

(*Id.* at 4.) The Court also informed the parties that "[a]ny motion challenging the adequacy of discovery responses must be filed, served, and calendared sufficiently in advance of the discovery cut-off date to permit the responses to be obtained before

1  that date if the motion is granted." (*Id.* at 4-5.)

2  On May 1, 2018, Plaintiffs filed a stipulation to continue the trial and pretrial

3  deadlines (Dkt. No. 87), which the Court approved on May 3, 2018. (Dkt. No. 89; *see*

4  *also* Dkt. No. 127-1, Gershman Decl. ¶¶ 2-3, Ex. 1 (declaring *Plaintiffs* sought to

5  extend pretrial deadlines by stipulation in April 2018 and Walmart obliged).) On

6  May 9, 2018, Plaintiffs filed a second stipulation to continue the expert discovery

7  cutoff because the prior stipulation inadvertently omitted the expert discovery cut-off

8  date (Dkt. No. 91), which was approved by the Court on May 15, 2018. (Dkt. No. 92.)

9  Pursuant to these stipulations, the parties agreed to the following pretrial deadlines:

10  - Trial date: April 2, 2019;

11  - Final Pretrial Conference: March 15, 2019;

12  - Expert Discovery Cut-off: October 31, 2018;

13  - Non-Expert Discovery Cut-off: November 16, 2018;

14  - Initial Expert Disclosures: September 21, 2018;

15  - Rebuttal Expert Disclosures: October 22, 2018;

16  - Last Day to Hear Motions: December 21, 2018;

17  - Trial Filings (First Round): February 22, 2019; and

18  - Trial Filings (Second Round): March 1, 2019.

19  Walmart previously indicated that, on August 10, 2018, "Plaintiffs served a

20  Local Rule 37-2 joint stipulation, seeking a court order to compel production of . . .

21  more surveillance footage," but withdrew the motion on or around August 27, 2018

22  after the class certification hearing. (Dkt. No. 127-1, Gershman Decl. ¶ 6.) On August

23  17, 2018—the same date as the class certification hearing—Plaintiffs served new sets

24  of document requests, in which they asked for all video footage at the Chino e-

25  commerce fulfillment center. (*Id.* ¶ 7, Exs. 6-7.)

26  At the class certification hearing on August 17, 2018, Plaintiffs' counsel

27  acknowledged the expert disclosure deadlines. Direct quotes from the hearing are

28  below:

**Mr. Yoon [Plaintiffs' counsel]:** . . . based upon the Court's tentative, we have a few dates coming up; and the most pressing initial deadline is the September 21st initial expert disclosure. So I don't know what the Court's procedure is for that. We can, of course, make any of these deadlines, but, if the Court had an opinion or would like to share something on how the Court likes to handle this post-certification, that would be helpful.

**Court:** We'll discuss that at the end. Thank you, Counsel.

(Gershman Decl.,  Ex. 7 at 144:25-145:10 (emphasis added).) After discussing the merits of Plaintiffs' motion for class certification, the Court revisited the issue:

**Court:** . . . Help me understand. You said there is a scheduling issue. Just walk me through. What is the question that you ultimately have? You said there [are] some dates that are coming up.

**Mr. Yoon:** Current schedule, Your Honor, is we have [a] April 2nd trial date next year. And from that there is a series of deadlines. But the main one is the November 16th, nonexpert discovery cut off to December 21st, last date to hear motions, and then the September 21st, initial expert disclosure.

**Court:** What's your question?

**Mr. Yoon:** We can – obviously, we have been litigating this case to meet all deadlines. But if the Court has any type of common way the Court likes to do things after certification, then we'd like to know. If the Court believes these deadlines are firm, then we won't spend any time  - -

**Court:** I can answer that question. The deadlines are firm.

**Mr. Yoon:** Then that makes it easier on us.

**Court:** The deadlines are firm. . . . I have a heavy calendar. I would like to keep the deadlines as they are. I hope that answers your question.

**Mr. Yoon:** Yes, that answer the question completely, yes, Your Honor.

(Gershman Decl., Ex. 7 at 159:25-160:25 (emphases added).)

On September 18, 2018 at 7:27 p.m.—only two full business days before the date Plaintiffs' initial expert disclosures were due—Plaintiffs filed an ex parte application to submit initial expert disclosures subject to the requirements of Rule 26(a)(2)(C) in lieu of 26(a)(2)(B) and extend the expert discovery cut-off date. (Dkt. No. 126.) Plaintiffs argued ex parte relief was warranted because Plaintiffs could not

provide expert disclosures without certain discovery—including video footage of the worksite and security check lines, a site inspection, badge swipe data, and post-certification data. (*Id.*)

On September 20, 2018, the Court denied Plaintiffs' ex parte application, finding Plaintiffs "fail[ed] to demonstrate that [they were] without fault in creating the present 'crisis' requiring ex parte relief" and that "Plaintiffs [were] not diligent in their efforts to adhere to the existing expert disclosure deadline." (Dkt. No. 128 at 3-4.)

On October 5, 2018, Plaintiffs filed two motions to compel discovery from Walmart. (Dkt. Nos. 134-135.) Then, on November 9, 2018, Plaintiffs withdrew the motions. (Dkt. No. 147.)

### 2.    Initial Expert Reports

Plaintiffs served the initial expert reports at issue on September 21, 2018, the date they were due pursuant to the Court's Pretrial Order.[4] (*See* Dkt. Nos. 89, 92; Dkt. No. 144-1, Declaration of Matthew R. Gershman ("Gershman Decl.") ¶ 2.) Plaintiffs' initial reports were timely, so the only issue is whether they comply with Rule 26(a).

Under Rule 26(a)(2)(B), an expert must disclose in his report "a complete statement of all opinions the expert will express and the basis and reasons for them" and "the data or other information considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B)(i)-(ii). The parties must submit their expert disclosures "at the time and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D).

The requirement of a "detailed report" under Rule 26(a)(2) serves multiple functions: "It helps the opposing party to meaningfully depose the expert; it helps the opposing party to determine its own expert needs; and it prevents the expert from 'lying in wait' with new, last-minute opinions." *Ridgeway v. Wal-Mart Stores, Inc.*, No. 08-cv-05221-SI, 2016 WL 4529430, at *9 (N.D. Cal. Aug. 30, 2016) (citation omitted). Another purpose of the rule is "to require the disclosure of 'information

---

[4] The Court expresses no opinion on the reliability of any expert testimony because neither party has filed *Daubert* motions.

1  regarding expert testimony sufficiently in advance of trial that opposing parties have a
2  reasonable opportunity to prepare for effective cross examination and perhaps arrange
3  for expert testimony from other witnesses.'" *In re Google Adwords Litig.*, No. C08-
4  03369, 2010 WL 5185738, at *2 (N.D. Cal. Dec. 8, 2010) (citation omitted).

5                              a.        **Dr. Kriegler's Initial Report**

6         Plaintiffs designated Dr. Kriegler as an expert witness and attached his
7  "preliminary report" to their initial disclosures.  (Gershman Decl. ¶ 2, Ex. 1
8  (hereinafter, "Pl.'s Initial Disclosures") ¶ 1.) Plaintiffs informed Walmart that Dr.
9  Kriegler's "final report will follow once all data is provided, which will disclose the
10 nature of his testimony and his opinion." (*Id.*)  Plaintiffs stated that "the opinion as of
11 now and substance of his testimony is set forth in the [attached report]. Generally, it
12 will concern Plaintiff's and the Class's damages based on the facts of the company's
13 electronically maintained records, to wit: lost wages, interest and other facts relating
14 to that testimony, including but not limited to summary and analysis of Class data."
15 (*Id.*) Dr. Kriegler indicates that "[his] work in this case is ongoing because some
16 relevant data ha[s] not been produced yet." (Pl.'s Initial Disclosures, Ex. A
17 (hereinafter, "Kriegler Initial Report") at 1.)

18        With respect to the security checkpoint subclass, Dr. Kriegler indicates that he
19 will opine (a) how long it takes employees to get through the security checkpoint,
20 including waiting in line by using surveillance video footage and (b) the amount of
21 time it takes to walk from the timeclock terminals to the security checkpoint using one
22 of three approaches that are not explained in great detail.[5] (*Id.* at 13.) Dr. Kriegler

23 _____

24 [5] Dr. Kriegler's first approach to calculate the time to walk from the timeclock to the
   security checkpoint uses the combination of timekeeping and turnstile data. The
25 second approach utilizes surveillance footage "to estimate the proportion of
   employees that use each timeclock terminal" and ergonomic testimony "to measure a
26 reasonable amount of time it takes to walk from each timeclock to the security
   checkpoint." (Kriegler Initial Report at 14.) The third approach relies on "surveillance
27 footage to estimate both (i) the time it takes to walk from the timeclocks to the
   security checkpoint and (ii) the proportion of employees that use each timeclock
28 terminal." (*Id.*)

asserts that he, along with his staff, "have the capacity to review several hundred hours of video." (*Id.*)

To determine class-wide damages for the alternative workweek subclass, Dr. Kriegler proposes a four-step analysis: First, "identify who was on an AWS based on Shift Pattern Data and patterns in Timekeeping Data"; second, "calculate the difference between overtime hours in the Timekeeping Data but for the AWS and overtime hours accordingly to the Payroll Data"; third, "multiply the number of underpaid overtime hours by the employee's hourly rate of pay" for each employee pay period; fourth, "add these damages together across employees to arrive at a classwide total." (*Id.* at 15.)  Based on mathematical criteria described in an attachment to his initial report, Dr. Kriegler identified 1,199 employees who were on a morning AWS at some point according to shift pattern data and 1,035 employees who "were likely on a morning AWS based on a set of mathematical criteria applied to the Timekeeping Data." (*Id.*)

For the meal break subclass, Dr. Kriegler computes damages in two ways. First, Dr. Kriegler computes damages by assuming *all* meal periods were noncompliant. Second, he computes damages by assuming thirty-minute meal breaks in which employees took an off-site break violate California law. (*Id.* at 16.) To calculate damages under the second point, Dr. Kriegler calculates damages when Walmart's time keeping data "show[s] a meal period length of exactly 30 minutes" and the turnstile data "show[s] that the employee re-entered the facility no more than 15 minutes prior to the meal punch-in, i.e., when the employee concluded his/her meal break." (*Id.*) Dr. Kriegler "offer[s] no opinion as to whether recorded breaks of 31+ minutes were less than 30 minutes when accounting for off-the-clock travel time and security check time." (*Id.*) However, he states meal periods "*potentially* include fewer than 30 minutes of uninterrupted break time" if (1) the time keeping data "show[s] 31-40 minute meal periods" and (2) the turnstile data "show[s] that the employee re-entered the facility no more than 15 minutes prior to the meal punch-in, *i.e.*, when the

employee concluded his/her meal break." (*Id.*)

To calculate waiting time penalties, Dr. Kriegler uses "average daily wage" as an input, the amount of which can be determined "either (i) across all pay periods during employment, or (ii) for the final pay period during their employment." (*Id.* at 18.) Dr. Kriegler reports class-wide waiting time penalties for each approach. (*Id.*) Dr. Kriegler states that he has identified "any putative class member who last appeared on or before December 22, 2017 in both the Timekeeping Data and the Payroll Data as a former (terminated) employee." (*Id.*)

Finally, for the wage statement subclass, Dr. Kriegler calculates penalties for employees who received allegedly nondiscretionary overtime adjustments. (*Id.*) Dr. Kriegler also attaches the break-down of waiting time penalties and wage statement penalties for each category of damages and lists the number of employees and class-wide penalties for each category. (*See id.* Attachment 5.)

The Court finds Dr. Kriegler's initial report regarding "walking time," "wait time," and "security checkpoint time" in support of the security checkpoint subclass falls short. Dr. Kriegler merely lists all *possible* methods for calculating damages for time spent walking to, waiting at, and going through the security checkpoint, but these methods are discussed in the abstract and they raise serious questions as to *how* he will calculate time in this particular case.   As to "walking time," "wait time," and "security checkpoint time," the Court concludes that Plaintiffs failed to provide "a complete statement of all opinions [Dr. Kriegler] will express and the basis and reasons for them" and "the data or other information considered by [Dr. Kriegler] in forming them" as required by Rule 26(a)(2)(B)(i) and (ii). The Court concludes that Dr. Kriegler's initial report as to the alternative workweek, meal break,  wage statement, and waiting time penalty subclasses are sufficient for purposes of this motion because Dr. Kriegler articulated the methods and bases for his opinions for these claims.

1

### b.    Dr. Bonin's Initial Report

2    In the initial disclosure, Plaintiffs stated that Dr. Bonin's report is "preliminary"

3    and that the "final report will follow once discovery is permitted for a site inspection,

4    which will disclose the nature of her testimony and her opinion," but indicated that

5    "generally the substance of her testimony will concern average times it takes

6    employees to walk from . . . each time clock to the security check area within the

7    warehouse facility." (Pl.'s Initial Disclosures, Ex. B (hereinafter, "Bonin Initial

8    Report") ¶ 5.)

9    Dr. Bonin states her opinion "will be based on the facts and data related to the

10   facility, namely the distances from each time clock to the security check point." (*Id.*

11   ¶ 6.) Dr. Bonin "will then opine as to the average walking time by applying average

12   walking speeds from peer-reviewed literature." (*Id.* ¶ 6.) Dr. Bonin cites and attaches

13   three sources: (1) a 1988 report finding different ranges of "normal walking speed[s]"

14   for men and women between the ages of 20-60 years old; (2) a 1997 report finding

15   different ranges of "'comfortable' walking speeds" for females and males between the

16   ages of 20-60 years old; and (3) a 1996 report that determined the "average walking

17   speeds of men and women under the age of 65, while crossing a street at a crosswalk."

18   (*Id.*)

19   Dr. Bonin states that she "intend[s] to collect the specific distances needed for

20   [her] calculations by conducting a site inspection of the warehouse facility and

21   measuring the distances of the shortest path from each time clock to the security check

22   area." (*Id.* ¶ 7.) The remainder of the report provides:

23       Alternatively, if I am not permitted to conduct a site inspection, I
24       can perform my analysis if I am provided with the specific locations of the
         time clocks and the security checkpoint on the provided floor plan . . . . If
25       I am not permitted to conduct a site inspection, I will assume walking paths
         from each time clock to the security checkpoint based on the layout of the
26       warehouse in the provided floor plan. I will determine the distances of
         these paths and calculate the time required to travel these paths based on
27       typical walking speeds reported in the literature . . . . Surveillance video

28

13.

footage of employees walking inside the warehouse would allow me to directly measure the employees' walking speeds, determine an average and range of walking speeds for the warehouse employees, and estimate time to walk specific distances based on those speeds.

(*Id.* ¶¶ 8-10.)

The Court finds that Dr. Bonin's report does not comply with Rule 26(a) because Dr. Bonin neither provides an opinion regarding the time it takes to walk from point A to point B nor adequately discloses "the basis and reasons" for such an opinion. Instead, Plaintiffs' initial disclosure simply states Dr. Bonin will rely on three sources to determine employees' walking speeds without describing how she was going to arrive at a figure or what average walking speed she would use—e.g., the average "normal walking speed," the average "comfortable walking speed," the average walking speed while crossing a street, or the average of all three reports. Nor did Plaintiffs supplement Dr. Bonin's initial report, as required by Rule 26(e), after Walmart pointed out that the initial disclosure was incomplete.

With one month until trial, it is unclear how Dr. Bonin will reconcile the discrepancies in the three reports and how any of those reports would apply to persons outside of the reports' speed and age criterion. Neither the Court nor Walmart should have to guess. The Court therefore concludes that Plaintiffs failed to provide "a complete statement of all opinions [Dr. Bonin] will express and the basis and reasons for them" and "the data or other information considered by [Dr. Bonin] in forming them" as required by Rule 26(a)(2)(B)(i) and (ii).

### 3. Supplemental Expert Reports

Plaintiffs nonetheless argue that the expert reports are admissible pursuant to Rule 26(e), which requires supplementation of an initial disclosure "if the party learns that in some material respect the disclosure . . . is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." The Ninth Circuit, however,

recognizes that "Rule 26(e) creates a 'duty to supplement,' not a right." *Luke v. Family Care & Urgent Med. Clinics*, 323 F. App'x 496, 499-500 (9th Cir. 2009). Rule 26(e) does not "create a loophole through which a party who submits partial expert witness disclosures, or who wishes to revise her disclosures in light of her opponent's challenges to the analysis and conclusions therein, can add to them to her advantage after the court's deadline for doing so has passed." *Id.* Rather, supplementation under Rule 26(e) means "correcting inaccuracies, or filing the interstices of an incomplete report based on information that was not available at the time of the initial disclosure." *Id.* (citation omitted).

Here, Dr. Kriegler supplemented his report on November 14, 2018[6]—almost two months after the expert disclosure deadline and seven days before Walmart's deadline to file its motion for decertification. (*See* Dkt. No. 155-1, Declaration of Mark Kemple in Support of Mot. to Strike ("Kemple Decl.") ¶ 8, Ex. 14 (hereinafter, "Kriegler Supp. Report").)

Walmart challenges Dr. Kriegler's supplemental analysis of video footage in support of the security checkpoint subclass. Walmart argues that "there has been no new video footage produced to Plaintiffs since May 2018," so Dr. Kriegler's supplemental opinions regarding claims based on video footage could and should have been disclosed in his initial report. (Dkt. No. 155 at 11.) Walmart also moves to strike Dr. Kriegler's supplemental report on the ground that it contains surrebuttal opinions in response to Walmart's rebuttal expert reports.[7] (*Id.* at 12-13.)

---

[6] Dr. Bonin did not supplement her expert report. However, at the hearing on the motion, Plaintiffs' counsel indicated that they intended to supplement Dr. Bonin's report following the outcome of this motion. The Court finds supplementation would be inappropriate here. The Court is troubled by Plaintiffs' dilatory approach to litigating this case. Apart from the alleged discovery issue regarding a site inspection, Dr. Bonin does not explain how she intends to calculate walking speed based on the sources attached to her report. Dr. Bonin's initial report is clearly deficient in this respect. The Court concludes Dr. Bonin's opinion (or lack thereof) regarding average walking speed is not based on information previously unavailable to Dr. Bonin.

[7] In Walmart's reply in support of its motion to strike, Walmart states "more could be

1    With respect to the security check and overtime subclasses, Dr. Kriegler states

2    he "ha[s] begun to examine/analyze surveillance footage in order to assess—*to the*

3    *extent possible*—the following components of allegedly compensable off-the-clock

4    time," including "walking time" (the time it takes to walk from the timeclock station

5    to the security checkpoint entrance), "wait time" (the time class members wait in line

6    before entering the security checkpoint area), and "security checkpoint time" (the time

7    from when class members enter the security checkpoint area until they exit through

8    the turnstiles). (Kriegler Supp. Report at 8 (emphasis added).)

9    To calculate "walking time," Dr. Kriegler "ha[s] begun to estimate the

10   percentage of people who exited the facility and do not clock out close to the security

11   checkpoint area." (*Id.*) Dr. Kriegler states he uses this *new* step "to account for the

12   possibility that employees clock out at a time keeping station (i) close to the security

13   checkpoint area, and (ii) in a different area than at the beginning of their shift." (*Id.*)

14   Dr. Kriegler asserts this percentage multiplied by the "10th and 25th percentiles of Pre-

15   Shift Time"—i.e., the amount of time from when the employee went through the

16   turnstiles located at the entrance of the facility until the time the employee clocked

17   in— "can be used to estimate a reasonable amount of time that employees spend

18   walking to the security checkpoint area after clocking out." (*Id.*)

19   For his "wait time" calculation, Dr. Kriegler states that he "ha[s] begun to

20   examine the likely busiest hours in terms of facility exits" by reviewing surveillance

21   footage. (*Id.*)  He chose to focus his wait-time analysis on "peak" hours because

22   "lines to enter the security checkpoint are extremely rare during 'non-peak' exit

23   times." (*Id.* at 8-9.)

24   _____

25   said if we were given time to review and respond to" Dr. Kriegler's supplemental
report. (Dkt. No. 155 at 13.) The Court notes, however, that Walmart did not file an

26   amended motion to strike or submit supplemental briefing addressing the substance of
Dr. Kriegler's opinions regarding other subclasses. The Court therefore addresses only

27   his supplemental opinions regarding the security checkpoint subclass and surrebuttal
opinions. The Court's decision is without prejudice regarding the admissibility of

28   other portions of Dr. Kriegler's report.

16.

To calculate "security checkpoint time," Dr. Kriegler states that he "ha[s] begun to analyze a sample of individuals (i) who were the only person going through the security checkpoint area, or (ii) whose Security Checkpoint Time appeared to be unaffected by others concurrently undergoing the process." (*Id.* at 9.)  He seeks to measure the time that is "generally required" to go through the security check process "without distractions." (*Id.*) The security checkpoint time includes time spent "(i) walking to the metal detectors, (ii) going through metal detectors, (iii) having security checkpoint personnel inspect employees' personal items such as backpacks or purses, and (iv) going through one of the turnstiles." (*Id.*)

Walmart contends that Dr. Kriegler's supplemental report is not a "supplement" under Rule 26(e) because Dr. Kriegler's changes are based on information that was available to him at the time of his opening expert report and well before the close of expert discovery. The Court agrees.

In his initial report, Dr. Kriegler's proposed methods for calculating "walking time," "wait time," and "security checkpoint time" are fundamentally different than the methods he proposes in his supplemental report.  With respect to calculating "walking time," in his initial report, Dr. Kriegler provided no information regarding the "10th and 25th percentiles of Pre-Shift Time" or the specific time clocks he would consider and the location of those time clocks. Now, Dr. Kriegler's supplemental report attempts to address some of the criticisms outlined in Walmart's rebuttal expert reports by estimating the percentage of people who exit the facility *and do not clock out near the security checkpoint area*.

Dr. Kriegler provides even less information in his initial report regarding how he intended to calculate "security checkpoint time" and "waiting time." Now, in his supplemental report, Dr. Kriegler explains the sampling of days (fifteen weekend days and fifteen week days) and hours that he intends to use (hours at the end of shifts).[8]

---

[8] Dr. Kriegler explains that within the selection of days, he samples "Shift End Hours"

17.

(*See id.* at 10-11.) In his supplemental report, Dr. Kriegler also discloses, for the first time, that his sample for "security checkpoint time" is comprised of individuals who were either "the only person going through the security checkpoint area" or "whose Security Checkpoint Time appeared to be unaffected by others concurrently undergoing the process." (*Id.* at 9.)

Plaintiffs cannot credibly claim that Dr. Kriegler's analysis regarding a damages model in support of the security checkpoint subclass is based on information previously unavailable or unknown to Dr. Kriegler. That Plaintiffs failed to give Dr. Kriegler surveillance video that Plaintiffs had since May 2018 or that Dr. Kriegler chose to assume rather than investigate or begin to review the surveillance footage to determine whether his prior methods were feasible does not render that information unknown or undiscovered as required by Rule 26(e).

Under these circumstances, the Court concludes that Plaintiffs' arguments regarding Dr. Kriegler and Dr. Bonin's duty to supplement under Rule 26(e) ring hollow.

### 4.    Substantial Justification/Harmlessness

The burden of proving that a party's failure to disclose was either substantially justified or harmless is on the party seeking to avoid sanctions. *R & R Sails, Inc.*, 673 F.3d at 1246. Plaintiffs fail to demonstrate that their failure to disclose was substantially justified or harmless.

Plaintiffs claim any deficiencies in their expert reports are the result of Walmart's "gamesmanship" because Walmart "refused to provide the discovery that

_____

as follows:

- *Walking Time and Security Checkpoint Time* – based on one randomly selected Shift End Hour in the morning and one in the evening.
- *Wait Time* – based on the two Shift End Hours with the most clock-outs in the Timekeeping Data in the morning and the two Shift End Hours with the most clock-outs in the Timekeeping Data in the evening.

(Kriegler's Supp. Report at 10-11.)

Plaintiffs' expert need[ed] to complete their reports." (Dkt. No. 146 at 5.) Plaintiffs lay blame on opposing counsel, arguing that discovery was delayed by a "ten-month meet and confer process to obtain video footage of the facility" and that defense counsel failed to admit they "destroyed" the requested video footage until after Plaintiffs filed a motion to compel seeking the video. (*Id.*) Plaintiffs contend they relied on defense counsel's "implied representation" that other surveillance video existed to develop their "sampling methodologies" and "would have litigated this issue far differently" if they "knew what they know now." (*Id.* at 10 n.2.)

Walmart counters that this "is not true." (Dkt. No. 155 at 6.) Walmart contends Plaintiffs' alleged "surprise about what video footage exists" is "disingenuous" because Walmart (through its prior counsel at K&L Gates) informed Plaintiffs in *January 2018* that it would "continue to preserve the collected video in connection with the litigation, [but it would] . . . not collect additional video past the time period already collected," as there was "no reason to believe that doing so [was] necessary to resolve the issues in dispute in this litigation." (*Id.* at 7-8 (quoting Gershman Decl. ¶ 2, Ex. 8 at 1-2).) Walmart argues that, aside from asking Walmart to stipulate that Plaintiffs experts could perform a sampling of video,[9] "Plaintiffs offered no basis for why they supposedly thought (as they apparently suggest now) that Walmart would be required to record new video footage for Plaintiffs on an ongoing basis in perpetuity." (*Id.* at 8.)

The Court has reviewed all of the emails attached to the parties submissions and

---

[9] In response to prior defense counsel's January 24, 2018 email indicating Walmart would not collect and preserve future video footage, Plaintiffs proposed that the parties stipulate the collected video is representative of the class period. (Dkt. No. 146-1, Yasuda Decl. ¶ 2, Exs. A-B.) Plaintiffs' counsel claims they "never received a response." (Yasuda Decl. ¶ 2.) It appears Plaintiffs did not follow up on its proposal and did inquire whether Walmart intended to collect or preserve future surveillance footage. Nor did Plaintiffs follow-up or discuss the matter after Walmart terminated its prior counsel from K&L Gates in February 2018 and retained counsel from Greenberg Traurig.

finds that Walmart *did* disclose it would no longer collect and preserve all future video footage. Even accepting Plaintiffs' interpretation of these emails, the Court is troubled by the way in which Plaintiffs have litigated this case. Certainly, the Court expects counsel to meet and confer in earnest before seeking relief from the Court. But such efforts must show diligence. Conferring about the alleged discovery disputes over surveillance video and a site inspection[10] for more than ten months is excessive. Throughout this litigation, Plaintiffs have waffled back and forth about what evidence they have, what evidence they need, and the reasons why they are not in possession of this evidence, making it difficult to find Plaintiffs' actions and failure to serve adequate expert reports were justified.[11]

Moreover, failure to disclose testimony is not substantially justified where, as here, the need for such testimony could reasonably have been anticipated. *See Wong v. Regents of the Univ. of Cal.*, 410 F.3d 1052, 1061-62 (9th Cir. 2005). Plaintiffs proposed the existing expert disclosure deadline in May 2018 when they asked Walmart to stipulate to continue the pretrial and trial schedule and presumably knew it would have to propose a damages model through expert testimony. And, upon receiving the Court's tentative order before the certification hearing on August 17, 2018, Plaintiffs were aware the Court was inclined to certify the class. At that time, Plaintiffs were also aware that decertification "may be appropriate if . . . Plaintiffs were not able to use time or video records to demonstrate how much time was spent passing through security." (Class Cert. Order at 24.) Yet, at the hearing on Plaintiffs'

---

[10] To the extent Plaintiff argues that Dr. Bonin's failure to disclose "the basis and reasons" for her opinion is justified because Walmart failed to agree to reasonable site inspection terms, the Court finds the alleged discovery dispute has nothing to do with calculating walking speed because Dr. Bonin indicated that she would rely on peer-reviewed literature to calculate walking speed, not information from the site inspection. Therefore, Dr. Bonin's failure to disclose her method for calculating walking speed is not justified.

[11] This is especially true given that Plaintiffs were in possession of the necessary surveillance video footage since May 2018 and could have provided them to Dr. Kriegler to review in preparing his initial report. But Plaintiffs chose not to.

certification motion, Plaintiffs' counsel told the Court "[w]e have the video. We'll be able to actually see how long it takes" to go through Walmart's security check. (Dkt. No. 122 at 13:4-6.)  Plaintiffs have therefore known Dr. Kriegler and/or Dr. Bonin's testimony would be necessary to certify this action and to maintain certification many months before the initial expert disclosure deadline. Plaintiffs failure to provide both initial and supplemental expert reports in compliance with the federal rules is not justified.

Plaintiffs contend "there is no true prejudice to Defendants . . . because there is more than sufficient time to conduct depositions and rebut the expert testimony" and Plaintiffs offer to stipulate that Defendants have the right to conduct discovery. (Dkt. No. 146 at 5.) But Plaintiffs served Dr. Kriegler's supplemental report on November 15, 2018—one day before Walmart's reply in support of its motion to strike was due, one day before the summary judgment deadline, and days before the decertification deadline.  And, as of the January 18, 2019 hearing, Plaintiffs still had not supplemented Dr. Bonin's report even though trial was, at the time, approximately two months away. In addition, Plaintiffs failed to make their experts available for deposition prior to the date Walmart was required to designate a rebuttal expert. (Dkt. No. 187 at 16:1-4.)  At this point in the litigation, dispositive motion deadlines have expired, discovery is closed, and Walmart was not provided with Plaintiffs' experts' opinions and the basis of their opinions. "[D]isruption to the schedule of the court and other parties . . . is not harmless." *Rodman v. Safeway Inc.*, 125 F. Supp. 3d 922, 938 (N.D. Cal. 2015), *aff'd*, 694 F. App'x 612 (9th Cir. 2017) (quoting *Wong*, 410 F.3d at 1062).

The Court therefore concludes that Plaintiffs' failure to provide adequate expert reports was not harmless.

**5.     Willfulness, Bad Faith, or Fault and Propriety of Other Alternatives**

Because Walmart seeks to exclude expert testimony regarding Plaintiffs' proposed damages model for the security checkpoint subclass, it arguably amounts to a dismissal of Plaintiffs' security checkpoint class action claim and derivative overtime claim. The Court must therefore "consider whether the claimed noncompliance involved willfulness, fault, or bad faith." *Martinez v. County of San Benito*, No. 15-CV-00331-JST, 2018 WL 1863013, at *2 (N.D. Cal. Apr. 18, 2018) (quoting *R & R Sails*, 673 F.3d at 1247).

"[D]isobedient conduct not shown to be outside the control of the litigant is all that is required to demonstrate willfulness, bad faith, or fault." *K. P. v. Santa Clara Cty. Office of Educ.*, No. 5:15-CV-01512-EJD, 2016 WL 5930641, at *3 (N.D. Cal. Oct. 12, 2016) (quoting *Henry*, 983 F.2d at 948). Plaintiffs have not persuaded the Court that the delays at issue or the defects in the reports were outside their control. To the contrary, Plaintiffs' inability to satisfy the expert disclosure deadlines in this case appear to be entirely of their own making. Plaintiffs do not dispute that they have had possession of the video footage since April 2018 or that they withheld the video footage from Dr. Kriegler until sometime after his initial report was due. Nor do Plaintiffs dispute that Dr. Bonin could have provided an average walking time or at least explained how she intended to calculate average walking time based on the articles that she attached to her initial report.

Plaintiffs represent that they were not seeking a litigation advantage because they misunderstood what video footage existed and had tried to resolve discovery disputes by meeting and conferring with defense counsel.[12] However, Plaintiffs'

---

[12] The Court notes that Dr. Kriegler's surrebuttal opinions in his supplemental report are wholly improper. Plaintiffs provide no justification for such opinions. Nor do Plaintiffs provide an acceptable explanation for why they are harmless. The Court's scheduling order does not authorize surrebuttal reports. Yet, Plaintiffs *chose* to serve a report containing surrebuttal opinions, an action that was in Plaintiffs' control.

explanation rings hollow when examined in conjunction with the record in this case. The original expert disclosure deadline—scheduled in October 2017—was July 20, 2018, and was extended to September 21, 2018 at Plaintiffs' request in May 2018. (Dkt. Nos. 50. 87.) At a class certification hearing on August 17, 2018, Plaintiffs' counsel acknowledged the expert disclosure deadlines and told the Court they "can, of course, make any of these deadlines" and "have been litigating this case to meet all deadlines." (Dkt. No. 122 at 14-15, 30.) Plaintiffs' counsel told the Court they had the video footage and intended to use it to calculate how long it takes employees to go through the security checkpoint. At the hearing, the Court also put Plaintiffs on notice that the existing "[d]eadlines are firm." (Dkt. No. 122 at 30.) On September 20, 2018—the day before the initial expert disclosure deadline—the Court denied Plaintiffs ex parte application to submit partial expert reports and supplement those reports at a later date or extend the expert disclosure deadline, finding "Plaintiffs have not been diligent in their efforts to adhere to the existing expert disclosure deadline" and "were not diligent in seeking modification to the expert disclosure deadline." (Dkt. No. 128.) Nonetheless, Plaintiffs submitted partial expert reports the following day. Then, Plaintiffs waited almost two months to supplement Dr. Kriegler's report and, at least as of the January 18 hearing date, still have not supplemented Dr. Bonin's report.

Merely allowing Walmart to depose Plaintiffs' experts and prepare revised rebuttal expert reports before trial would be an insufficient sanction. So would extending the remainder of the pretrial deadlines and trial date and reopening expert discovery, as Plaintiffs suggest, because all dispositive motion deadlines have passed. Indeed, any continuance or further delay of the resolution of this action would not be a sanction at all, as it is precisely the relief that Plaintiffs seek.[13] Imposition of monetary

---

[13] If the past is indicative of the future, the Court anticipates the same issues arising around the time of any future deadlines.

sanctions is likely ineffective here as well since, if Plaintiffs prevail, they will almost certainly recover a substantial amount at trial or through settlement and with that Plaintiffs' counsel will recover a substantial amount in attorneys' fees. The Court finds that a monetary fine in this case is a modest imposition of sanctions and would fail to incentivize diligence.

Accordingly, the Court finds that Plaintiffs' noncompliance was willful and that alternatives to exclusion are insufficient. The Court therefore **GRANTS** in part and **DENIES** in part Walmart's Motion to Strike the initial and supplemental reports of Plaintiffs' experts. The Court **GRANTS** Walmart's request to exclude Dr. Kriegler's testimony regarding the security check as set forth above and **STRIKES** Dr. Kriegler's initial and supplemental report regarding "walking time," "wait time," and "security check time." The Court **GRANTS** Walmart's request as to Dr. Bonin's initial report and **STRIKES** Dr. Bonin's initial report in its entirety. In addition, to the extent Dr. Kriegler's supplemental report contains surrebuttal opinions in response to Walmart's rebuttal expert reports, the Court **STRIKES** those opinions.

## B.    The Court <u>Grants</u> in Part and <u>Denies</u> in Part Walmart's Motion for Decertification.

Walmart moves to decertify the security checkpoint subclass, the overtime subclass, the meal break subclass, the wage statement penalty subclass, and the waiting time penalty subclass on predominance and manageability grounds.

### 1.    Security Checkpoint and Overtime Subclasses

The security checkpoint and overtime subclasses are comprised of employees who are "required to go through a security checkpoint during a meal period and/or at the end of his/her shift" during the class period and employees who are not paid overtime wages for the time spent (1) between clocking out and walking to a security checkpoint, (2) waiting in line to enter the security checkpoint, or (3) going through the security checkpoint.

Walmart argues the security checkpoint and overtime subclasses should be decertified on the ground that predominance cannot be satisfied in the absence of some appropriate common method for calculating class-wide damages. Specifically, Walmart argues that Plaintiffs fail to present a non-individualized means to (1) measure the time spent traveling from the time clocks to the security check point for each person, "much less (2) establish what each person was doing during that person-specific period for each day." (Decert. Mot. at 1.) Concerning point (1), Walmart argues "Plaintiffs ignore that each person may use a different time clock each day (the starting point, which is not tracked), may exit at a different point (the end point, also not tracked), walks at different speeds (as the Court also noted), and, moreover, chooses to do different activities during the interval which further changes the length of the interval." (Dkt. No. 180 at 3-4.) Concerning point (2), Walmart asserts "it is beyond dispute that employees perform all manner of personal activities during this unknown and unknowable interval, including socializing in and out of the break rooms, retrieving personal belongings he/she chose to bring to work, and use the rest room."[14] (*Id.* at 4.)  In Walmart's view, "[t]here is no way to assess, much less quantify such activity, other than literally asking each person, each day, what they did and for how long." (*Id.*)

Plaintiffs counter that their proposed methodology for calculating damages is similar to the method approved in *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036 (2016). (Dkt. No. 174 at 13.) Plaintiffs indicate that their evidence of damages at trial will be twofold. First, "Plaintiffs intend to introduce a sampling of video surveillance footage, expert analysis of the video surveillance footage, and expert analysis of a site inspection, all for purposes of demonstrating the amount of time employees spend

---

[14] These facts also cut against certification because whether an employee was "working" from the time they clocked out and the time they entered the security checkpoint requires individual inquiries that predominate. This is a damages and liability issue.

1  walking to and undergoing security checks on average." (*Id.*) Second, "Plaintiffs
2  intend to introduce expert testimony regarding the amount of resulting unpaid wages."
3  (*Id.*) Perhaps anticipating that the Court will exclude Plaintiffs' expert testimony
4  regarding security checkpoint time, Plaintiffs also argue that "expert testimony is not
5  *required* for purposes of Plaintiffs' case." (*Id.*) Rather, in Plaintiffs' view, the jury
6  may "consider employee testimony and video surveillance footage without regard to
7  Plaintiffs' expert, and determine on its own the amount of off-the-clock time worked
8  by class members based upon its own observations." (*Id.*)

9  ### a.  Damages Model Requirement

10  In *Comcast Corp v. Behrend*, 569 U.S. 27, 36-38 (2013), the Supreme Court
11  held that a court can certify a Rule 23(b)(3) class only if plaintiffs establish that there
12  is a class-wide method of awarding relief that is consistent with the plaintiffs' theory
13  of liability. The Ninth Circuit has made clear, however, that "the presence of
14  individualized damages cannot, by itself, defeat class certification under Rule
15  23(b)(3)." *Leyva v. Medline Industries Inc.*, 716 F.3d 510, 514 (9th Cir. 2013); *see*
16  *also Just Film v. Buono*, 847 F.3d 1108, 1121 (9th Cir. 2017) ("That some
17  individualized calculations may be necessary does not defeat finding predominance.");
18  *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 986 (9th Cir. 2015)
19  ("damage calculations alone cannot defeat certification") (quoting *Yokoyama v.*
20  *Midland Nat. Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010)). Thus, "[u]ncertainty
21  regarding class members' damages does not prevent certification of a class as long as
22  a valid method has been proposed for calculating those damages." *Lambert v.*
23  *Nutraceutical Corp.*, 870 F.3d 1170, 1182 (9th Cir. 2017), *cert. granted on other*
24  *grounds,* 138 S. Ct. 2675 (2018).

25  ### b.  Plaintiffs Fail to Present a Workable Method for
26  Calculating Class-wide Damages and these Subclasses
27  Are Unmanageable.

28  The Court is cognizant that at this stage—a motion for decertification—"the

26.

question is only whether [Plaintiffs have] presented a workable method [for calculating class-wide damages]." *Lambert*, 870 F.3d at 1184. The Court therefore rejects Walmart's arguments that decertification is warranted based on individualized damages issues. However, the Court finds that Plaintiffs' security checkpoint subclass and Plaintiffs' overtime subclass to the extent it is based on the security checkpoint claim cannot be maintained because Plaintiffs are unable to put forth a workable damages model. The Court emphasizes that it is not decertifying the class because individual issues as to damages predominate, but rather because Plaintiffs have failed to put forth a damages model that measures the damages attributable to Walmart's wrongful conduct for trial.[15]

The Court therefore **GRANTS** the motion to decertify the security checkpoint subclass and the overtime subclass to the extent it is premised on the security checkpoint subclass.

### 2.    Meal Break Subclass

Plaintiffs' meal period claim is brought under California Labor Code section 226.7. An employer satisfies section 226.7 if the employer "relieves its employees of all duty, relinquishes control over their activities and permits them a reasonable opportunity to take an uninterrupted 30-minute break, and does not impede or

---

[15] The Court also notes that absent Dr. Kriegler's proposed method for calculating walking time, waiting time, and time to go through the security checkpoint, Plaintiffs' evidence is essentially individual testimony and a policy of requiring employees to submit to a security check. The Court recognizes that class actions serve important rights through collective enforcement and that the burden at the class certification stage is slight, and that a court need only be able to make a reasonable judgment that Rule 23 requirements are satisfied. This makes sense at an early stage in the litigation. But the trial is set for April 2019—one month from the date of this Order. Under the rare circumstances in this case, Plaintiffs have failed to provide any evidence to support extrapolation from individual experiences to class-wide proof that is not merely speculative. Because Plaintiffs lack common evidence, the Court has no confidence that the jury will be able to do anything but speculate as to the time it takes to walk to the security checkpoint, wait in line, and go through the security check, making this case unmanageable. This finding further supports decertification.

1   discourage them from doing so." *Brinker Rest. Corp. v. Superior Court*, 53 Cal. 4th
2   1004, 1040 (2012).

3        Plaintiffs' meal period claim is based on two district legal theories: (1)
4   Walmart's security check infringed on class members' thirty-minute meal period and
5   (2) the practical effect of Walmart's security checkpoint policy *discourages*
6   employees from leaving the premises during their lunch break or taking meal breaks.
7   Walmart challenges both theories on predominance grounds. Whether Walmart
8   offered its employees "a reasonable opportunity to take an uninterrupted 30-minute
9   break, and [did] not impede or discourage them from doing so" is a legal question
10  common to all class members. *Brinker*, 43 Cal. 4th at 1040. In the class certification
11  order, the Court concluded that "who left the facility during their meal period and how
12  much time they were deprived of [as a result of the security check] can presumably be
13  determined from records or video surveillance." (Class Cert. Order at 23-24.) The
14  Court, however, acknowledged that "[d]ecertification of this case may be appropriate
15  if, for instance, Plaintiffs were not able to use time or video records to demonstrate
16  how much time was spent passing through security." (*Id.*)

17              **a.    Plaintiffs' Meal Period Interruption Theory**

18       The Court certified Plaintiffs' meal period interruption claim under the belief
19  that Walmart had a thirty-minute meal policy that applied uniformly to all employees
20  and that, during the class period, employees were required to go through security if
21  they chose to exit the facility. The Court also certified the claim under the belief that
22  records existed showing when, after clocking out, employees went through security
23  and that Plaintiffs had video footage from which they could calculate the time it takes
24  to go through security at lunch.

25       Plaintiffs contend that employees must, as a matter of common policy, "clock
26  out for their meal periods on one of [Walmart's] time clocks, walk through the
27  Fulfillment Center to the designated security check area, and participate in a required
28  security check." (Dkt. No. 171 at 5.) Plaintiffs point out that "time clock records

1  indicate the timing and length of meals" and that "employees scan their assigned

2  badges at a turnstile" when they return to the Fulfillment Center. (*Id.*) Plaintiffs

3  contend, from these records, the jury can determine the number of recorded thirty-

4  minute meal periods during which an employee left the Fulfillment Center. (*Id.*)

5  Plaintiffs explain that "[i]f an employee records a precise 30-minute meal" that

6  "recorded 30 minutes *necessarily* includes time spent traveling to and proceeding

7  through the required security check." (*Id.*)

8      Walmart argues that discovery has shown this is not in fact true. Rather,

9  Walmart contends there are no records showing when, after clocking out, employees

10  went through security. Walmart also contends that employees are provided a grace

11  period and could take a full thirty-minute break outside of Walmart's facility. (*See*

12  Dkt. No. 180 at 10, 11 n.8.) Walmart therefore reasons that, even if employees take a

13  thirty-minute lunch break and go through security, they have the *option* to take a full

14  thirty-minute break outside of the facility. (Dkt. No. 159-2, D69-D074 (hereinafter,

15  "McChristian Depo.") at D 073:9-11 (stating employees on thirty-minute lunch

16  schedule must clock in from lunch within thirty-five minutes and "it doesn't always

17  have to be 30 [minutes]"); *see* Dkt. No. 159-2, D 001-D015 (hereinafter, "Alvarado

18  Depo.") at D09:1-4 ("Q. But Walmart does give a 5-minute window on top of that. So

19  if an associate takes a 35-minute lunch there is no accountability, correct? A.

20  Correct."); *see also* Dkt. No. 159-2, D132-D136 (hereinafter, "Vidana Decl.") at D134

21  ¶ 6 (five minute grace period to clock in above thirty-minute lunch). Walmart also

22  points out that even Dr. Kriegler, Plaintiffs' expert, agrees that class members took

23  meal breaks in excess of thirty minutes, thirty-five minutes, and forty minutes in

24  thousands of instances. (Dkt. No. 180 at 10.)

25      The Court acknowledges that there is competing testimony regarding the length

26  of meal breaks that Walmart provided pursuant to a common policy. The Court is

27  unaware of any *written* policy stating that employees are allowed *only* thirty minutes

28  for meal breaks. The parties have also provided conflicting evidence as to whether

1    there was a five minute grace period and whether employees were aware of the grace

2    period. (*See* Dkt. No. 159-2, D056-D068 (hereinafter, "Hernandez Depo.") at D61-

3    D065 (explaining employees had at least four minutes of "wiggle room" after thirty-

4    minute meal break); Dkt. No. 159-2, D087-D090 (hereinafter, "Brown Decl.") ¶ 6 ("I

5    also get one 30-minute meal period.").) Because there was no single uniform written

6    policy and no consistent practice of denying uninterrupted thirty-minute meal breaks,

7    the Court no longer considers this to be a case in which "questions of law or fact

8    common to class members predominate over any questions affecting only individual

9    members." Fed. R. Civ. P. 23(b)(3); *see Ordonez v. Radio Shack, Inc.*, No. CV 10-

10   7060-CAS (JCGx), 2013 WL 210223, at *8 (C.D. Cal. Jan. 17, 2013) ("Rather than

11   demonstrating the existence of a uniform policy of depriving employee of their meal

12   breaks, the evidence before the Court presents numerous possibilities as to *why* certain

13   employees may have had a late, short, or missed meal break during a given shift. As

14   such, the Court finds that it cannot conclude that any short, late, or missed meal break

15   that plaintiff's expert identified corresponds to a legal violation on a class-wide basis.

16   In similar factual circumstances, courts—including this one—have rejected plaintiff's

17   argument that a common question capable of resolution through a common answer is

18   available when a defendant's policy is facially legal.").[16]

19       In addition to predominance, Rule 23(b)(3) requires a court to find that "a class

---

[16] Assuming Walmart does have a common policy that strictly limits employees to thirty-minute meal periods and Walmart has a common policy that requires employees to go through a security check at the exit of the facility, how those policies affect members of the class depends on the individual circumstances of each employee. Determining if the employee performed uncompensated work, or of the amount of work that was recorded, involves individual inquiries as to whether the employee was not properly compensated. This inquiry becomes even more complicated by the fact that employees would walk to the break room to get their lunch, clock out, and then go through the security checkpoint in that order. For example, even class representative Chelsea Hamilton's deposition testimony demonstrates that she would walk to the break room or to get her lunch out of her locker (the duration of time this took is unknown), then she would clock out and go through the security checkpoint before exiting the fulfillment center to eat her lunch in her car. (*See* Dkt. No. 159-2, D016-D055 (hereinafter, "Hamilton Depo.") at D037-D038.)

action is superior to other available methods for fairly and efficiently adjudicating the controversy." Pertinent to that determination are "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(D). The Court previously noted that manageability might be an issue for decertification if Plaintiffs could not use video footage or other data to calculate time spent going through the security checkpoint, but deferred ruling on the issue until the decertification stage.

Walmart argues that Plaintiffs cannot meet their manageability requirement of Rule 23(b)(3) because Plaintiffs failed to submit a trial plan and have put forth "no common method of proof that would not entail individualized issues." (Decert. Mot. at 21.) The Court agrees. Plaintiffs have identified over 20,000 recorded meal periods that were precisely thirty minutes during which an employee exited Walmart's facility. (*See* Dkt. No. 171 at 3; Kriegler Report ¶ 52.) But Plaintiffs have presented no method for calculating time that Plaintiffs' spend going through the security checkpoint. Instead, Plaintiffs appear to take the position that it necessarily took "some" time. But there is conflicting evidence regarding how long it took employees to go through the security checkpoint—the range is zero to about twenty minutes— and whether employees spent time in the breakroom or elsewhere doing things not considered "work" before clocking out for their lunch break.

The Court notes that, even at this very late stage of the case, Plaintiffs *still* have not articulated their method or plan to try this case. For example, at the hearing on the decertification motion, the Court asked Plaintiffs' counsel when Dr. Kriegler planned to review the surveillance videos and noted that trial is less than two months away. Plaintiffs' counsel responded: "Well, once we have the video, it's not terribly difficult to review it. It takes some time, but it's—just put more people on the problem and the problem will—the problem will be answered fairly quickly." (Dkt. No. 187 at 23:2-8.) But, as explained above, Plaintiffs *have had* the video footage for months.

Notably, later in the hearing, Plaintiffs' counsel told the Court: "[the] security check is easy to see because we have it all on video" and "we can first show the video

to the jur[y]" so they can see "what [the] security check looked like for a few months of the class period." (*Id.* at 28:24-29:3.) Plaintiffs' counsel further explained that "the trier of fact can determine what it wants on the other evidence. We'll have testimony about that from witnesses who were there at other times when the process might have been slightly different and more time-consuming, but we'll have the video." (*Id.* at 29:8-12.) Because Plaintiffs still have not identified a viable method to proceed, the case is unmanageable and class treatment is not superior under Rule 23(b). *See Ordonez*, 2014 WL 4180958 at *6 ("substantial manageability problems remain" where "Plaintiff has not proffered a viable method of determining when (or if) a particular employee took a rest break on a particular day, short of obtaining testimony regarding each Radioshack stores and each Radioshack employee. The parties agree that rest breaks were not recorded.").

Because Plaintiffs meal period interruption claim raises serious predominance and manageability issues, the Court **GRANTS** the motion to decertify the meal period subclass to the extent it is premised on Plaintiffs meal interruption theory.

### b.   Plaintiffs' Meal Period Discouragement Theory

Walmart moves to decertify Plaintiffs' meal-break claim to the extent it is premised on the theory that the security exit check "discouraged" employees from leaving the premises of the facility during their lunch break. (*See* Decert. Mot. at 21-24.) Walmart contends the question of whether an employee is "dissuaded" from taking a meal break is an individual inquiry. (*Id.* at 23.) Walmart points out that, on more than 40,000 occasions, employees left the facility during their meal break, suggesting on more than 40,000 occasions employees were not dissuaded from leaving the premises due to the security check during their lunch break. (*Id.* at 24; *see id.* at 22 n.13.)

Plaintiffs counter by accusing Walmart of mischaracterizing their meal period "impediment" theory. (Dkt. No. 171 at 6.) Relying on *Brinker*, Plaintiffs contend "a meal period is not truly 'provided' if it is required to be on-site." (*Id.*) Plaintiffs

1    explain that an employer "is prohibited from 'exerting coercion against the taking of,

2    creating incentives to forgo, or otherwise encouraging the skipping of legally

3    protected breaks." (*Id.*) Taken together, these rules bar employers, like Walmart, from

4    "implementing practices or procedures that incentivize employees to forgo or impede

5    the right to a full, off-duty, off-premises, 30-minute meal period." (*Id.* at 6-7.)

6    Plaintiffs assert that an employer who does so fails to comply with the legal

7    requirements for meal breaks. (*Id.*)

8         The Court certified Plaintiffs' "dissuasion" or "impediment" theory because the

9    primary question is whether the mere existence of the security checkpoint system can

10   be considered an "impediment" to taking a meal period or as discouraging employees

11   from taking a meal period. The Court concluded that the focus of this inquiry is on the

12   action of the employer, not necessarily on whether an employee personally felt

13   discouraged. (Class Cert. Order at 11.) The Court reasoned: "Whether the checkpoint

14   is an impediment is a common question that can be answered objectively as to all

15   class members." (*Id.*)

16        Now, Walmart argues that the Court focused on only whether a common

17   question existed, not whether common issues predominated over individual inquiries

18   under Rule 23. Walmart complains that Plaintiffs' experts offer "no common proof to

19   establish 'dissuasion' of each employee in each shift." (Decert. Mot. at 24.) If the

20   Court does not decertify the class based on the dissuasion theory, Walmart claims

21   "virtually every employer with any 'dissuasive' feature on the path to an exterior

22   lunch"—such as "a staircase, an elevator bank, a large campus, etc."—"would be

23   subject to immediate certification  of . . . class claims for 'dissuasion' of lunch

24   periods, to be assessed by a jury based on 'objective' assessment without reference to

25   expert opinion or testimony whether persons were in fact dissuaded." (Dkt. No. 180 at

26   12.) Walmart misses the point.

27        The Court finds that decertification is not warranted at this stage. Whether a

28   security checkpoint is an impediment to taking a meal break or an incentive to forgo

the taking of meal breaks outside the fulfillment center is a common question, which predominates over other inquiries. As the Court noted in its class certification order, this is an objective question, so Plaintiffs' experts need not provide proof of dissuasion for certification. The Court is not persuaded that every employer will be liable for any "dissuasive feature" simply because the feature is on the path to an exterior lunch. Generally employers do not have *company-wide policies* about elevators, stairs, or large campuses like the facility-wide security check policy here, which will give rise to consistent liability regarding security checks for meal breaks. *See Lao v. H&M Hennes & Mauritz, L.P.*, No. 5:16-CV-00333-EJD, 2018 WL 3753708, at *6 (N.D. Cal. Aug. 8, 2018) ("In the absence of a company-wide policy 'that would give rise to consistent liability' regarding security checks for rest breaks, the trier of fact would be left to face individualized liability issues that are not suitable for classwide resolution.").

The Court therefore **DENIES** Walmart's motion for decertification of the meal break subclass to the extent it is premised on an impediment/dissuasion theory.

### 3. Wage Statement Penalty and Waiting Time Penalty Subclasses

The derivative wage statement penalty and waiting time penalty subclasses were certified to pursue penalties relating to alleged non-payment of wages. The Court **GRANTS** Walmart's motion to decertify these derivative subclasses but only to the extent wage statement penalties and waiting time penalties are based on Plaintiffs' meal break interruption theory, the security checkpoint subclass, and the overtime subclass.

## IV. CONCLUSION

For the foregoing reasons, the Court (1) **GRANTS** in part and **DENIES** in part Walmart's motion to strike the initial and supplemental reports of Plaintiffs' experts and (2) **GRANTS** in part and **DENIES** in part Walmart's motion for decertification. The Court hereby:

- **GRANTS** Walmart's request to exclude Dr. Kriegler's testimony regarding the security check and surrebuttal opinions as set forth above; **STRIKES** Dr. Kriegler's initial and supplemental report regarding "walking time," "wait time," and "security check time"; and **STRIKES** Dr. Kriegler's supplemental report to the extent it contains surrebuttal opinions;

- **GRANTS** Walmart's request as to Dr. Bonin's initial report and **STRIKES** Dr. Bonin's initial report in its entirety.

- **GRANTS** the motion to decertify the security checkpoint subclass and overtime subclass.

- **GRANTS** the motion to decertify the meal period subclass to the extent it is premised on Plaintiffs meal interruption theory.

- **DENIES** Walmart's motion for decertification of the meal break subclass to the extent it is premised on an impediment/dissuasion theory.

- **GRANTS** Walmart's motion to decertify the waiting time penalty subclass and the wage statement penalty subclass to the extent the subclasses are based on Plaintiffs' meal break interruption theory, the security checkpoint subclass, or the overtime subclass.

In addition, because the subclasses concern only Walmart's *Chino* facility and the Plaintiffs concede the class period begins in July 2015 (the date the Chino facility opened) and ends August 21, 2018 (the date of the Court's prior certification order) the Court hereby **AMENDS** the class definitions as follows:

1. **Alterative Workweek Subclass**: all current and former non-exempt employees employed by Defendants in the State of California and who worked at the Walmart Chino Fulfillment center and pursuant to an alternative workweek schedule and were not paid daily overtime for work in excess of eight (8) but less than ten (10) hours;

**2. Overtime Subclass:** all current and former non-exempt employees employed by Defendants in the State of California and who worked at the Chino Walmart Fulfillment center and who worked on or more shifts in excess of eight (8) hours in a day or forty (40) hours in a workweek and who were not properly paid all overtime wages during the period from July 31, 2015[17] to August 21, 2018;

**3. Meal Break Subclass**: all current and former non-exempt employees employed by Defendants in the State of California and who worked at the Chino Walmart Fulfillment center and who worked a shift in excess of six (6) hours during the period from July 31, 2015 to August 21, 2018;

**4. Waiting Time Penalty Subclass**: all current and former non-exempt employees employed by Defendants in the State of California and who worked at the Chino Walmart Fulfillment center and who separated from their employment with Defendants during the period from July 31, 2015 to August 21, 2018;

**5. Wage Statement Penalty Subclass**: all current and former non-exempt employees employed by Defendants in the State of California and who worked at the Chino Walmart Fulfillment center during the period from July 31, 2015 to August 21, 2018.

**IT IS SO ORDERED.**

Dated: March 04, 2019

_____
HONORABLE ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT COURT JUDGE

---

[17] Neither party provided the Court with the exact opening date. Therefore, out of an abundance of caution, the Court uses July 31, 2015—the last day of July 2015—as the date the class period begins.